UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x
:
HENRY SHATKIN, on behalf of himself and     :   No. 07 Civ. 7928 (PAC)
all others similarly situated,              :
:
:   Jury Trial Demanded
:                                   
            Plaintiff              :
:
:
        v.                         :
:
:   FIRST AMENDED
:   CLASS ACTION COMPLAINT
:
THE BANK OF NEW YORK MELLON        :
CORPORATION and THE BANK OF NEW    :
YORK,                              :
:
            Defendants             :
:
:
------------------------------x

      Plaintiff, individually and on behalf of all others similarly situated, by his undersigned attorneys, for his class action complaint, alleges as follows. All allegations in this complaint are based upon the investigation of counsel and upon information and belief, except the allegations pertaining to the named plaintiff, which are based upon personal knowledge.

### I. SUMMARY OF ACTION

      1.     This is a class action on behalf of all clients of non-party Sentinel Management Group, Inc. ("Sentinel") who had assets managed by Sentinel during the period from January 1, 2004 through August 13, 2007, and for whom the Bank of New York Mellon ("BONYM") and The Bank of New York ("BONY") functioned as custodian of their assets (the "Class").

      2.     Sentinel is a registered investment adviser that primarily manages investments of short-term cash for various advisory clients, including futures commodities merchants, hedge funds, financial institutions, pension funds and individuals.

CLASS ACTION COMPLAINT

3. The defendant in this actions, BONYM and BONY, are the custodian banks charged with safeguarding the assets of the Class members.

4. Sentinel attracted investors by portraying its investment strategies as low-risk with a high rate of return. Sentinel assured the Class that their investments were safe, in part, because their assets would be segregated into accounts under the custodial control of Defendant BONYM.

5. Beginning by at least 2004, with the assistance and/or acquiescence of the Defendants, Sentinel employed a covert and undisclosed leveraging program under which client assets were used as security for huge loans obtained by Sentinel. The existence of these loans was never disclosed to clients, including Plaintiff and the Class, and periodic client account statements did not contain any notice of this unauthorized use of client funds.

6. Leverage is an effective financial tool when all is going well in the markets, but when a highly leveraged "bet" is made and the markets turn sour, disaster ensues. In essence, Sentinel made big bets in the credit markets with borrowed money – obtained with loans provided by the Defendants and secured by assets of Plaintiff and the Class without their knowledge, let alone their consent.

7. From May 2007 through August 13, 2007, the credit and bond markets experienced significant turmoil. During this period, Sentinel was highly leveraged through its unauthorized use of its clients' assets, and had placed a very bad bet with money it borrowed from Plaintiff and the Class without their knowledge. Sentinel tried to recover by making further bets in even riskier securities, and escalated its leverage program by improperly shifting $460 million in client assets from one of the purportedly "segregated" accounts to a "House" account owned by Sentinel, where the assets were used as security for Sentinel's huge line of credit. Defendants, the custodian that Plaintiff and the Class depended upon to safeguard these assets, transferred these assets, which were required to be kept in segregated accounts for the benefit of the Class, into the "House" account owned by Sentinel.

CLASS ACTION COMPLAINT

8. By August 13, 2007, Sentinel's "segregated" client accounts had been drained of the great majority of their assets. Sentinel refused to return client assets to their owners, including Plaintiff and the Class, when such clients requested redemptions because a significant percentage of these assets had been improperly pledged as collateral for loans made by the Defendants to Sentinel. On August 13, 2007, Sentinel announced that it had halted client redemptions. Although Sentinel issued a false statement that it had halted client redemptions due to market conditions, the truth was that Sentinel had squandered away the client assets through the use of unauthorized transfers, encumbrances, investments and leverage strategies. Defendants' actions, and omissions, allowed Sentinel to lose the funds that Plaintiff and the Class had entrusted to Defendants for safekeeping.

9. Financial records obtained from Defendants, as custodian of the "segregated" client account SEG 3, show an actual balance of just $94 million when the actual balance should have been approximately $700 million. <u>Hundreds of millions of dollars worth of assets belonging to the Class are missing</u>.

10. On August 17, 2007, Defendants informed Sentinel that they had seized and were planning to sell at auction (on or about August 22, 2007) hundreds of millions of dollars in assets that had been pledged as collateral in loans made to Sentinel – including assets that rightfully belong to Plaintiff and the Class.

