# Exhibit E

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **SENTINEL MANAGEMENT GROUP, INC.,** | ) | **CASE NO. 07 B 14987** |
| | ) | |
| Debtor. | ) | Hon. John B. Squires |
| —————————————————————— | ) | |
| | ) | |
| **FREDERICK J. GREDE,** as Chapter 11 Trustee for Sentinel Management Group, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **ADV. NO. _____** |
| **PHILIP M. BLOOM, ERIC A. BLOOM, CHARLES K. MOSLEY,  SENTINEL INVESTMENT GROUP, INC., SENTINEL FINANCIAL SERVICES, INC., SENTINEL MANAGEMENT INTERNATIONAL, LTD., FOUNTAINHEAD INVESTMENTS, INC., EB TRUST 2005, SYBIL BLOOM REVOCABLE TRUST, PHILIP M. BLOOM REVOCABLE TRUST, PHILIP M. BLOOM REMAINDER TRUST, ERIC A. BLOOM LIVING TRUST and PHILIP M. BLOOM GRANTOR ANNUITY TRUST,** | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Frederick J. Grede, not individually but as Chapter 11 Trustee for Sentinel Management Group, Inc. ("the Trustee"), hereby states for his Complaint as follows:

### NATURE OF THE ACTION

1.      This is an adversary proceeding by the Trustee against certain insiders at Sentinel Management Group, Inc. ("Sentinel" or "Debtor"), an investment adviser. These insiders, led by defendants Philip M. Bloom, Eric A. Bloom, and Charles K. Mosley ("the Individual Defendants"), operating through a pattern of criminal conduct, committed a long-term, massive

fraud against Sentinel and its customers. The remaining defendants are related companies, trusts and investment vehicles controlled by the Individual Defendants which they used to funnel off unlawful profits from Sentinel.

2.    The Individual Defendants' pattern of unlawful conduct defrauded Sentinel of money and property, deprived Sentinel of its right to receive the honest and loyal services of the Individual Defendants, deceived Sentinel's mid-level management, caused Sentinel to lose valuable and profitable clients and business, and permitted Sentinel to remain in business after it became insolvent. The Individual Defendants' scheme also permitted the Individual Defendants to fraudulently convey to themselves tens of millions of dollars generated by misusing customer funds.

3.    The Individual Defendants represented that Sentinel invested in low-risk, high liquidity securities on behalf of its customers, and that it observed the legal requirement that customer funds be segregated. Instead, the Individual Defendants caused Sentinel to engage in a risky leveraged trading strategy and commingled and misused client funds for their own financial gain, employing a pattern of deception and lies.

4.    Specifically, the Individual Defendants: (a) lied about the nature of investments made on behalf of customers; (b) fraudulently maintained and utilized three inconsistent sets of records concerning the allocation of securities among customer portfolios and the "House" portfolio, which was traded for the benefit of the defendants themselves; (c) fraudulently concealed from customers the use of leveraging through bank loans and repurchase agreements; (d) fraudulently used securities required to be segregated for Sentinel customers as collateral for their "House" loans; (e) commingled and transferred funds and securities among supposedly segregated customer portfolios, and between the "segregated" customer portfolios and the

insiders' "House" portfolio; (f) fraudulently diverted income earned on securities attributable to customers to service the loans for the benefit of insiders; (g) extracted fraudulent trading gains for their personal accounts; (h) unlawfully failed to allocate trades at the time they were made and instead waited until the settlement date to assign the trades to specific accounts or portfolios; (i) lied to customers on a daily basis by submitting false and misleading account statements that misrepresented key facts about their accounts; and (i) provided false reports to and otherwise lied to federal regulators.

5.    During the year prior to Sentinel's bankruptcy filing, the Individual Defendants improperly transferred at least $20 million in ill-gotten gains to themselves and the other defendants in the form of bogus administrative fees, bonuses, dividends, account withdrawals and redemptions, salaries, false trading profits, and other payments.

6.    Even after their scheme began to unravel, the insiders continued to loot the company through a pattern of fraudulent and improper transfers to themselves and other unlawful transactions. Indeed, their fraudulent activities accelerated during the weeks preceding Sentinel's bankruptcy. For example, on July 18, 2007, knowing that the insiders' "House" loans had been improperly collateralized with supposedly segregated customer securities, defendant Philip M. Bloom (Sentinel's Chairman of the Board) caused Sentinel to redeem all account balances reflected in accounts controlled by him, causing Sentinel to transfer more than $11 million to his family trusts. Between July 18 and August 9, defendant Eric Bloom (Sentinel's CEO) caused $600,000 to be transferred out of Sentinel to himself or to defendant Sentinel Investment Group, Inc., the Debtor's parent corporation controlled by Philip and Eric Bloom.

