# Exhibit F

KC FILED
SEP 10 2007
9-10-07
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

---

HENRY SHATKIN, on behalf of himself and all others similarly situated,

   Plaintiff

v.

ERIC ANDREW BLOOM, PHILIP MARTIN BLOOM, JOHN MATTHEW KEEL, THERESA CLAIRE ARANA and CHARLES MOSELEY,

   Defendants

---

Civ. No.

Jury Trial Demanded

**CLASS ACTION COMPLAINT**

07CV5076
JUDGE ANDERSEN
MAGISTRATE JUDGE COLE

---

Plaintiff, individually and on behalf of all others similarly situated, by his undersigned attorneys, for its class action complaint, alleges as follows. All allegations in this complaint are based upon the investigation of counsel and upon information and belief, except the allegations pertaining to the named plaintiff, which are based upon personal knowledge.

## I. SUMMARY OF ACTION

1. This is a class action on behalf of all clients of non-party Sentinel Management Group, Inc. ("Sentinel") who had assets managed by Sentinel during the period from January 1, 2004 through August 13, 2007 (the "Class").

2. Sentinel is a registered investment adviser that primarily manages investments of short-term cash for various advisory clients, including futures commodities merchants, hedge funds, financial institutions, pension funds and individuals. Sentinel filed for bankruptcy protection on August 17, 2007, and is not a party to this action.

- 1 -

3. The defendants in this action are certain of the officers and directors of Sentinel (the "Defendants") who caused Sentinel to engage in widespread misconduct that has caused Plaintiff and the Class to lose hundreds of millions of dollars.

4. The Defendants caused Sentinel to attract investors by offering high returns while falsely portraying its investment strategies as low-risk. Sentinel assured the Class that their investments were very safe, and promised that client assets would be segregated into accounts under the control of a third party custodian bank.

5. These assurances were false and deceptive. In fact, beginning by at least 2004, Defendants employed a covert and undisclosed leveraging program at Sentinel under which client assets were used as security for huge loans obtained by Sentinel. The existence of these loans was never disclosed to clients, including Plaintiff and the Class, and periodic client account statements did not contain any notice of this unauthorized and illicit use of client funds.

6. Leverage is an effective financial tool when all is going well in the markets, but when a highly leveraged "bet" is made and the markets turn sour, disaster ensues. In essence, Defendants were causing Sentinel to make big bets in the credit markets with borrowed money – obtained with loans secured by assets of Plaintiff and the Class without their knowledge, let alone their consent.

7. From May 2007 through August 13, 2007, the credit and bond markets experienced significant turmoil. During this period, Sentinel was highly leveraged through its unauthorized use of its clients' assets, and thus had placed a very bad bet with money it borrowed from Plaintiff and the Class without their knowledge. Defendants tried to recover by making further bets in even riskier securities, and escalated Sentinel's leverage program by improperly shifting $460 million in client assets from one of the purportedly "segregated" accounts to a "House" account owned by Sentinel, where the assets were used as security for Sentinel's huge line of credit.

8. By August 13, 2007, Sentinel's "segregated" client accounts had been drained of the great majority of its assets under management – assets that rightfully belonged to the Class.

The Company was unable to return the client assets to the Class because they had been improperly pledged as collateral for money loaned to Sentinel. On August 13, 2007, Sentinel announced that it had halted all client redemptions.

9. The Defendants caused Sentinel to issue a false statement that it had halted client redemptions due to market conditions when, in fact, the truth was that the Defendants had caused Sentinel to squander away the client assets due to the failure of Defendants' high-risk and unauthorized leverage strategies. The Defendants caused Sentinal to lose the funds Plaintiff and the Class had entrusted to Defendants. Financial records obtained from the custodian bank of the "segregated" client account SEG 3 shows an actual balance of just $94 million where it should be approximately $700 million. <u>Hundreds of millions of dollars worth of assets belonging to the Class are missing</u>.

10. On August 17, 2007, Sentinel filed for bankruptcy protection.

## II. JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction of the claims asserted herein pursuant to the Class Action Fairness Act and 28 U.S.C. § 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which the Class of plaintiffs are citizens of States different from Defendant.

