# Exhibit M

# UNITED STATES BANKRUPTCY COURT

For the __Northern__ District of __Illinois__

This is to certify that the within and attached document(s) is a full, true and correct copy of the original thereof as the same appears on file in the office of the Clerk of the United States Bankruptcy Court for the Northern District of Illinois.

Kenneth S. Gardner
Clerk of Court

By: __Sabrina Daniel__
Deputy Clerk

Dated: __02/29/2008__

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **SENTINEL MANAGEMENT GROUP, INC.**, | ) | Case No. 07 B 14987 |
| | ) | |
| Debtor. | ) | Hon. John B. Squires |
| | ) | |
| **THE BANK OF NEW YORK,** | ) | |
| | ) | |
| Plaintiff, | ) | Adv. No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| **FREDERICK J. GREDE**, as Chapter 11 Trustee of Sentinel Management Group, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff The Bank of New York ("BNY"), by and through its attorneys, Mayer Brown LLP and Emmet, Marvin & Martin, LLP, files this Complaint for Declaratory Judgment against Defendant Frederick J. Grede (the "Trustee"), as Chapter 11 Trustee of Sentinel Management Group, Inc. ("Sentinel"), and alleges as follows:

## NATURE OF THE ACTION

1. This is an adversary proceeding brought by BNY against the Trustee for a declaratory judgment as follows:

   a. that BNY has a valid, first-priority, perfected security interest in and lien upon the cash and securities held in all accounts established and

    maintained for Sentinel by BNY other than accounts that were specifically named and designated as "segregated accounts" (collectively, the "Collateral"); and,

  b. that BNY's security interest secures loans and other extensions of credit to Sentinel, which, as of the date of the commencement of this action, had a principal balance of $312,247,000, plus pre- and post-petition interest and pre- and post-petition fees and expenses, including reasonable attorneys' fees and expenses.

2. Upon information and belief, Sentinel is a registered investment advisor that manages investments for futures commission merchants, hedge fund managers, financial institutions, pension funds, high-net worth individuals and other types of investors.

3. At all relevant times, BNY was Sentinel's clearing bank. BNY was also custodian of cash and securities deposited by Sentinel into its BNY accounts and cleared transactions involving those assets at Sentinel's instruction. BNY also made loans and extended other forms of credit to Sentinel.

4. Pursuant to agreements between BNY and Sentinel, in consideration for BNY's extensions of credit and to secure Sentinel's obligations to BNY, Sentinel granted BNY a first-priority security interest in and lien upon the Collateral.

5. On August 17, 2007, Sentinel filed for protection under Chapter 11 of the U.S. Bankruptcy Code in this Court. As of that date, the outstanding principal balance of Sentinel's indebtedness to BNY was $312,247,000.

6. BNY now seeks to exercise its statutory and contractual rights with respect to the Collateral. Accordingly, this Complaint seeks equitable relief in the form of a declaratory

judgment that it has a valid, first-priority, perfected security interest in and lien upon the Collateral, free and clear of all claims, interests, liens and security interests of all other parties in interest, which secures Sentinel's obligations to BNY. This Complaint also seeks a judgment awarding to BNY its reasonable attorneys' fees and expenses incurred in this adversary proceeding.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 2201(a) because it is a case of actual controversy between BNY and the Trustee arising in or related to the above-captioned Chapter 11 bankruptcy proceeding, which is pending in this Court.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1409(a) because this adversary proceeding is related to the above-captioned Chapter 11 bankruptcy proceeding, which is pending in this District.

9. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K) because it is a proceeding to determine the validity, extent and priority of a lien, and is filed pursuant to Federal Rules of Bankruptcy Procedure 7001(2) and (9).

## THE PARTIES AND RELATED ENTITIES

10. BNY is a state-chartered bank with its principal place of business in New York, New York. BNY is one of the principal subsidiaries of The Bank of New York Mellon Corp. and a member of both the Federal Reserve (the "Fed") and the Depository Trust & Clearing Corporation ("DTCC"). BNY is also a client of Euroclear Bank ("Euroclear").