11. On August 17, 2007, Sentinel filed for bankruptcy protection.

## II.    JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction of the claims asserted herein pursuant to the Class Action Fairness Act and 28 U.S.C. § 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the Class of plaintiffs are citizens of States different from Defendant's state of citizenship.

CLASS ACTION COMPLAINT

13. Venue is proper under 28 U.S.C. § 1391(b) and (c), because Defendant resides or may be found within this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

### III.    PARTIES

14. Plaintiff, Henry Shatkin ("Plaintiff"), is an individual residing in Chicago, Illinois. Plaintiff had an account at Sentinel and his assets were deposited in a purportedly segregated account with the Defendants.

15. Defendant The Bank of New York Mellon Corporation ("BONYM") is a Delaware Corporation headquartered in New York City. BONYM was formed on July 1, 2007 as a result of the merger of The Bank of New York Company, Inc. and Mellon Financial Corporation.

16. Defendant The Bank of New York ("BONY") is a federally chartered bank headquartered in New York City. Defendant BONY is a subsidiary of Defendant BONYM.

17. Defendants BONYM and BONY are sometimes hereinafter collectively referred to as the "Defendants." The Defendants acted as the custodian of assets that were managed by Sentinel, but owned by Plaintiff and the Class.

### IV.    CLASS ACTION ALLEGATIONS

18. This action is brought as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of Plaintiff and all entities that had investments managed by Sentinel from January 1, 2004 through and including August 13, 2007, and for whom the Defendants functioned as custodian of their assets. Excluded from the Class is the defendant herein, members of the immediate families of the defendant, any entity in which the defendant has a controlling interest, and the legal representatives, heirs, successors or assigns of the defendant.

19. This action is properly maintainable as a class action for the following reasons:

   (a) The Class is so numerous that joinder of all members is impracticable;

(b) There are common questions of law and fact involved herein which predominate over any questions affecting only individual Class. These common questions of law and fact include:

(i) Whether assets of Plaintiff and the Class were improperly encumbered by the Defendants;

(ii) Whether the Defendants, without authorization, wrongfully controlled assets belonging to Plaintiff and the Class;

(iii) Whether the Defendants breached their fiduciary duties to Plaintiff and the Class;

(iv) Whether Plaintiff and members of the Class have suffered losses from the conduct alleged herein.

(c) Plaintiff's claims are typical of the claims of the other Class members. The damages suffered by plaintiff and all other Class members arise from and were caused by the same violations and course of conduct. Plaintiff does not have interests antagonistic to, or in conflict with, the Class;

(d) Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel experienced in class and securities litigation to vigorously prosecute this action;

(e) A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action; and furthermore, the expense and burden of individual litigation make it impracticable for the Class to seek redress individually for the wrongs they have suffered.

(f) Notice can be provided to Class members via a combination of published notice and first class mail using techniques and forms of notice similar to those customarily used in class actions.

CLASS ACTION COMPLAINT

## V. UNDERLYING FACTUAL ALLEGATIONS

20. Plaintiff and the Class were clients of the investment advisory firm Sentinel. Because federal regulations prohibit investment advisors like Sentinel from taking possession and control of client assets, the Defendants provided custody and safeguarding of the assets of the Class.

### A. Sentinel's Investment Programs

21. Sentinel had the general practice of pooling its clients' assets in one of three allegedly "segregated" client custodial accounts held by the Defendants. These accounts were referred to by Sentinel as SEG 1, SEG 2 and SEG 3:

   a) SEG 1 contained assets of registered Futures Commission Merchants ("FCMs") with only domestic customer deposits.[1]

   b) SEG 2 contained assets of FCMs with domestic customer deposits trading in foreign markets;

   c) SEG 3 contained assets of all other types of clients, including hedge funds, trust accounts, endowments and individuals.

22. Clients of Sentinel share in the profits and losses on the investments made by Sentinel on a pro-rata basis, according to each client's proportionate share of the total assets held in the respective SEG 1, SEG 2 or SEG 3 Accounts.