7.    On August 4, 2007, upon learning of the Individual Defendants' leveraging scheme and Sentinel's liquidity crisis, Sentinel's law firm specifically instructed defendants

Philip Bloom and Eric Bloom that they should immediately stop accepting new deposits from customers. The defendants refused that advice, on the grounds that doing so would cause a "run on the bank," and during the week of August 6, accepted over $306 million in new deposits from customers.

8.    This Complaint seeks equitable relief, including avoidance of fraudulent transfers, as well as actual damages exceeding Three Hundred Fifty Million Dollars ($350,000,000.00) and punitive damages. In addition, Plaintiff seeks a Preliminary Injunction requiring all persons, entities, and institutions with actual knowledge of such order to freeze any and all assets and accounts held by or for the benefit of any of the defendants.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because this adversary proceeding is related to and arises under the Chapter 11 case, *In Re Sentinel Management Group, Inc.*, pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, as Case No. 07 B 14987.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

11.    This Complaint is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (C), (E), (F), (H) and (O).

## THE PARTIES AND RELATED ENTITIES

12.    Plaintiff Frederick J. Grede is the chapter 11 trustee for the Debtor, duly appointed under Section 1104 of the Bankruptcy Code by Orders of this Court dated August 23 and 29, 2007.

13.    Sentinel is an Illinois corporation, headquartered in Northbrook, Illinois. Sentinel is registered with the Securities and Exchange Commission ("SEC") as an investment adviser,

and with the Commodity Futures Trading Commission ("CFTC") as a futures commission merchant ("FCM"). It is also a member of the National Futures Association ("NFA"), which is Sentinel's designated self-regulatory organization ("DSRO"). As of July 31, 2007, Sentinel claimed to have $1.5 billion in client assets under management.

14.    Defendant Philip M. Bloom is a resident of Highland Beach, Florida. At all times relevant to this complaint, Philip Bloom was Chairman of the Board of Directors of Sentinel, an officer of Sentinel, and directly or indirectly owned and controlled a significant percentage of Sentinel's stock. He was a registered principal of Sentinel with the NFA. As Chairman of the Board and an officer, Philip Bloom was able to direct Sentinel employees and agents to make disbursements to him or for his benefit.

15.    Defendant Eric A. Bloom is Philip Bloom's son, and a resident of Northbrook, Illinois. At all times relevant to this complaint, Eric Bloom was the President and Chief Executive Officer of Sentinel, a director of Sentinel, and directly or indirectly owned and controlled a significant percentage of Sentinel's stock. He was a registered principal of Sentinel with the NFA. Eric Bloom was in charge of day-to-day management of Sentinel and was able to direct employees to make disbursements to him or for his benefit. For much of the period relevant to this complaint, Eric Bloom also served as the Chief Compliance Officer for Sentinel.

16.    Defendant Charles K. Mosley is a resident of Vernon Hills, Illinois. Until August 15, 2007, he was a director of Sentinel, its Senior Vice President and head trader. He was also an account holder in the "House" portfolio. He was a registered principal of Sentinel with the NFA. Mosley was responsible for Sentinel's trading strategies and decisions, subject to supervision by Eric Bloom and Philip Bloom.

17.    Defendant Sentinel Investment Group, Inc. ("SIG") is an Illinois corporation with its principal place of business in Northbrook, Illinois, and owns 100% of the common stock of Sentinel.  SIG's shareholders are the Philip M. Bloom Remainder Trust (59.0%), Eric A. Bloom Living Trust (2.4%), Sentinel Financial Services, Inc. (16.8%), and Fountainhead Investments, Inc. (21.7%).  Until approximately May or June 2007, SIG also had a set of shareholders who held preferred, non-voting shares of SIG.  SIG was also an account holder in the House portfolio.

18.    Defendant Sentinel Financial Services, Inc. ("SFS") is an Illinois corporation, with its principal place of business in Northbrook, Illinois.  Defendant SFS is a shareholder of defendant SIG and an account holder in the "House" portfolio.  Defendant SFS is wholly owned by the Philip M. Bloom Grantor Annuity Trust, which on information and belief is controlled by Philip Bloom.

19.    Defendant Sentinel Management International, Ltd. ("SMI") was originally incorporated in the Commonwealth of the Bahamas and is domesticated in the State of Delaware, with its principal place of business in Northbrook, Illinois.  Defendant SMI is a wholly owned subsidiary of SIG, and maintained an account in the "House" portfolio.