12. Venue is proper under 28 U.S.C. § 1391(b) and (c), because the Defendants reside or may be found within this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

## III. THE PARTIES AND SIGNIFICANT NONPARTY

13. Plaintiff, Henry Shatkin ("Plaintiff"), is an individual residing within this judicial district. Plaintiff had an account at Sentinel Management Group, Inc. and his assets were deposited in a purportedly segregated account at a third party custodian.

14. Nonparty Sentinel Management Group, Inc. ("Sentinel"), an Illinois corporation headquartered in Northbrook, Illinois, is an investment advisory group that primarily manages investments of short-term assets for various advisory clients, including financial institutions,

- 3 -

pension funds and individuals. Sentinel is not a party to this action because of its recent filing for bankruptcy protection.

15. Defendant Eric Andrew Bloom ("Eric Bloom") was, at all relevant times, President, CEO and a member of the board of directors of Sentinel. In his role as CEO and President Defendant Eric Bloom oversaw all aspects of Sentinel's management, including personnel, financial reporting and client relations. Defendant Eric Bloom personally signed Plaintiff's and the Class' Investment Advisory Agreements and Defendant Moseley's termination letter.

16. Defendant Philip Martin Bloom ("Philip Bloom") is the founder of Sentinel and was, at all relevant times, Chairman of the Board of Directors of Sentinel. As such, he had authority in determining company policies and making certain they were properly implemented.

17. Defendant John Matthew Keel ("Keel") was, at all relevant times, Chief Compliance Officer of Sentinel. As Chief Compliance Officer, Defendant Keel's duties included making sure that Sentinel followed all federal, state and regulatory body regulations and guidelines applicable to Sentinel's business, specifically including the Investment Advisers Act of 1940 (15 U.S.C. § 80b-1, *et seq.*) and Rule 206(4)-2 promulgated thereunder (17 C.F.R. § 275.206(4)-2) regarding segregation of client assets.

18. Defendant Theresa Claire Arana ("Arana") was, at all relevant times, Chief Financial Officer of Sentinel. As Chief Financial Officer of Sentinel, Defendant Arana was responsible for, among other responsibilities, overseeing all financial reports and reconciliations of Sentinel and client investment accounts. Defendant Arana was specifically responsible for reconciling each of the segregated client accounts, and knew or was reckless or negligent in not knowing, exactly what was in each segregated account, and whether the assets in any account were subject to any security agreements.

19. Defendant Charles Moseley ("Moseley") was, at all relevant times, a Portfolio Manager and Head Trader of Sentinel, until his termination for "misconduct" on August 16, 2007. Defendant Mosely is a resident of Vernon Hills, Illinois.

- 4 -

## IV. CLASS ACTION ALLEGATIONS

20. This action is brought as a class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of Plaintiff and all persons and entities that had investments managed by Sentinel from January 1, 2004 through and including August 13, 2007. Excluded from the Class are Defendants herein, members of the immediate families of the Defendants, any entity in which any of the Defendants has a controlling interest, and the legal representatives, heirs, successors or assigns of any of the Defendants.

21. This action is properly maintainable as a class action for the following reasons:

(a) The Class is so numerous that joinder of all members is impracticable;

(b) There are common questions of law and fact involved herein which predominate over any questions affecting only individual members of the Class. These common questions of law and fact include:

(i) Whether assets of Plaintiff and the Class were improperly encumbered by Defendants and Sentinel;

(ii) Whether Defendants violated the Illinois Consumer Fraud and Deceptive Practices Act;

(iii) Whether Defendants were negligent in their actions as alleged herein;

(iv) Whether Defendants, without authorization, wrongfully controlled assets belonging to Plaintiff and the Class;

(v) Whether Defendants breached their fiduciary duties to Plaintiff and the Class;

(vi) Whether Defendants conspired to inflict the wrongs complained of herein up Plaintiff and the Class; and

(vii) Whether members of the Class have suffered losses from the conduct alleged herein.