11. Defendant Frederick J. Grede is Chapter 11 Trustee of Sentinel. The Trustee was appointed under Section 1104(a)(2) of the U.S. Bankruptcy Code by Orders of this Court dated August 23, 2007 and August 29, 2007.

12. The Official Committee of Unsecured Creditors of Sentinel Management Group, Inc. (the "Committee") was appointed by the U.S. Trustee on September 6, 2007.

13. Sentinel is a corporation organized and existing under the laws of the State of Illinois with its principal place of business in Northbrook, Illinois.

14. Upon information and belief, from time to time prior to the date Sentinel filed for Chapter 11 bankruptcy protection in this Court, Sentinel entered into investment advisory agreements and investment management agreements with its customers (collectively, the "Investment Agreements") pursuant to which Sentinel agreed to invest and manage funds for such customers, who hold securities entitlements from Sentinel.

15. Sentinel was, at all relevant times, a securities intermediary for its customers.

16. BNY was not and is not a party to any of the Investment Agreements.

## FACTS

### BNY and the Securities Holding and Transfer System

17. With the help of depositories such as the Fed, DTCC and Euroclear, banks, brokers, dealers, exchanges, fund managers, investment managers, and other financial institutions transfer billions of shares of securities in financial markets all over the world every day. In 2006, for example, the Fed alone serviced nearly 22.3 million securities transfers with a value of more than $377 trillion. On average, the Fed serviced 88,800 securities transfers with a value of more than $1.5 trillion every business day. That same year, DTCC processed approximately 292.7 million deliveries of book-entry securities and settled securities transactions

4

with a value of more than $1.5 quadrillion and Euroclear settled approximately 34 million securities transactions with a value of more than €218 trillion.

18. The clearing process is an essential step in each and every one of these transactions. In simple terms, the clearing process is the settlement of the buy and sell instructions of transacting parties. When a securities transfer "clears," each of the transacting parties has received the securities it purchased or has been paid for the securities it sold.

19. BNY is a leading provider of domestic and global clearing services. Through its extensive sub-custodian network, regional operations centers and direct or indirect memberships in depositories in dozens of markets around the world, including the Fed, DTCC and Euroclear, BNY clears more than 600,000 securities transactions for its customers every day, including approximately 50% of all transactions in U.S. Government securities.

20. Due to the inherently fast-paced nature of the securities markets, BNY customers, like all investors, must be able to settle securities transactions promptly. In accordance with industry practice, therefore, BNY accepts delivery of securities on behalf of its customers and regularly provides extensions of credit, including intra-day and overnight loans and provisional credits, in the event its customers do not have immediately available cash to pay for the securities at the time of transfer to BNY. Without the liquidity provided, in part, by such extensions of credit, securities could not be traded at the volume or in the time frame demanded and expected by the financial markets.

21. In consideration for such services and extensions of credit, and in order to secure their obligations to repay any credit extended, BNY requires its customers to grant BNY a security interest in and lien upon financial assets held in BNY accounts that have not been designated "segregated" accounts. In this way, BNY is able to promote liquidity and efficiency

in the securities markets and satisfy industry standards while simultaneously protecting itself and its shareholders against the risks it undertakes in extending such credit to its customers.

22. The efficient and orderly operation of this process depends upon the legal policies and framework of the indirect holding system for financial assets, which generally do not allow customers of a securities intermediary to assert rights against anyone other than their own securities intermediary. Indeed, a contrary rule would greatly impair the ability of securities intermediaries to perform the services required of them and, thereby, the interests of investors.

23. For this reason, BNY—whether acting as secured lender, clearing bank, or both—is entitled to rely on the instructions, representations and warranties of its customers, including Sentinel, a highly-regulated entity that was at all relevant times registered with the U.S. Securities and Exchange Commission, the U.S. Commodity Futures Trading Commission, and the National Futures Association.

## The Governing Agreements

24. On or about October 21, 1997, Sentinel and BNY entered into a Securities Clearing Agreement, attached hereto as Exhibit A and incorporated herein by reference, and a Security Agreement, attached hereto as Exhibit B and incorporated herein by reference (collectively, the "1997 Agreements"). Sentinel executed and delivered the 1997 Agreements.