### B. The Defendants' Role in the Sentinel Scandal

23. Each of Sentinel's clients, including Plaintiff and the Class, were required to sign an "Investment Advisory Agreement." According to the Investment Advisory Agreement, all client assets would be aggregated with assets of other clients and deposited in one of the above-described segregated accounts (SEG 1, SEG 2 or SEG 3), which were purportedly under the custody of the Defendants. The Investment Advisory Agreement specifically provided that

---

[1] FCMs are futures brokers that are members of the National Futures Association ("NFA") and whose investments are subject to the rules of the Commodity Futures Trading Commission ("CFTC").

Sentinel "shall not own nor have any interest in funds or securities in the Account or of any other funds or securities in which Client has a beneficial interest."

24. As an investment advisor, Sentinel was not allowed to hold client assets pursuant to federal regulation. Accordingly, the Defendants were retained as custodian of all of Sentinel's client assets. According to the Investment Advisory Agreement signed by Eric A. Bloom, President, CEO and a member of Sentinel's board of directors, all client assets were to be deposited with the Defendants and "held for the benefit of Client":

> 5. Custodial Arrangements.
>
> (a) Client's Assets shall be deposited in one or more custodial accounts (each, an "Account") maintained at the Bank of New York. . . All Assets shall be deposited with Custodian and held for the benefit of Client. The Custodian shall be responsible for the custody and possession of the Assets . . .
>
> (b) Sentinel shall not own or have any interest in funds or securities in the Account or of any other funds or securities in which Client has a beneficial interest.

25. Plaintiff and the Class added funds to their accounts by forwarding checks or wire transfers directly to the Defendants in New York City, rather than by making such payments to Sentinel. Additionally, the Defendants were paid by Plaintiff and the Class for their services by direct withdrawals from the segregated accounts.

26. The Defendants are one of the largest providers of asset custody services in the world, with more than $20 trillion in assets under custody or administration. According to the BONYM website, they are highly sophisticated with a thorough understanding of their responsibilities and obligations as custodian of assets:

> **Custody Services**
>
> BNY Mellon Asset Servicing has a rich and long history of providing custody and investment services. We have well-trained individuals around the world who devote 100 percent of their time to institutional custody and accounting services.
>
> * Superior subcustodian network
>
> * 24/7 global operations

-7-

CLASS ACTION COMPLAINT

> \* Complete asset servicing — corporate actions, income collections, full tax reclaim and proxy services
>
> \* Automated trade processing and reconciliation
>
> \* Online cash availability, reporting and forecasting
>
> \* Comprehensive foreign exchange capabilities
>
> \* Foreign and domestic derivative securities processing
>
> \* Multicurrency online information delivery
>
> We continually enhance our industry-leading security movement and control system to meet today's global processing requirements. We offer a straight-through-processing solution — from the receipt of trade instructions to the communication of settlement to the depositories and subcustodians, through our custody, accounting and online systems.
>
> Our core custody platform combines a complex range of services to maximize efficiency while measuring and managing risk. In addition, we can integrate the delivery of related services for you, including securities lending, performance measurement, compliance monitoring, cash management and foreign exchange.
>
> **Commitment and Expertise**
>
> With operations centers worldwide, our well-trained, highly dedicated industry experts work with you to formulate customized servicing solutions. That, combined with our understanding of the interaction among markets, global regulatory issues and local tax laws, ensures that we help you optimize your efficiency with full command of risk parameters.

27.     Prior to accepting its role as Custodian, the Defendants were required to investigate and make certain they properly understood their role as custodian of the assets belonging to Plaintiff and the Class.

28.     As one of the largest and most sophisticated custodians in the world, the Defendants were aware of (or were negligent or reckless in not being aware of) Rule 206(4)-2 (17 C.F.R. § 275.206(4)-2) promulgated under the Investment Advisers Act, which prohibits an investment advisor from having custody of client funds or securities and requires that all client assets be held by a qualified custodian in either: 1) a separate account under the client's name; or

- 8 -

CLASS ACTION COMPLAINT

2) in segregated accounts that contain only client funds. The public policy reasons for such a rule are clear – without this regulation, investment advisors would be able to access client assets and convert or encumber client assets for their own illicit purposes. The custodian bank, which is paid handsomely for its efforts, acts as a barrier to keep deceitful investment advisors from pilfering client assets.

**C.     Assets Belonging to Plaintiff and the Class Are Used as Collateral to Secure Huge Loans Made by the Defendants to Sentinel**

29.     Beginning by at least 2004, the Defendants wrongfully provided Sentinel with huge loans secured by the value of securities that they knew or were negligent or reckless in not knowing rightfully belonged to Plaintiff and the Class. These loans were used by Sentinel to buy additional securities.