20.    Defendant Fountainhead Investments, Inc. ("Fountainhead"), is an Illinois corporation wholly owned by defendant EB Trust 2005 and controlled by defendant Eric Bloom. Its principal place of business is in Northbrook, Illinois, and it maintained an account in the "House" portfolio.

21.    Defendant Sybil Bloom Revocable Trust is, on information and belief, a trust established for the direct or indirect benefit of Philip Bloom and/or Sybil Bloom, who is Philip Bloom's spouse and Eric Bloom's mother.  It maintained an account in the "House" portfolio, which account was controlled by Philip Bloom.

6

22.     Defendant Philip Bloom Revocable Trust is, on information and belief, a trust established for the direct or indirect benefit of defendant Philip Bloom. It maintained an account in the "House" portfolio.

23.     Defendant EB Trust 2005 is, on information and belief, a trust established for the direct or indirect benefit of Eric Bloom, which is controlled by Eric Bloom.

24.     Defendant Philip M. Bloom Remainder Trust is, on information and belief, a trust established for the direct or indirect benefit of Philip Bloom.

25.     Eric A. Bloom Living Trust is, on information and belief, a trust established for the direct or indirect benefit of Eric Bloom.

26.     Philip M. Bloom Grantor Annuity Trust is, on information and belief, a trust established for the direct or indirect benefit of Philip Bloom.

27.     Each of the defendants is an insider of the Debtor, as that term is defined in Section 101(31) of the Bankruptcy Code.

## **BACKGROUND**

28.     Sentinel is a registered investment adviser that primarily managed investments of short-term cash for various clients, including commodity brokers, also known as futures commission merchants or "FCMs," hedge funds, financial institutions, pension funds, and individuals.

29.     Sentinel solicited clients by offering them the opportunity to participate in a variety of safe investment programs, each of which purportedly had its own investment policy designed to meet the requirements and risk profiles of different types of clients. Regardless of which investment program a particular client chose, Sentinel purportedly pooled the client's assets with those of similar types of clients in one of three segregated client custodial accounts maintained at the Bank of New York. The accounts were referred to within Sentinel as SEG 1,

7

SEG 2 and SEG 3. SEG 1, 2 and 3 portfolios were further broken down into "Groups" which, according to the Individual Defendants, represented particular types of investment profiles for certain groups of customers.

30.     SEG 1 was supposed to contain customer funds and property of registered commodity brokers, or FCMs. The investment of FCM customers' funds is subject to the provisions of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 et seq., and the rules and regulations promulgated thereunder by the CFTC, 17 C.F.R. § 1.1 - 190.10, including the strict investment standards embodied in CFTC Rule 1.25, 17 C.F.R. § 1.25, and generally is supposed to consist of only the highest grade securities and similar highly liquid investments. FCMs also are members of, and subject to the rules and regulations of, the NFA.

31.     SEG 2 was supposed to contain the funds and property of FCM customers that are engaged in trading at foreign exchanges, invested in accordance with CFTC Rule 30.7, 17 C.F.R. § 30.7. Rule 30.7 imposes restrictions on the investment of customer funds similar to those in Rule 1.25.

32.     SEG 3 was supposed to contain assets of all other types of clients, including FCMs' own (i.e., non-customer) funds, hedge funds, trust accounts, endowments and individuals.

33.     In addition to the SEG 1, SEG 2, and SEG 3 customer portfolios, Sentinel managed a "House" or "Street" portfolio, which was a portfolio of securities held for the benefit defendants Philip Bloom Revocable Trust, Sybil Bloom Revocable Trust, Fountainhead, Charles Mosley, SIG, SFS, and SMI.

34.     Sentinel's relationship with its customers was governed by an "Investment Advisory Agreement" or, with respect to certain accounts opened during and after 2004, an "Investment Management Agreement." The agreements provided discretionary authority to

Sentinel to buy and sell securities without requesting authority from clients before executing the trades. The agreements often included an Addendum specifying the investment policy that Sentinel was supposed to use to invest the client's funds. For example, the Addendum for the largest client in SEG 3 stated that its funds would be invested consistent with the limitations of CFTC Rule 1.25.

35.    The Sentinel customer agreements specified a management fee that would be charged the customer, typically stated as a set number of basis points multiplied by the client assets under management, and deducted from interest to be paid to the customer on a daily basis.

36.    The Individual Defendants represented on Sentinel's website that "Sentinel clients receive a daily account statement (by email or fax), which shows, down to the penny, precisely what securities they own."