(c) Plaintiff's claims are typical of the claims of the other members of the Class. The damages suffered by plaintiffs and all other Class members arise from and were caused by the same violations and course of conduct. Plaintiff does not have interests antagonistic to, or in conflict with, the Class;

(d) Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel experienced in class and securities litigation to vigorously prosecute this action;

(e) A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. Furthermore, the expense and burden of individual litigation make it impracticable for the members of the Class to seek redress individually for the wrongs they have suffered.

(f) Notice can be provided to Class members via a combination of published notice and first class mail using techniques and forms of notice similar to those customarily used in class actions.

## V. UNDERLYING FACTUAL ALLEGATIONS

### A. The Sentinel Investment Programs

22. Sentinel had the general practice of pooling its clients' assets in one of three allegedly "segregated" client custodial accounts held at the Bank of New York. These accounts were referred to by Sentinel as SEG 1; SEG 2 and SEG 3:

a) SEG 1 contained assets of registered Futures Commission Merchants ("FCMs") with only domestic customer deposits.[1]

b) SEG 2 contained assets of FCMs with domestic customer deposits trading in foreign markets;

---

[1] FCMs are futures brokers that are members of the National Futures Association ("NFA") and whose investments are subject to the rules of the Commodity Futures Trading Commission ("CFTC").

- 6 -

c) SEG 3 contained assets of all other types of clients, including hedge funds, trust accounts, endowments and individuals.

23. Clients of Sentinel share in the profits and losses on the investments made by Sentinel on a pro-rata basis, according to each client's proportionate share of the total assets held in the respective SEG 1, SEG 2 or SEG 3 Accounts.

24. Sentinel had a thriving business, managing more than $1.2 billion in short-term assets for its clients. Sentinel had built this business by offering its clients outstanding returns on their short-term investments. For example, according to its website, Sentinel's SEG 1 program was reportedly delivering monthly returns as much as a half-percentage-point above the 90-day Treasury Bill yield – an excellent return on short-term investments. The SEG 3 accounts were reportedly achieving 1 to 1.2 percentage-point spreads over T-Bill returns.

25. Each of Sentinel's clients, including Plaintiff and the Class, were required to sign an "Investment Advisory Agreement." Plaintiff executed his Investment Advisory Agreement, and Defendant Eric Bloom signed the Investment Advisory Agreement on behalf of Sentinel.

26. According to the Investment Advisory Agreement, all client assets would be aggregated with assets of other clients and deposited in one of the above-described segregated accounts (SEG 1, SEG 2, or SEG 3), which were purportedly under the custody of a custodian bank. The Investment Advisory Agreement specifically provided that Sentinel "shall not own nor have any interest in funds or securities in the Account or of any other funds or securities in which Client has a beneficial interest."

27. As set forth in more detail below, this provision of the Investment Advisory Agreement was deceptive in that the accounts were not actually segregated and client assets were mixed with those of Sentinel and encumbered for the purposes of Sentinel getting huge undisclosed loans using the assets as collateral, as described in more detail below.

**B.     The Defendants Were Required to Cause Sentinel to Keep Client Assets Segregated**

28. Rule 206(4)-2 (17 C.F.R. § 275.206(4)-2) promulgated under the Investment Advisers Act prohibits an investment advisor from having custody of client funds or securities

- 7 -

and requires that all client assets be held by a qualified custodian in either: 1) a separate account under the client's name; or 2) in segregated accounts that contain only client funds.

### C. The Defendants Caused Sentinel to Use Class Member Assets as Collateral to Secure Huge Loans for Sentinel

29. Beginning by at least 2004, Defendants caused Sentinel to obtain huge loans secured by the value of securities rightfully belonging to Plaintiff and the Class. These securities were leveraged to obtain loans for up to three times the value of the assets, and were used by Sentinel to buy additional securities.

30. Upon information and belief, these additional securities purchased under this covert leverage program were not purchased for the benefit of Plaintiff and the Class, who were the rightful owners of the securities being leveraged.

31. The client account statements, which should have accurately reflected the portfolio holdings, the value of the portfolio, and all transactions in the portfolio, did not reflect the fact that the securities had been encumbered through the covert leverage program. Plaintiff and the Class had no way of knowing that that their assets had been leveraged by Sentinel to obtain additional financing.