25. On or about January 9, 2003, Sentinel and BNY entered into a Global Clearing and Custody Agreement, attached hereto as Exhibit C and incorporated herein by reference, and a Security Agreement, attached hereto as Exhibit D and incorporated herein by reference (collectively, the "2003 Agreements") (together with the 1997 Agreements, the "Governing Agreements"). Sentinel executed and delivered the 2003 Agreements.

26. All of the Governing Agreements are still in effect.

27. No customer of Sentinel was or is a party to any of the Governing Agreements.

28. Under the Governing Agreements, Sentinel appointed BNY as its "clearing agent" for the purpose of accepting receipt and making delivery of cash and securities. Ex. A, § 2.01; Ex. C, § 2.1(a). In accordance with this appointment, Sentinel authorized BNY to "make appropriate debit and credit entries of Securities and monies . . . to effect the execution of each Instruction of [Sentinel] for the receipt or delivery of Securities." Ex. A, § 2.02; see also Ex. C, § 4.1. Such transactions were to be cleared through one or more accounts established and maintained by BNY in Sentinel's name for that purpose. Ex. A, § 2.02; Ex. C, §§ 2.1(a), 4.1.

29. Pursuant to the Governing Agreements, at Sentinel's request, BNY established and maintained on its books and records, in the name of Sentinel and in a manner consistent with its usual business practices, the following types of accounts: (i) domestic and foreign currency accounts (the "Cash Accounts"); (ii) securities accounts used to settle and clear Sentinel's transactions through the Fed, DTCC, Euroclear and in physical securities (the "Securities Accounts"); and (iii) segregated cash and securities accounts (the "Segregated Accounts"). See Ex. A, § 2.04(a); see also Ex. C, § 2.2(a).

30. The Governing Agreements also permitted BNY to make loans and extend other forms of credit to Sentinel if Sentinel pledged sufficient collateral to BNY. Ex. A, § 2.03(b), Art. III, § 4.07; Ex. C, § 4.3, Art. V, § 6.12. Sentinel pledged financial assets to BNY as collateral by maintaining them in the Cash or Securities Accounts, in which Sentinel granted BNY a security interest and lien. Ex. A, § 3.04; Ex. C, § 5.2.

31. At all times, Sentinel was the only party authorized to direct transfers into, out of and between the Cash, Securities and Segregated Accounts.

32.     Specifically, Sentinel—and only Sentinel—was authorized to direct a transfer out of a Cash or Securities Account and into a Segregated Account by issuing a "Segregation Instruction":

> . . . [Sentinel] shall be entitled to deliver to [BNY] a Segregation Instruction to transfer fully paid for Securities and freely available cash balances into a Segregated Account. . . . [Sentinel] acknowledges and agrees that its issuance to [BNY] of a Segregation Instruction and [BNY's] compliance therewith shall constitute the sole means by which [Sentinel] shall identify to [BNY] any Securities as fully paid for Securities of [Sentinel's] customers or Securities subject to repurchase agreements or other purposes acceptable to [BNY]. [BNY] will not have, and will not assert, any claim or lien against Securities held in a Segregated Account nor will [BNY] grant any third party, including any Federal Reserve Bank, any interest in such Securities.

Ex. A, §§ 2.04(a), 3.04(a); Ex. C, §§ 2.2(a), 5.2.

33.     Likewise, Sentinel—and only Sentinel—was authorized to direct a transfer out of a Segregated Account and into a Cash or Securities Account by issuing a "Desegregation Instruction," each time representing to BNY that it had absolute authority to make the transfer:

> [Sentinel] shall be entitled to deliver to [BNY] a Desegregation Instruction to transfer Securities from a Segregated Account to [an Account]. . . . <u>[Sentinel's] delivery of a Desegregation Instruction shall constitute a representation and warranty by [Sentinel] to and for the benefit of [BNY] that [Sentinel] **is authorized to issue such Desegregation Instruction and by so doing to transfer and pledge to [BNY] the full value of any and all such Securities**</u> . [Sentinel] acknowledges and agrees that upon delivery of Securities to a [non-segregated a]ccount pursuant to a Desegregation Instruction, any and all claims to such Securities by any third party, including without limitation, claims of or by customers or counterparties of [Sentinel], are discharged, extinguished, released and terminated.