30.     Upon information and belief, these additional securities purchased under this covert leverage program were not purchased for the benefit of Plaintiff and the Class, who were the rightful owners of the securities being leveraged.

31.     The client account statements, which should have accurately reflected the portfolio holdings, the value of the portfolio, and all transactions in the portfolio, did not reflect the fact that the securities had been encumbered through the covert leverage program. Plaintiff and the Class had no way of knowing that that their assets had been leveraged by Sentinel to obtain additional financing.

32.     Sometime before August 13, 2007, the Defendants allowed Sentinel to move at least $460 million in customer assets from SEG 1, SEG 2 and/or SEG 3 to Sentinel's own "House" account. This "House" account was owned by Sentinel, not by any of its clients (including Plaintiff and the Class), even though the Defendants (as custodian safeguarding these assets) were paid handsomely by class members to make sure that nothing like this could happen to class members' assets. Disregarding its responsibilities as custodian, the Defendants allowed the transfer. The transfer of these securities from the segregated accounts was not disclosed to Plaintiff or the Class in their client account statements.

CLASS ACTION COMPLAINT

33.     A possible reason for the Defendants' complicity in this transfer is that the assets that were improperly transferred out of the segregated client account and into Sentinel's "House" account became immediately subject to a security agreement in favor of the Defendants guaranteeing a previously issued line of credit from the Defendants to Sentinel.

34.     As described below, the assets in the "House" account that were improperly transferred from the SEG1, SEG 2, and SEG 3 accounts were later seized by the Defendants when Sentinel defaulted on this line of credit.

### D.     Plaintiff and the Class are Left Holding the Bag

35.     On August 13, 2007, Sentinel <u>announced that it was halting all redemptions by its clients</u>. Also on that day, the customer statements that were sent to clients whose assets were supposedly held in the SEG 3 account by Defendants represented that the aggregate of all securities held in the SEG 3 account was worth more than $670 million. Contrary to these representations, only about $94 million of securities were actually held in the SEG 3 account by the Defendants. The reason for this discrepancy is that the Defendants had moved the securities to Sentinel's own "House" account.

36.     For example, Plaintiff received a statement from Sentinel dated August 13, 2007 purporting to show that he had $454,201.75 in assets specifically identified by CUSIP number. This statement should have represented Plaintiff's proportionate share of all assets in the SEG 3 account. A comparison of these CUSIP Numbers with those included in the Bank of New York's custody report for SEG 3 on August 13, 2007 shows that *at least* $396,595.26 -- or more than 87% of the assets listed on Plaintiff's customer statement -- were, in reality, no longer being held in the SEG 3 account.

37.     Certain of the specific assets listed on Plaintiff's August 13, 2007 client report (that were not still being held in the SEG 3 account) did appear on a list of collateral held by the Defendants.

CLASS ACTION COMPLAINT

### E. Sentinel Quickly Implodes

38. On August 16, 2007, Sentinel fired Charles Moseley, a portfolio manager and Head Trader for Sentinel, for "misconduct" in his job performance. The exact nature of this misconduct has net yet been disclosed, but on information and belief is related to the misconduct alleged herein.

39. On August 17, 2007, the Defendants informed Sentinel that they intended to begin selling the securities in the "House" account to satisfy Sentinel's debt on loans made by the Defendants to Sentinel, and secured by all of the assets in the "House" account. This letter was sent on the letterhead of Bank of New York Mellon and signed by a Managing Director of the Bank of New York.

40. On August 17, 2007, Sentinel filed for bankruptcy protection in the United States Bankruptcy Court for the Northern District of Illinois.

41. On August 20, 2007, the U.S. Securities and Exchange Commission filed a complaint alleging fraud, misappropriation and misuse of client assets by Sentinel.

42. Certain of the securities that Defendants have seized and has either sold or intends to sell are, on information and belief, the rightful property of Plaintiff and the Class.