37.    The Individual Defendants also represented on the Debtor's website that client assets were "held in a separate custody account at The Bank of New York under the protection of U.S. fiduciary law. . . . [Sentinel] cannot and does not have an ownership interest in the assets in custody." They also stated on the website that "Sentinel accounts are protected by something stronger than insurance: federal law. Client assets managed by Sentinel are held in custody at The Bank of New York under the protection of the U.S. Treasury's Office of the Controller [sic] of the Currency regulations governing fiduciary institutions. Unlike FDIC insurance, which covers only the first $100,000 of bank's liability to depositors, there is no financial limit on the protection provided by fiduciary law."

## DEFENDANTS' FRAUDULENT INTENT

38.     From at least 2003 through August 2007, the defendants, led by the Individual Defendants, devised and participated in a series of inter-related schemes which operated as a fraud on Sentinel and its customers.

### A.     Fraudulent Representations About the Nature of the Investments.

39.     The Individual Defendants advised customers, through the Sentinel website, marketing materials and otherwise, that Sentinel "buys only the highest quality and most liquid securities," and that Sentinel's objective "is to achieve the highest yield consistent with preservation of principal and daily liquidity, not simply the highest yield."

40.     The Individual Defendants also represented on Sentinel's website that while "repurchase agreements" or "repos" may be used in the various portfolios, the repurchase agreements would be reverse "overnight" repurchase agreements to accommodate the liquidity needs of clients.

41.     These representations were false.  In fact, as the Individual Defendants knew, they had purchased or held securities for client portfolios that were neither high quality nor liquid securities.  Among those securities were highly-structured private placements that were illiquid and subject to substantial market risk.  Many of these securities were not even initially purchased for customer accounts, but rather were "re-allocated" from the House portfolio to SEG portfolios in order to fill SEG portfolio shortfalls resulting from the Individual Defendants' scheme. Moreover, the Individual Defendants caused Sentinel to deliver many securities to counterparties as part of long-term repos, not overnight, reverse repo agreements, which reduced liquidity and put Sentinel at risk.

**B.     Sentinel's Three Sets of Records Reflecting Allocation of Securities.**

42.     Under the direction of the Individual Defendants, Sentinel maintained three conflicting sets of records reflecting the allocation of securities among SEGs 1, 2, and 3 and the "House." One set of records was the daily customer statements purporting to reflect which securities were held on behalf of a particular customer. A second set of records showing the alleged allocation of securities among the SEGs and the House was contained in Sentinel's FoxPro system and in the "Active and Matured Securities" reports printed from that system. A third set of records was the daily Bank of New York custodial statements, reflecting the accounts in which the securities actually were held.

**C.     Fraudulent and Undisclosed Leveraging.**

43.     The majority of Sentinel's customers were parties to customer agreements with Sentinel that neither authorized nor disclosed borrowing or leveraging using securities held for customers. The newer form of customer agreement, which covered a minority of customers, did disclose the potential use of some form of leverage, but did not disclose the potential use of leveraging in the manner or to the extent that it was ultimately used. The fact that leveraging was actually being used was never disclosed to clients on their daily account statements.

44.     Despite these facts, from at least 2003, defendants Philip Bloom, Eric Bloom and Charles Mosley employed an unlawful leveraging scheme using funds obtained from customers or borrowed using customer securities.

45.     As noted above, many of the securities purchased by Sentinel were transferred to counterparties in exchange for cash in so-called "repurchase" or "repo" transactions. In such transactions, Sentinel typically borrowed money from the Bank of New York to buy securities. Sentinel then transferred the security purchased to a repo counterparty, such as FIMAT or Cantor

Fitzgerald, which loaned Sentinel, for example, 90% of the price of the security and took back the security as collateral for the amount loaned. Sentinel then used that money to repay 90% of the loan from the Bank of New York. Sentinel would then use the Bank of New York line of credit to purchase and repo additional securities.

46.     By the end of 2006, the Individual Defendants had obligated Sentinel to pay repo counterparties more than $2 billion, and had caused Sentinel to incur a bank loan of more than $200 million in large part related to the repo transactions. This type of leveraging had the impact of magnifying gains in a rising market, but also carried the risk of magnifying losses if the market moved unfavorably.

47.     The Individual Defendants concealed these loans and repos, and the risk they carried. The Sentinel daily account statements that the Individual Defendants caused to be emailed to customers reflected none of this borrowing. There was no indication on any customer account statement that any securities purportedly held for the benefit of customers had been removed from segregation and were encumbered by a bank loan used to support, among other things, repo activity. Nor was there anything on the statements to show the repo transactions, which increased the risk to investors and reduced the liquidity of their investments.