32. Sometime prior to August 13, 2007, the Defendants caused Sentinel to move at least $460 million in customer assets from SEG 1, SEG 2 and/or SEG 3 to Sentinel's own "House" account. This "House" account was owned by Sentinel, not by any of its clients (including Plaintiff and the Class). The transfer of these securities out of the segregated accounts was never disclosed to Plaintiff or the Class in any of their client account statements.

33. As described below, the assets in the "House" account that were improperly transferred at the direction of Defendants from the SEG1, SEG 2, and SEG 3 accounts were later seized as collateral when Sentinel defaulted on this line of credit.

### D. The Defendants Caused Sentinel to Invest in Significantly Riskier Investments Than Disclosed to Plaintiff and the Class

34. Although the Defendants caused Sentinel to tout the safety of their investment program, these statements were deceptive. In reality, Defendants had caused Sentinel to

- 8 -

dramatically ramp up its level of risk sometime between May of 2007 and August 13, 2007, as reported by *Barron's* magazine on September 2, 2007:[2]

> TO BOOST THE NUMBERS, however, Sentinel used tons of leverage and longer-dated -- and riskier -- maturities. In the prime program, for instance, the average maturity had ballooned to some 33 years by June, according to company reports. Sentinel, unbeknownst to clients, also frequently used its portfolios as collateral in the "repo" market, to earn a rate higher than what it paid out to clients, and even bought racier, higher-yielding bonds. Thus, even though it said clients could redeem 100% of their money on any business day, as they could at a money-market fund, Sentinel wasn't in a position to handle a run on the bank like the one the subprime debacle set off.
>
> An analyst at a firm hired by several Sentinel clients to sort through the mess believes that, by this spring, desperation reigned inside Sentinel. "Look at these account statements between May and the end of the line, the Aug. 13 freeze," this person says, brandishing a sheaf of papers.
>
> In May, the $400 million in prime portfolios had held securities of high-quality corporate names like GE and Toyota, along with longer-dated bonds backed by capital securities of major banks and insurers. Sure the average maturity of the holdings, as mentioned, had bulged out to beyond 30 years. But the securities were largely of the floating-rate variety, subject to interest-rate resets every quarter. Thus, the portfolios were somewhat protected against price loss from a rise in long-term rates.
>
> But fast-forward to the Aug. 13 statements that were Exhibit A in the SEC's recent filings. The quality names had disappeared from customer statements, replaced by single-A and triple-B tranches of collateral debt and loan obligations in obscure entities like Taberna Funding, a pool of capital securities of obscure real-estate investment trusts, real-estate developers and home builders originated by Cohen Brothers Financial. And nearly half of the portfolios were in private placements so arcane that even after two days of forensic digging, the clients' analyst had yet to uncover any information on them.
>
> Sentinel was desperately grasping for yield. But most of the names that produced it would be difficult to sell under the best of circumstances. They were impossible to liquidate in today's seized-up credit markets. Horrible collateral performance in the Taberna securitizations has rendered Sentinel's lower-ranked tranches virtually worthless.

---

[2] Laing, *Why Sentinel Collapsed*, BARRON'S, September 2, 2007.

> "Clearly, Sentinel was trying for a Hail Mary play in Prime to boost income yield and perhaps make up for past losses by buying absolute garbage," concludes the analyst. "Unfortunately, as happens so often when a gambler doubles down, losses just escalate."

### E. The Defendants Seized Class Members' Assets and Refuse to Return Them

35. On August 13, 2007, Defendants caused Sentinel to send a letter to clients announcing that it was halting all redemptions by its clients. This letter falsely stated that the reason for halting the redemptions was a purported "liquidity crisis" in the credit markets:

> Dear Client:
>
> As you undoubtedly know, the credit markets, along with most other markets, have experienced a liquidity crisis in the past several weeks. Investor fear has overtaken reason and has induced a period in which most securities have simply ceased to trade.
>
> * * *
>
> We are concerned that we cannot meet any significant redemption requests without selling securities at deep discounts to their fair value and therefore causing unnecessary losses to our clients. We contacted the CFTC today and asked their permission to halt redemptions until we can honor them in an orderly fashion.