Ex. A, § 2.04(b) (emphasis added); Ex. C, § 2.2(b) (emphasis added).

34.     With respect to any and all assets pledged to BNY as collateral by Sentinel, including any assets transferred pursuant to Desegregation Instructions, Sentinel further represented and warranted that it owned the securities free and clear of all liens, claims, security

8

interests and encumbrances or, if the securities were beneficially owned by others, that it had the right to transfer and pledge such assets as collateral to BNY. Ex. A, §§ 2.04(b), 2.06, 4.01(d); Ex. C, §§ 2.2(b), 2.3(c). For example, the 1997 Agreements provide, in pertinent part, as follows:

> **[Sentinel] hereby represents and warrants to [BNY]**, which representations and warranties shall be deemed to be continuing and to be reaffirmed upon the delivery to [BNY] of any Instructions . . . [that Sentinel] owns the Securities in the [Accounts] free and clear of all liens, claims, security interests and encumbrances (except those granted herein) or, **if the Securities in the [Accounts] are owned beneficially by others, [Sentinel] has the right to pledge such Securities to the extent financed by [BNY] hereunder, free of any right of redemption or prior claim by the beneficial owner**; [BNY's] security interest in the Collateral shall be a first lien and security interest subject to no setoffs, counterclaims or other liens prior to or on a parity with it in favor of any other party . . . and [Sentinel] shall take any and all additional steps which [BNY] requires to assure itself of such priority and status, including notifying third parties or obtaining their consent to, [BNY's] security interest; no Securities in the [Accounts] are "securities carried for the account of any customer" within the meaning of Rules 8c-1 or 15c2-1 of the Securities Exchange Act of 1934, as amended[.]

Ex. A, § 4.01(d) (emphasis added); see also Ex. C, § 2.3(c).

35. As security for the payment and performance of Sentinel's obligations to BNY under the Governing Agreements, Sentinel granted BNY a security interest in and lien upon (i) all accounts established and maintained by BNY in Sentinel's name and all financial assets held therein, Ex. A, § 3.04; Ex. C, § 5.2, including the Cash Accounts and the Securities Accounts, (ii) each account in respect of which or for whose benefit Sentinel's indebtedness relates and all financial assets held therein, Ex. C, § 5.2, including the Cash Accounts and the Securities Accounts, (iii) all Sentinel property in the possession or control of BNY, id., including the Cash Accounts and the Securities Accounts, and (iv) all personal property and fixtures of

Sentinel, or in which Sentinel has an interest, wherever located, including any such property and fixtures in BNY's possession or control, Ex. B, p.1; Ex. D, p.1.

36. Notwithstanding the foregoing, BNY expressly disclaimed any security interest in or lien upon all of the Segregated Accounts, which were established and maintained by BNY at Sentinel's request and in Sentinel's name. Ex. A, § 2.04(a); Ex. C, § 2.2(a).

37. Upon any default by Sentinel of its repayment obligations under the Governing Agreements, including the filing of any petition for Chapter 11 bankruptcy protection, BNY has the right to sell or otherwise dispose of any and all of the Collateral pledged by Sentinel and to apply the proceeds toward the outstanding balance of Sentinel's indebtedness. Ex. A, §§ 3.04, 4.03; Ex. B, p.1; Ex. C, § 5.2 & Art. VII; Ex. D, p.1.

38. BNY is also entitled to indemnification from Sentinel for any and all losses sustained or incurred by BNY as a result of its performance, or in connection with the enforcement of its rights, under the Governing Agreements, including reasonable attorneys' fees and expenses. Ex. A, § 4.05(b); Ex. B, p.2; Ex. C, § 6.1(c); Ex. D, p.2.

39. The Governing Agreements are governed by, and construed in accordance with, the laws of the State of New York, without regard to conflict of laws principles. Ex. A, § 4.12; Ex. B, p.3; Ex. C, § 9.6(a); Ex. D, p.3.

### BNY's Extensions of Credit to Sentinel

40. From October 1997 to August 2007, in the ordinary course of business and pursuant to the Governing Agreements, BNY accepted Sentinel's instructions (i) for the receipt, delivery and transfer of cash and securities, (ii) to debit and credit the Cash Accounts and Securities Accounts, and (iii) to make transfers between and among the Cash Accounts, the Securities Accounts and the Segregated Accounts.