### F. Plaintiff and the Class Have Been Significantly Damaged

43. As described above, nearly $400,000 of Plaintiff's assets are missing from the SEG 3 account per the records of Defendants. As described by *Barron's*, this is plainly a Class-wide problem, with more than $700 million "missing" from the SEG 3 account:[2]

> But the real blood will be spilled by the hedge funds, commodity traders and wealthy individuals who had about $800 million in Sentinel's Seg-III account. This account, regulators say, was looted to boost Sentinel's house account. The money was pledged as collateral for loans to Sentinel. Driscoll says that Seg-III holders will be lucky to get even half their money. <u>As of two weeks ago, investigators had found only $92 million of the $800 million</u>. (Emphasis added).

---

[2] *Id.*

CLASS ACTION COMPLAINT

According to this report, more than $700 million has gone "missing" from the segregated account over which Defendants acted as custodian.

## CLAIMS FOR RELIEF

### COUNT I

### NEGLIGENCE
### (Against All Defendants)

44.   Plaintiff refers to and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint.

45.   By virtue of the conduct alleged herein, Defendants were on notice since 2004 that a diversion of assets owned by Plaintiff and the Class from the segregated accounts overseen by Defendant was intended and/or was being executed by Sentinel. Additionally, Defendants stood to profit, and did profit, from the diversion of assets belonging to Plaintiff and the Class.

46.   Defendants had a duty to Plaintiff and the Class to safeguard the assets in the segregated accounts from misappropriation by Sentinel.

47.   Defendants were negligent in not taking adequate steps to safeguard assets belonging to Plaintiff and the Class.

48.   It was foreseeable that Defendants' negligent conduct would cause injury and damage to Plaintiff and the Class.

49.   Defendants' negligence caused damages to Plaintiff and the Class in an amount to be proven at trial.

### COUNT II

### CONVERSION
### (Against All Defendants)

50.   Plaintiff refers to and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint.

CLASS ACTION COMPLAINT

51. As alleged herein, Defendants, without authorization and wrongfully, intentionally assumed or exercised control over property that rightfully belonged to Plaintiff and the Class in derogation of the ownership rights of Plaintiff and the Class.

52. Defendants used this wrongful and unauthorized control to encumber these assets improperly by subjecting them to a security agreement for loans Defendants made to Sentinel.

53. These encumbrances interfered with the rights of Plaintiff and the Class members to their immediate, absolute and unconditional possession of the property.

54. Defendants' conduct caused damages to Plaintiff and the Class in an amount to be determined at trial.

## COUNT III

### BREACH OF FIDUCIARY DUTY
### (Against All Defendants)

55. Plaintiff refers to and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint.

56. As custodian of the assets of Plaintiff and the Class, Defendants owed a fiduciary duty to Plaintiff and the Class.

57. By virtue of the conduct alleged herein, Defendants knowingly participated in the breach of its fiduciary duties to Plaintiff and the Class.

58. Defendants' breaches of fiduciary duty proximately caused damages to Plaintiff and the Class in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf himself and those similarly situated, prays for entry of judgment as follows:

A) Certifying the Class and appointing Plaintiff and his counsel to represent them;

CLASS ACTION COMPLAINT

B) Finding that Defendants' actions constitute negligence, conversion and breach of fiduciary duty;

C) Awarding money damages to Plaintiff and the Class members;

D) Awarding reasonable attorneys' fees and costs; and

E) Granting such other relief as may be deemed just and equitable.

## JURY DEMAND

Plaintiff hereby pleads his demand for a trial by Jury.

DATED:   October 2, 2007

Respectfully submitted,

LOVELL STEWART HALEBIAN LLP

By _____
Christopher Lovell (CL-2595)
Imtiaz A. Siddiqui (IS-4090)
500 Fifth Avenue
New York, NY 10110
(212) 608-1900

Karl P. Barth
Peter H. Rachman
**LOVELL MITCHELL & BARTH, LLP**
11542 NE 21st Street
Bellevue, WA 98004
(425) 452-9800

David B. Killalea
Stephen A. Weisbrod
**GILBERT RANDOLPH LLP**
1100 New York Ave., N.W.
Suite 700
Washington, DC 20005
(202) 772-2200

Paul M. Weiss
**FREED & WEISS, LLP**
111 West Washington
Suite 1331
Chicago, IL 60602
(312) 220-0000

Terrence F. Durkin
**THE LAW OFFICES OF
    TERRENCE F. DURKIN**
414 Orleans Plaza
Suite 312
Chicago, IL 60610
(312) 813-7366

Counsel for Plaintiff