48.     As of July 3, 2007, defendants Philip Bloom, Eric Bloom and Charles Mosley were aware that the following leverage was reflected on Sentinel's internal FoxPro records, even though only the "House" portfolio benefited from that leverage:

|  | House | SEG 1 | SEG 2 | SEG 3 |
|---|---|---|---|---|
| Amount on deposit | $18,125,235.75 | $632,778,833.16 | $6,766,417.26 | $772,707,516.79 |
| Loan | $139,220,000.00 | $0.00 | $2,020,000.00 | $279,600,000.00 |
| Repo positions | $244,540,502.98 | $118,885,007.50 | $0.00 | $2,021,259,208.64 |
| Total leverage | $383,760,502.98 | $118,885,007.50 | $2,020,000.00 | $2,300,859,208.64 |

49.     As the credit market tightened in the summer of 2007, the leveraging scheme fell apart and Sentinel was unable to meet its obligations to customers.

**D.     Diversion of Customer Assets to Collateralize the Defendants' Loan.**

50.     The Individual Defendants incurred a substantial loan for the "House" portfolio from the Bank of New York, and used as collateral for that loan securities that were supposedly segregated for the benefit of customers.  They did so without the customers' knowledge or consent, and in violation of the legal requirement to keep customer accounts and assets separate from their own personal accounts and assets.

51.     The use of securities purchased for customers as collateral for the Sentinel loan began in approximately 2003.

52.     As of July 27, 2007, Sentinel's loan balance at the Bank of New York was $348,520,000, and the Individual Defendants had caused over $200 million in supposedly segregated customer securities to be posted as collateral for the loan.

**E.     Commingling of Customer Assets.**

53.     Under SEC Rule 206(4), 17 C.F.R § 275.206(4)-(2), promulgated under the Investment Advisers Act of 1940 (the "1940 Act") 15 U.S.C. § 80(b)-6(4), a registered

investment adviser such as Sentinel is not allowed to have custody of any client funds or securities unless, among other requirements, the funds and securities are held in segregated accounts that hold only clients' funds and securities. Similarly, under CFTC Rule 1.20, 17 C.F.R. § 1.20, and section 4(d)(a)(2) of the Commodity Exchange Act ("CEA), 7 U.S.C. § 6d(a)(2), customer funds of a registered FCM such as Sentinel were strictly required to be segregated for the benefit of customers.

54.    The Individual Defendants also represented to their customers, on the Sentinel website and elsewhere, that customer funds were segregated among different customer portfolios or segregated accounts, and within Groups based on investment strategies within those segregated accounts.

55.    In spite of their promises that the assets of customers in SEGs 1, 2 and 3 would be segregated from each other, and from the defendants' own funds, at the custodial bank, defendants Philip Bloom, Eric Bloom and Charles Mosley commingled funds and securities among the three SEG portfolios, and between those portfolios and the defendants' portfolio. In particular, the Individual Defendants caused the Debtor to send statements to customers reflecting that certain securities were held for the customers' benefit in the appropriate custodial SEG account, even though they were not.

**F.    Diversion and Misallocation of Interest Income.**

56.    Sentinel purchased securities that generated daily interest income, including government securities and corporate debt.

57.    Sentinel represented to its customers on a daily basis that they were receiving their pro rata share of interest income generated by the pool of securities in which their funds had been invested.

58.    That representation was false.  In fact, a portion of customer interest income was being siphoned off by Philip Bloom, Eric Bloom and Charles Mosley to service Sentinel's loan with the Bank of New York, much or all of which was borrowed for the sole benefit of the "House" portfolio.

59.    In addition, some of the interest earned on securities paid for with customer funds was diverted into the "House" account, for the benefit of the Individual Defendants.

60.    Customer interest income was commingled and misallocated across the SEGs and the defendants' own portfolio. On any given day, the misallocation of accrued interest could amount to tens of thousands of dollars.  Defendant Eric Bloom was well aware of the misallocation of income. For example, on January 16, 2007, a Sentinel manager sent him an email asking:  "Are we still financing the return on the Seg 1 with Seg 3 [?]"  A May 15, 2007 email from another manager to Eric Bloom said:  "I was reviewing the Daily Rate Sheet for the past week and noticed that the supplement level from Seg III to Seg I & II has been consistently 'high.'  Has anything been happening that would account for the change?"

**G.    Extraction of Unlawful Trading Profits.**

61.    During the period January 2004 through July 2007, the defendants' trading accounts reported trading gains in excess of $19 million, and the average reported monthly gain was approximately $450,000.  Defendants fraudulently procured these trading gains through the scheme described herein.

62.    The defendants' portfolio continued to report substantial gains well into the summer of 2007.  For example, in June the accounts held by trusts belonging to Philip and Sybil Bloom were credited with over $1,400,000 in gains.  Defendant SIG realized over $258,000 in gains in June and over $238,000 in July.  SIG's largest shareholders were the defendant Philip

15

Bloom Revocable Trust and defendant Fountainhead (Eric Bloom's investment vehicle). Over the same two-month period, Fountainhead itself realized well over $150,000 in gains.