36. On August 13, 2007, Defendants caused Sentinel to email false and misleading customer account statements to its clients. For example, the customer statements that were sent to clients whose assets were supposedly held in the SEG 3 account by the custodian bank represented that the aggregate of all securities held in the SEG 3 account was more than $670 million. Contrary to these representations, only about $94 million of securities were actually held in the SEG 3 account by the custodian bank. The reason for this discrepancy is that Sentinel had moved the securities to Sentinel's own "House" account.

37. For example, Plaintiff received a statement from Sentinel dated August 13, 2007 purporting to show that it had $454,201.75 in assets specifically identified by CUSIP number. This statement should have represented Plaintiff's proportionate share of all assets in the SEG 3 account. A comparison of these CUSIP Numbers with those included in the custodian's report for SEG 3 on August 13, 2007 shows that *at least* $396,595.26 -- or more than 87% of the assets

- 10 -

listed on Plaintiff's customer statement -- were, in reality, no longer being held in the SEG 3 account.

38. Certain of the specific assets listed on Plaintiff's August 13, 2007 client report that were not still being held in the SEG 3 account did show up on a list of collateral held by The Bank of New York.

39. A reconciliation dated August 13, 2007 and signed by Defendant Arana shows an opening inventory balance of approximately $700 million for SEG 3, while the actual beginning balance was just $94 million.

## F. Sentinel Quickly Implodes

40. On August 16, 2007, Defendant Eric Bloom fired Defendant Moseley for "misconduct" in his job performance. The exact nature of this misconduct has not yet been disclosed, but on information and belief is related to the misconduct alleged herein.

41. On August 17, 2007, Sentinel filed for bankruptcy protection in the United States Bankruptcy Court for the Northern District of Illinois.

42. On August 20, 2007, the Securities and Exchange Commission filed a complaint alleging fraud, misappropriation and misuse of client assets by Sentinel.

## G. Plaintiff and the Class Have Been Significantly Damaged

43. As described above, nearly $400,000 of Plaintiff's assets are missing from the SEG 3 account per the records of the custodian bank. As described by Barron's, this appears to be a Class-wide problem, with more than $700 million "missing" from the SEG 3 account:[3]

> But the real blood will be spilled by the hedge funds, commodity traders and wealthy individuals who had about $800 million in Sentinel's Seg-III account. This account, regulators say, was looted to boost Sentinel's house account. The money was pledged as collateral for loans to Sentinel. Driscoll says that Seg-III holders will be lucky to get even half their money. As of two weeks ago, investigators had found only $92 million of the $800 million.

---

[3] *Id.*

- 11 -

## VI. CLAIMS FOR RELIEF

### COUNT I

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT [815 ILCS 505/1 ET SEQ.]

### (Against All Defendants)

44. Plaintiff refers to and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint.

45. Plaintiff brings this claim pursuant to the Illinois Consumer Fraud Act ("ICFA") and/or similar consumer protection statutes enacted to protect consumers against unfair, deceptive or fraudulent business practices. *See, e.g.*, 815 ILCS § 505/1 *et seq.*

46. At all relevant times, Plaintiff, the Class, and each of the Defendants were "persons" within the meaning of 815 ILCS 505/1(c).

47. As alleged herein, Defendants employed unfair methods of competition and unfair or deceptive acts or practices, including but not limited to (a) the use or employment of a deception, fraud, false pretense, false promise, and/or misrepresentation, and/or (b) the concealment, suppression or omission of one or more material facts, with intent, or reckless disregard for the fact, that others would rely thereupon, including but not limited to the following:

- That Sentinel was improperly and covertly encumbering assets belonging to the Class for the purpose of obtaining loans;
- That Sentinel had begun investing in assets that were far more speculative and risky than the substantially lower-risk investment strategies touted on the company's website;
- That the assets in client accounts were not properly segregated, and a significant amount of assets were, in fact, transferred to a "House" account owned by Sentinel.