41. From October 1997 to August 2007, in the ordinary course of business and pursuant to the Governing Agreements, BNY also regularly made loans and extended other forms of credit to Sentinel, including loans and such other forms of credit to finance the purchase of securities by Sentinel.

42. BNY provided monthly statements to Sentinel that set forth the daily outstanding balance of any such credit extended and the daily interest rate applicable thereto. A copy of the statement setting forth the outstanding principal balance of Sentinel's indebtedness as of the Petition Date is annexed hereto as Exhibit E.

43. To secure Sentinel's obligations to BNY, and in accordance with the Governing Agreements, BNY required Sentinel to maintain at all times in the Cash Accounts and Securities Accounts collateral in an amount satisfactory to BNY. See Ex. B, p.1; Ex. D, p.1.

44. With respect to all cash and securities pledged as collateral to BNY by Sentinel, including any cash and securities transferred pursuant to Desegregation Instructions, BNY relied on Sentinel's express representations and warranties in the Governing Agreements, as well as on its statutory representations and warranties, that it was authorized to transfer and pledge such cash and securities as collateral to BNY. See Ex. A, § 4.01(d); Ex. C, § 3.3(c).

**Sentinel's Default**

45. Upon information and belief, on August 13, 2007, Sentinel announced to its customers that it was halting all redemptions of customer assets as a result of the ongoing liquidity crisis in the credit markets.

46. On August 17, 2007, Sentinel filed for Chapter 11 bankruptcy protection in this Court. The filing constituted an event of default under the Governing Agreements (the "Default").

47. As of the Petition Date, the principal balance of Sentinel's outstanding indebtedness to BNY was $312,247,000.

48. BNY relied on the fact that Sentinel's obligations are secured by a valid, first-priority, perfected security interest in and lien upon the Collateral in extending this credit to Sentinel.

## ACTUAL CONTROVERSY

49. The Trustee is "investigating the basis, validity and extent of BNY's asserted liens and interests in the BNY Collateral." Stipulation and Order Authorizing Sale of Securities at 2 (Dec. 13, 2008).

50. On January 18, 2008, BNY filed a proof of claim in Sentinel's Chapter 11 case.

51. Thus, an actual controversy currently exists between BNY and the Trustee with respect to the basis, validity and extent of BNY's security interest and lien upon the Collateral.

52. The declaratory relief requested is urgently required because the resolution of this adversary proceeding will clarify and resolve the relative rights and obligations between BNY and the other parties in interest, which will materially impact the value of Sentinel's estate and any proposed distribution thereof in the above-captioned Chapter 11 bankruptcy proceeding.

## COUNT I

**Request for Declaratory Judgment that BNY Has a Valid, First-Priority, Perfected Security Interest In and Lien Upon the Collateral By Statute and Operation of Law**

53. BNY restates and realleges each and every allegation contained in Paragraphs 1 through 52 of this Complaint as if fully set forth herein.

54. From time to time prior to the Petition Date, BNY received instructions from Sentinel pursuant to which BNY purchased securities for credit to Sentinel's Securities Accounts.

55. Sentinel was obligated to pay the purchase price for the securities to BNY at the time of purchase.

56. BNY credited the securities to Sentinel's Securities Accounts before such payment was made.

57. To date, Sentinel has not paid BNY for some or all of these securities.

58. The entitlements to these securities comprise a portion of the Collateral.

59. Based upon the foregoing, BNY seeks a judgment declaring that, pursuant to Articles 8 and 9 and the New York Uniform Commercial Code, BNY has a valid, first-priority, perfected security interest in and lien upon the Collateral by statute and operation of law.

## COUNT II

**Request for Declaratory Judgment that BNY Has a Valid, First-Priority, Perfected Security Interest In and Lien Upon the Collateral Pursuant to The Governing Agreements**

60. BNY restates and realleges each and every allegation contained in Paragraphs 1 through 59 of this Complaint as if fully set forth herein.