63.    Meanwhile, customer portfolios sustained millions of dollars in losses in June and July.

64.    When a Sentinel manager questioned the gains allocated to the defendants' portfolio at the same time the customer portfolios were losing money, Eric Bloom advised the manager that the gains were legitimate, and no adjustment was made to the allocation of gains.

**H.     Failure to Allocate Trades When Made and Reallocation of Trades.**

65.    Defendant Mosley traded for both the customer portfolios – SEGs 1, 2 and 3 – and for the defendants' own portfolio.

66.    Defendants Philip Bloom and Eric Bloom established a compensation system for Mosley which created powerful incentives for profitable trades to be allocated or diverted to the defendants' portfolio and less profitable trades to be allocated to public customers. In particular, Mosley's compensation consisted of a base salary, plus a bonus of 10% of the gains in the House portfolio only, plus a bonus based on the profitability of Sentinel. Mosley received no bonus based on the success of his trading for public customer portfolios.

67.    Pursuant to this compensation system, defendant Mosley received bonus payments on December 22, 2006 and March 8, 2007, which totaled over $468,000.

68.    Securities trades must be allocated to the customer or customers on whose behalf the trades are made. Trades must be allocated so that the risks and rewards of any trade are realized by the customer(s) whose assets were used to make the trade. Under the securities laws of the United States, trades cannot be made without a pre-determined allocation, then later

allocated in a manner which is preferential to one or more accounts.  15 U.S.C. § 78j(b); 15 U.S.C. § 80b-6.

69.    Mosley, with the full knowledge of Eric Bloom and Philip Bloom, did not allocate trades to SEGs 1, 2, or 3 or to the defendants at the time the trades were made.  Instead, Mosley frequently waited until days later, when the trades settled, to assign the trades to the various portfolios.  For example, on May 4, 2007, Sentinel's assistant trader sent Mosley an email indicating that "we have some trades settling next week and we don't know what seg you want the buys in and what transactions to close for the sells."

70.    In effect, Mosley simply made undifferentiated trades and later decided which portfolio would receive the securities.  By delaying the assignment of trades until settlement date, Mosley was able to disproportionately direct profitable trades to the defendants' accounts and unprofitable trades to customers.  For example, on June 5, 2007, the defendants' portfolio and SEG 3 bought the same security, but SEG 3 received an inferior price.

71.    The Individual Defendants were well aware of the practice of allocating trades among portfolios on the settlement date instead of when the trades were made and failed to stop it.  The practice of not allocating trades at the time they were made was a recurring topic of discussion at meetings of Sentinel's credit committee, which included Mosley and Eric Bloom.

72.    Even after trades were allocated, defendant Charles Mosley moved securities between customer portfolios and the "House" in order to benefit the Individual Defendants. Defendant Eric Bloom was well aware of that misconduct.  For example, he received a memo on November 21, 2006, advising him that a security had been originally bought for SEG 3, held for ten days there, "then moved to HSE.  Three weeks later, it was sold at a profit of approx. $43k. Order ticket and trade blotter show [SEG 3]."  The same memo also details a transaction in

17

another security, which originally was bought for the defendants' "House" portfolio, but then half of that security was re-directed to SEG 3, which then shared in the loss when the security was sold. That same memo details a transaction in which a security purportedly was sold by the "House" to SEG3 at a gain, but then continued to be held by the "House" account.

## I.    False and Misleading Customer Statements.

73.    On a daily basis, the Individual Defendants created and submitted to their customers account statements that were materially false. The Individual Defendants used certain spreadsheets that they had created, including the "Allocation Beta" and the "Daily Yield/Rate Calculation" to produce materially false customer statements.

74.    Using the "Allocation Beta" spreadsheet, Sentinel employees, acting under the direction of defendants Eric Bloom and Charles Mosley, determined the market value of securities that had been attributed on the customer statements to particular customer groups. From that market value, the Individual Defendants deducted a predetermined figure, known as the "over/under," to arrive at an artificial cost basis for the securities, which would be represented on the customers' statements. The market value and manufactured cost basis figures were reported to the customers. By manufacturing a cost figure in this fashion, defendants ensured that the customers would believe that the value of the portfolio always exceeded its cost.

75.    When the market value of the securities attributed to a customer group in fact declined, the Individual Defendants concealed that decline by borrowing cash, and "allocating" those additional funds to the group that needed to show additional equity. On at least one occasion, defendant Charles Mosley instructed a subordinate to fill a hole in a customer statement by falsely reporting that $300,000 in cash was being held for that customer when in fact no such funds existed.