48. Defendants' improper conduct, as described herein, was conducted and implemented in whole or in part from Sentinel's headquarters in Illinois.

49. Plaintiff and the Class have, in fact, been misled or deceived by Defendants' misconduct, as alleged herein, and damaged in an amount to be proven at trial.

## COUNT II

## NEGLIGENCE

### (Against All Defendants)

50. Plaintiff refers to and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint.

51. Defendants owed a duty of care to Plaintiff and the Class.

52. Defendants, by virtue of the conduct alleged herein, breached that duty of care by failing to perform their activities as a reasonably prudent person would, under the circumstances.

53. Defendants' breach proximately caused damages to Plaintiff and the Class in an amount to be determined at trial.

## COUNT III

## CONVERSION

### (Against All Defendants)

54. Plaintiff refers to and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint.

55. As alleged herein, Defendants, without authorization and wrongfully, assumed control, dominion or ownership of property that rightfully belonged to Plaintiff and the Class.

56. Defendants used this wrongful and unauthorized control to encumber these assets improperly by using them as security to obtain large bank loans.

57. Encumbering assets belonging to the Class in such a manner interfered with right to the absolute and unconditional immediate possession of the property.

58. Defendants caused Sentinel to use these bank loans to purchase more securities, but the proceeds from investing the improperly secured bank loans were not given to Plaintiff and the Class.

59. Additionally, assets belonging to Plaintiff and the Class were improperly taken from the segregated accounts and diverted to other purposes. Much of these assets are missing and have not been returned to the Class.

60. Plaintiff and the Class have made a demand for the return of their assets, or, alternatively, it would be futile to make such a demand on a company operating under bankruptcy protection.

61. Defendants' negligent and/or reckless and/or intentional conduct proximately caused damages to Plaintiff and the Class in an amount to be proven at trial.

## COUNT IV

## BREACH OF FIDUCIARY DUTY

### (Against All Defendants)

62. Plaintiff refers to and incorporates herein by reference the allegations contained in the preceding paragraphs of this Complaint.

63. As persons with responsibilities over the assets and accounts of Plaintiff and the Class, the Defendants owed a fiduciary duty to Plaintiff and the Class.

64. By virtue of the conduct alleged herein, Defendants breached their fiduciary duties to Plaintiff and the Class.

65. Defendants' negligent and/or reckless and/or intentional breaches of fiduciary duty proximately caused damages to Plaintiff and the Class in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf himself and those similarly situated, prays for entry of judgment as follows:

A)     Certifying the Class and appointing Plaintiff and his counsel to represent them;

B)     Finding that Defendants' intentional and/or reckless actions constitute a violation of the Illinois Consumer Fraud and Deceptive Practices Act, Negligence, Conversion, and/or Breach of Fiduciary Duty;

C)     Awarding money damages to plaintiff and Class members;

D)     Awarding reasonable attorneys' fees and costs; and

E)     Granting such other relief as may be deemed just and equitable.

## VII. JURY DEMAND

Plaintiff hereby pleads his demand for a trial by Jury

DATED:     September 10, 2007

Respectfully submitted,
**HENRY SHATKIN**,

By: _____
Paul M. Weiss
William Sweetnam
**FREED & WEISS LLC**
111 West Washington
Suite 1331
Chicago, IL 60602
(312) 220-0000

Karl P. Barth
Peter H. Rachman
**LOVELL MITCHELL & BARTH, LLP**
11542 NE 21st Street
Bellevue, WA 98004
(425) 452-9800

- 15 -

Christopher Lovell
Imtiaz A. Siddiqui
**LOVELL STEWART HALEBIAN, LLP**
500 Fifth Avenue
New York, NY 10110
(212) 608-1900

David B. Killalea
Stephen A. Weisbrod
**GILBERT RANDOLPH LLP**
1100 New York Ave., N.W.
Suite 700
Washington, DC 20005
(202) 772-2200

Terrence F. Durkin
**THE LAW OFFICES OF
 TERRENCE F. DURKIN**
414 Orleans Plaza
Suite 312
Chicago, IL 60610
(312) 813-7366

**Counsel for Plaintiff
 and Proposed Class**

- 16 -