61. BNY has a security interest in the Collateral pursuant to the Governing Agreements.

62. At all relevant times, BNY has been and continues to be the depository for the Cash Accounts, and has had and continues to have control over the Cash Accounts and the cash on deposit in such Cash Accounts.

63. At all relevant times, BNY has been and continues to be the securities intermediary with respect to the Securities Accounts, and has had and continues to have control over the Securities Accounts and the securities entitlements held therein.

64. At all relevant times, BNY had and continues to have actual physical possession of all certificated securities that comprise a portion of the Collateral.

65. BNY's security interest has attached to the Collateral, is enforceable against Sentinel, and is perfected by control because:

   a. BNY gave value for its security interest in the Collateral by making loans and extending other forms of credit to Sentinel;

   b. Sentinel owned or had the right to grant security interests in the Collateral, as it represented and warranted to BNY in the Governing Agreements;

   c. Sentinel authenticated security agreements that provide a description of the Collateral by executing and delivering the Governing Agreements; and,

   d. BNY has control of the Collateral:

      i. Collateral consisting of deposit accounts (the Cash Accounts) and cash in such deposit accounts is in BNY's control because BNY is both the secured party and the bank with which the deposit accounts are maintained;

      ii. Collateral consisting of investment property, including securities accounts (the Securities Accounts) and the securities entitlements held therein, is in BNY's control because Sentinel is the entitlement holder, BNY is Sentinel's securities intermediary and

        Sentinel granted BNY a security interest in all of its investment property, including the Securities Accounts and the securities entitlements held therein; and,

  iii.  Collateral consisting of certificated securities is in BNY's possession because it is held in a vault at BNY's place of business, in the name of BNY's nominee, with blank indorsements and Sentinel granted BNY a security interest in all of its investment property, including its certificated securities.

66.    Since BNY's security interest in the Collateral is perfected by control, it has priority over claims by Sentinel's customers and any holders of competing security interests perfected by a method other than control.

67.    Based upon the foregoing, BNY seeks a judgment declaring that, pursuant to Articles 8 and 9 and the New York Uniform Commercial Code, it has a valid, first-priority, perfected security interest in and lien upon the Collateral pursuant to the Governing Agreements.

## COUNT III

### Request for Attorneys' Fees and Expenses

68.    BNY restates and realleges each and every allegation contained in Paragraphs 1 through 67 of this Complaint as if fully set forth herein.

69.    Pursuant to the Governing Agreements, BNY is entitled to indemnification from Sentinel for any and all losses sustained or incurred by BNY as a result of its performance, or in connection with the enforcement of its rights, under the Governing Agreements, including reasonable attorneys' fees and expenses.

70.   BNY has incurred and will continue to incur losses as a result of its performance, and in connection with the enforcement of its rights, under the Governing Agreements, including reasonable attorneys' fees and expenses arising out of the above-captioned Chapter 11 bankruptcy proceeding and this adversary proceeding.

71.   Based upon the foregoing, BNY seeks a judgment and order awarding BNY its reasonable attorneys' fees and expenses incurred in this adversary proceeding.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.   That this Court issue a judgment and order declaring that: (1) Plaintiff has a valid, first-priority, perfected security interest in and lien upon the Collateral; and (2) the security interest held by BNY secures Sentinel's obligations under the Governing Agreements, including pre- and post-petition interest and pre-and post-petition fees and expenses;

B.   That this Court issue a judgment and order awarding Plaintiff its reasonable attorneys' fees and expenses incurred in this adversary proceeding; and,

C.  That Plaintiff be awarded such other and further relief as this Court deems just and proper.

Dated: February 28, 2008
       New York, New York

                                        Respectfully submitted,

**MAYER BROWN LLP**

By: /s/ Brian Trust
      Brian Trust (admitted *pro hac vice*)
      1675 Broadway
      New York, New York 10019
      (212) 506-2500

By: /s/ Sean T. Scott
      Sean T. Scott
      71 S. Wacker Drive
      Chicago, IL 60606
      (312) 782-0600

**EMMET, MARVIN & MARTIN, LLP**

Eric M. Reuben
120 Broadway
32nd Floor
New York, NY 10271
(212) 238-3000

*Attorneys for Plaintiff*
*The Bank of New York*