76.     Defendant Eric Bloom was well aware of the process by which fabricated cost figures were created for the purpose of deceiving customers. For instance, on about March 22, 2007, a SEG 3 customer asked defendant Eric Bloom to provide them with daily information on the entire SEG 3 portfolio to which that customer belonged. On about March 27, 2007, Eric Bloom instructed a subordinate to provide him a copy of the daily securities allocation spreadsheet for transmission to the customer, but to "remove the over/under (col. h)" column which would have shown the customer the manner in which the cost basis was manipulated.

77.     As a further part of this scheme to mislead customers, defendant Eric Bloom created an Excel spreadsheet called the "Daily Yield/Rate Calculation." This spreadsheet was utilized every business day, under the direction and control of defendants Eric Bloom and Mosley.     The Daily Yield/Rate Calculation was used to divert interest from customers to servicing the bank loan, to misallocate interest among SEGs and the "House" portfolio, and to create phony rates of return for customer accounts.

78.     On a daily basis Defendant Eric Bloom received from one of his subordinates that day's version of the spreadsheet, sometimes with notations on how rates had been determined. For instance, on April 9, 2007, a Sentinel employee informed Eric Bloom that "Charles [Mosley] told me earlier where he would like prime [the return rate on the Prime portfolio] to be at today and to decrease fees in the house account to zero. Let me know if you don't like where these are at." On April 16, the same employee explained in an email to defendant Eric Bloom, "This is where [C]harles wanted them today. Even with adjusting the fees I couldn't get the difference down." On August 1, 2007, the same employee advised Mosley that rates could go up by a specified amount and asked whether those rates should be distributed "More to [the] Prime [portfolio] or 125 [portfolio]?" She later informed Mosley that she had "bumped up Prime

20bps" and had raised the "125 portfolio" by 10 basis points. On August 2, 2007, the same employee advised Mosley that she had "adjusted" the return on the Prime portfolio and had dropped the return rate for Group 7 by two basis points. On August 3, the same employee explained to defendant Charles Mosley that she had "bumped fees" to SEG 3 customers, raised the return on the prime portfolio to "a net rate of 6.75, up 25 [basis points]," and raised the "125 [portfolio] to a net rate of 5.80 up 5 [basis points] for group 10 and 8 for group 7."

79.    In fact, the statements sent to every customer by email or fax on every business day from approximately 2003 until August 13, 2007 contained materially false and misleading information, and omitted material facts about the customers' investments.

80.    First, the customer account statements purported to reflect which securities were being held in segregated accounts for the benefit of participants in the various SEG portfolio and Groups. In fact, as the Individual Defendants knew, the customer statements often reflected securities as being held in segregated accounts at the Bank of New York when they were not.

81.    Second, the customer account statements purported to reflect the "Cost" and "Market Value" of each customer's pro rata share of the pool of securities held for the benefit of that customer's SEG portfolio and Group. In fact, as Individual Defendants knew, the statements routinely misrepresented the cost of those securities, which were concocted using the "Allocation Beta" spreadsheet.

82.    Third, the Individual Defendants caused securities that were supposed to be segregated for customers to be delivered as collateral in order to obtain loans from the Bank of New York. The account statements the Individual Defendants caused to be sent to clients, which should have accurately reflected the portfolio holdings, the value of the portfolio and all

transactions in the portfolio, did not reflect the fact that any customer securities had been encumbered in this manner.

83.    Fourth, the Individual Defendants used client assets to obtain hundreds of millions of dollars in additional leveraged financing through repo transactions. However, the client account statements prepared and distributed by Sentinel did not reflect any of this activity.

84.    Fifth, the statements purported to reflect a "Net Interest Rate."  That rate, however, was simply a number made up by defendants Eric Bloom and Charles Mosley, not calculated from the returns on a particular portfolio.

### J.    The Scheme to Pay SIG an "Administrative" or "Management Fee."

85.    Sometime in late 2006, defendant Eric Bloom decided that he should be receiving an extra "bonus" for himself in addition to the regular annual bonus paid to him.  Rather than pay himself this bonus directly, Eric Bloom decided that Sentinel would pay an "administrative" or "management" fee to its parent company, defendant SIG.   Eric Bloom decided that the administrative fee should be $50,000 per month and retroactive not only for the entire year 2006, but also for part of 2005 as well.

86.    Pursuant to this scheme, on November 20, 2006, defendant Eric Bloom caused the transfer of $600,000 in Sentinel funds to SIG.

87.    Another $350,000 was transferred to SIG as an "administrative fee" on February 22, 2007.

88.    In March 2007, in an after-the-fact effort to justify these payments, defendant Eric Bloom caused outside counsel for Sentinel to draft a management services agreement, even though $950,000 in payments had already been made.

89.     A third payment, amounting to $350,000 was transferred to SIG on August 9, 2007.

90.     SIG performed no services, administrative, management or otherwise, for Sentinel.

## THE COLLAPSE OF SENTINEL

91.     In late June and early July 2007, Sentinel's two primary repo counterparties decided to stop financing higher-risk repo transactions with Sentinel. Those counterparties insisted on repayment of the repo loans.

92.     Because Sentinel's customer assets were so highly leveraged, Sentinel had no way to avoid defaults under its repo agreements other than to borrow more money from the bank to pay off the repo counterparties, or to raid the segregated accounts. The Individual Defendants did both. On June 25, the bank loan balance stood at $358 million. Within two days, Sentinel had borrowed an additional $215 million, increasing the outstanding loan balance by June 28, 2007 to more than $573 million. To collateralize the additional loan, on or about June 28, 2007 the Individual Defendants caused approximately $168 million in securities held in a segregated SEG 1 securities account at the Bank of New York to be removed from segregation, and transferred those securities to a clearing account in which Bank of New York asserted a security interest.

93.     On or about July 11, 2007, Sentinel's vice-president of sales learned that the SEG 3 "prime" portfolio consisted of just eleven securities, including highly illiquid "PRETSL" notes with maturities thirty years out (these risky, illiquid securities had been transferred from the "House" portfolio to SEG 3 as part of the Individual Defendants' scheme). The vice-president of sales warned defendant Eric Bloom that "this is not a portfolio that we can market to prospects"

and that he feared that when existing customers scrutinized their statements, they "will request a redemption."

94.     On or about July 17, 2007 Sentinel's loan balance (which in the interim had been reduced to $421 million) again increased, this time to $497 million. To collateralize the loan, the Individual Defendants again caused securities to be removed from the segregated SEG 1 securities account at the Bank of New York (this time $84 million of securities), and transferred those securities to the Bank of New York clearing account to be used as additional collateral.

95.     The next day, on or about July 18, 2007, defendant Philip Bloom instructed Sentinel employees to wire transfer the entire stated balance of over $11 million in accounts held in the names of the Sybil Bloom Revocable Trust and the Philip M. Bloom Revocable Trust to their bank. Sentinel carried out his orders.

96.     The following day, on or about July 19, 2007, defendant Eric Bloom removed $250,000 from his account at Sentinel.

97.     On or about July 30, 2007, the Individual Defendants caused approximately $248 million in corporate securities that were being held in the Bank of New York clearing account as collateral for the Bank of New York loan to be returned to the segregated SEG 1 securities account at the Bank of New York.

98.     On or about the next day, July 31, 2007, the Individual Defendants caused approximately $264 million in government securities that were being held in the Bank of New York clearing account as collateral for the Bank of New York loan to be transferred to a segregated SEG 1 account at the Bank of New York.

99.     In order to fill the collateral shortfall in the Bank of New York clearing account caused by the transfers of government and corporate securities back to segregated SEG 1

securities accounts, on July 31, 2007, the Individual Defendants caused substantially <u>all</u> of the corporate securities held in the segregated SEG 3 customer securities account at the Bank of New York – approximately $290 million in corporate securities – to be removed from segregation, and transferred those securities to the clearing account to be used as collateral for the Bank of New York loan.

100.    In order to conceal the misappropriation of customer assets from SEG 3, Eric Bloom and Charles Mosley subsequently directed a subordinate to transfer approximately $100 million in lower-grade, illiquid securities from the defendants' House portfolio to SEG 3. When the subordinate asked Mosley how Sentinel could make these transfers, Mosley told him in substance that "we have to do this" and that it would "buy us a few more days."

101.    Sentinel continued to experience severe financial stress through the end of July and into August as it was unable to simultaneously reduce its loan balance with the Bank of New York, sell the higher-risk securities it had received back from repo counterparties that had stopped financing such securities, and meet its redemption obligations to customers who wanted to withdraw funds.

102.    On or about July 31, 2007, SEG 3 customer Black River requested a redemption of its entire account balance, an amount exceeding $90 million, which redemption request Sentinel was unable to meet. After defendant Charles Mosley requested that Black River redeem its account over time, Black River agreed to redeem one-third of the account on August 1, one-third on August 2, and the remainder on August 3.

103.    On August 3, 2007, defendant Philip Bloom consulted Sentinel's outside counsel concerning the Individual Defendants' use of leverage and Sentinel's liquidity crisis.