## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HENRY SHATKIN, on behalf of himself and all others similarly situated,   )<br>  )<br>  )<br>Plaintiff,   )<br>v.   )<br>  )<br>THE BANK OF NEW YORK MELLON CORPORATION and THE BANK OF NEW YORK,   )<br>  )<br>  )<br>  )<br>Defendants.   ) | ECF Case<br><br>Civil No. 07 Civ. 7928 (PAC) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY

MAYER BROWN LLP
1675 Broadway
New York, New York  10019
(212) 506-2500

*Attorneys for Defendants*

**TABLE OF CONTENTS**

                                                                    Page

TABLE OF CONTENTS.................................................................. i

TABLE OF AUTHORITIES .............................................................. ii

PRELIMINARY STATEMENT .........................................................1

STATEMENT OF FACTS ................................................................2

    I.  THE PARTIES ....................................................................2

    II.  PLAINTIFF'S ALLEGATIONS.............................................3

    III. SENTINEL'S BANKRUPTCY AND RELATED PROCEEDINGS ..............4

ARGUMENT ...................................................................................6

    I.  PLAINTIFF'S CAUSES OF ACTION MUST BE DISMISSED UNDER
        NEW YORK UCC SECTION 8-503(E)......................................6

        A.  Plaintiff is an "Entitlement Holder," Sentinel is a "Securities
           Intermediary" and BNY is a "Purchaser" Under UCC Section
           8-503 ...................................................................7

        B.  This is an Action Based on Plaintiff's Alleged Property Interest
           in Financial Assets Held by BNY.............................................8

        C.  Because BNY Gave Value, Obtained Control, and Did Not Act
           in Collusion With Sentinel, the Complaint Must Be Dismissed..........10

        D.  The New York Legislature Intended To Protect Purchasers
           Under These Circumstances ..................................................14

    II.  IF THE COMPLAINT IS NOT DISMISSED, THE ACTION MUST BE
        STAYED PURSUANT TO UCC SECTION 8-503(D) ................................16

    III. EVEN IF A STAY WERE NOT MANDATED BY SECTION 8-503(D),
        THIS COURT SHOULD GRANT A STAY AS AN EXERCISE OF
        DISCRETION......................................................................18

CONCLUSION.............................................................................21

# TABLE OF AUTHORITIES

Page(s)

## **Cases**

*Bender v. Phillips*,
    8 P.3d 1074 (Wyo. 2000)........................................................................................11

*Dickerman v. No. Trust Co.*,
    176 U.S. 181 (1900)..........................................................................................11

*Drage v. First Concord Sec., Ltd.*,
    184 Misc. 2d 92 (Sup. Ct. N.Y. 2000) ............................................................ 17-18

*Glendora v. Malone*,
    917 F. Supp. 224 (S.D.N.Y. 1996) ..........................................................................6

*Goldstein v. Time Warner N.Y.C. Cable Group*,
    3 F. Supp. 2d 423 (S.D.N.Y. 1998) ................................................................ 18-19

*HMT, Inc. v. Bell BCI Co.*,
    2007 WL 295328 (W.D.N.Y. Jan. 30, 2007) .........................................................20, 21

*Home Savings of America, FSB v. Amoros*,
    233 A.D.2d 35 (App. Div. 1st Dep't 1997) ...............................................................10

*In re N.Y. Trap Rock Corp.*,
    42 F.3d 747 (2d Cir. 1994)..................................................................................11

*In re Toys "R" Us, Inc. Shareholder Litig.*,
    877 A.2d 975 (Del. Ch. Ct. 2005)..........................................................................11

*Kappel v. Comfort*,
    914 F. Supp. 1056 (S.D.N.Y. 1996).........................................................................20

*Landis v. No. Am. Co.*,
    299 U.S. 248 (1936)..........................................................................................18

*LaSala v. Needham & Co.*,
    399 F. Supp. 2d 421 (S.D.N.Y. 2005).......................................................................19

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006) ...............................................................................10

## TABLE OF AUTHORITIES
(CONTINUED)

Page(s)

**Cases**

*Norwest Mortgage, Inc. v. Dime Sav. Bank of N.Y.*,
    280 A.D.2d 653 (2d Dep't 2001) ...................................................................10

*Patrons Oxford Ins. Co. v. Harris*,
    905 A.2d 819 (Me. 2006) ...........................................................................11

*People v. Coleman*,
    2008 WL 351682 (Ill., Feb. 7, 2008) .........................................................11

*Thermal Imaging, Inc. v. Sandgrain Securities, Inc.*,
    158 F. Supp. 2d 335 (S.D.N.Y. 2001) ........................................................10

**Statutes**

17 C.F.R. § 275.206(4)-2 ....................................................................................14

N.Y. U.C.C. § 1-201 ...........................................................................................8

N.Y. U.C.C. § 8-102 ........................................................................................7, 8

N.Y. U.C.C. § 8-109 .........................................................................................13

N.Y. U.C.C. § 8-503 ................................................................................. *passim*

N.Y. U.C.C. § 8-503, cmt. 3 .....................................................................8, 12, 15

N.Y. U.C.C. § 8-504 .........................................................................1, 7, 11, 13

**Other**

Black's Law Dictionary (8th ed. 2004)................................................................11

The Bank of New York, "Clearing and Financial Advisor Services,"
at http://www.bankofny.com/htmlpages/sss_cls.htm ...........................................2

**TABLE OF AUTHORITIES**
(CONTINUED)

Pages

**Other**

James Steven Rogers,
    "Policy Perspectives on Revised U.C.C. Article 8,"
    43 UCLA Law Rev. 1431 (1996) ............................................................................16

N.Y. U.C.C. Article 8 "Legislative intent and declaration," N.Y. Advance Legislative
Service, 1997 Session, Ch. 566, Assembly Bill 6619-C, 1997 N.Y. A.L.S. 566 ........... 12-13

## PRELIMINARY STATEMENT

In his First Amended Complaint ("Complaint" or "FAC"), Henry Shatkin ("Plaintiff") brings three New York common law causes of action based on the alleged seizure of assets allegedly belonging to Plaintiff and other members of a putative class by defendants The Bank of New York Mellon Corporation and The Bank of New York. Plaintiff seeks to recover the value of those assets on the premise that they were wrongfully pledged as collateral for loans from The Bank of New York ("BNY") to Sentinel Management Group, Inc. ("Sentinel"), a "securities intermediary" that managed the assets for Plaintiff and the other putative plaintiffs and has since filed for bankruptcy in the United States Bankruptcy Court for the Northern District of Illinois ("Bankruptcy Court"). But by labeling his claims negligence, conversion, and breach of fiduciary duty, Plaintiff seeks an end-run around the very New York statute governing this dispute and forbidding, on its face, each of the common law claims asserted here.

That New York statute, N.Y. U.C.C. § 8-503(e), is dispositive, and above all *mandates* dismissal where, as here, an "entitlement holder" (Plaintiff) seeks to recover a financial asset from a "purchaser" (BNY) that (i) gave value to a "securities intermediary" (Sentinel), (ii) obtained control of the financial asset, and (iii) did not act in collusion with the securities intermediary to violate the securities intermediary's obligations under N.Y. U.C.C. § 8-504. It is undisputed, and in its Complaint Plaintiff acknowledges, that BNY gave value to Sentinel in the form of loans and obtained control of the financial assets securing the loans. It is also unquestionable that BNY did not act (and is not even alleged to have acted) in collusion with Sentinel.

Even if the Complaint could somehow survive dismissal, at the very least a stay is required under Section 8-503(d) to allow the court-appointed trustee in the bankruptcy proceedings, in the first instance, to elect to assert the claims alleged in the Complaint or to

recover the assets at issue here. Indeed, by bringing this action in the shadow of ongoing, parallel proceedings in the Bankruptcy Court, Plaintiff seeks to circumvent the structured bankruptcy procedures for creditors seeking to recover assets from a debtor. Finally, given the flurry of activity in the Bankruptcy Court that may well moot – or dramatically narrow – the issues in this case, the Court, in its discretion, should stay this action to avoid (i) the inefficiencies in having two proceedings address precisely the same issues, and (ii) the possibility of duplicative discovery and extraordinary cost and burden to defendants. Such a discretionary stay would be at little or no prejudice to Plaintiff (and the other putative class members), whose interests are represented in the bankruptcy proceedings and who already has filed a proof of claim in the Bankruptcy Court.

## STATEMENT OF FACTS

### I.    THE PARTIES

The Complaint purports to be a "class action on behalf of all clients of non-party Sentinel," an entity that "primarily manages investments of short-term cash for various advisory clients, including futures commodities merchants, hedge funds, financial institutions, pension funds, and individuals." FAC ¶¶ 1-2. Plaintiff Shatkin was one of those clients. FAC ¶ 14. Defendant BNY is a principal subsidiary of defendant The Bank of New York Mellon Corp. FAC ¶ 16. BNY is a leading provider of domestic and global clearing services that clears more than 600,000 securities transactions for its customers every day, including approximately 50% of all transactions in U.S. Government securities. *See* "Clearing and Financial Advisor Services," at http://www.bankofny.com/htmlpages/sss_cls.htm. BNY also plays a vital role in the financial markets by creating liquidity through extensions of credit to its customers, who need to settle securities transactions promptly but may not have cash immediately available at the time of settlement. *See generally id.*

2

## II.    PLAINTIFF'S ALLEGATIONS

According to the Complaint, Sentinel maintained cash and securities in segregated accounts at BNY (the "Segregated Accounts"), and a "house" account "owned by Sentinel" ("Street Account"). FAC ¶¶ 7, 21. Over the course of the 10-year relationship between BNY and Sentinel, Sentinel routinely desegregated financial assets from Segregated Accounts to the Street Account at BNY, and certain of those financial assets were used as collateral to secure loans that BNY extended to Sentinel. FAC ¶¶ 32-33. According to the Complaint, the loans were not being used for the benefit of Sentinel's clients, and the collateral – which BNY allegedly "seized" after Sentinel's collapse in August 2007 – actually belonged to the putative class. FAC ¶ 39. There is no allegation – nor could there be – that a contractual relationship existed between Plaintiff and BNY. The only alleged contract involving Plaintiff was the Investment Advisory Agreement that he allegedly entered into with Sentinel's CEO, a contract that BNY never received. FAC ¶ 24.[1]

Asserting claims of negligence, conversion, and breach of fiduciary duty against BNY, Plaintiff alleges that BNY "wrongfully provided Sentinel with huge loans secured by the value of securities that [it] knew or were negligent or reckless in not knowing rightfully belonged to Plaintiff and the Class," which enabled Sentinel to make "big bets in the credit markets with borrowed money." FAC ¶¶ 6, 29. Plaintiff seeks to recover the assets (or their value) that secured the BNY loans to Sentinel: "nearly $400,000" of Plaintiff's assets alleged to be missing from the Segregated Account, and an estimated total of "more than $700 million" alleged to be missing for the entire putative class. FAC ¶ 43.

---

[1]    Plaintiff also does not allege that BNY knew that Sentinel (purportedly) was not authorized by its clients to transfer and pledge the assets it did, or that BNY knew that the loans (allegedly) were not being used for the benefit of Sentinel's clients.

3

### III. <u>SENTINEL'S BANKRUPTCY AND RELATED PROCEEDINGS</u>[2]

On August 17, 2007, Sentinel filed for bankruptcy protection in the Bankruptcy Court, where proceedings have commenced and discovery is ongoing. FAC ¶ 40. A Trustee was appointed by orders of the Bankruptcy Court, dated August 23 and 29, 2007. *See* Declaration of Hector Gonzalez, dated February 29, 2008 ("Gonzalez Dec."), Exs. B and C. The U.S. Trustee also appointed an Official Committee of Unsecured Creditors ("Creditors Committee"). *Id.*, Ex. D. The Creditors Committee consists mainly of customers of Sentinel, *i.e.*, the putative class here.

On October 11, 2007, the Trustee filed an adversary complaint against Sentinel's principals alleging that they devised and participated in a series of interrelated schemes to defraud Sentinel and its customers. *Id.*, Ex. E. Specifically, the adversary complaint alleges that Sentinel's principals, *inter alia*, made fraudulent misrepresentations about the nature of customer investments; kept inconsistent records of allocations of securities in various bank accounts; fraudulently concealed the existence of leveraging through bank loans; fraudulently diverted income from customers' securities; fraudulently extracted customers' trading gains for personal accounts by insiders; issued false account statements; and engaged in a raft of other fraudulent and wrongful conduct. *Id.*, Ex. E ¶ 4. Not surprisingly, on September 10, 2007, Plaintiff filed his own action against Sentinel's principals in the Northern District of Illinois ("Shatkin/Bloom Action"). *Id.*, Ex. F. Without alleging any collusion between Sentinel and BNY or wrongdoing on the part of BNY – or any improper dealings between Sentinel's principals and BNY – the Shatkin/Bloom Action alleges that Sentinel's principals caused Sentinel to, *inter alia*, obtain unauthorized loans secured by client assets, transfer funds out of the Segregated Accounts and

---

[2]    This description of ongoing bankruptcy and related proceedings relies on publicly filed documents, and is put forth only in support of BNY's motion to stay.

into the Street Account to be used as collateral for loans, and issue inaccurate account statements to clients. This activity is alleged to have caused precisely the same damage as alleged in this case. *Id.*, Ex. F ¶¶ 22-43.

The activity in the Sentinel bankruptcy is ongoing. On October 1, 2007, Plaintiff filed a proof of claim in the Bankruptcy Court in the amount of $453,830, the approximate amount of the "losses" alleged by Plaintiff here ($400,000; *see* FAC ¶ 43). Gonzalez Dec., Ex. G. On October 18, 2007, the Bankruptcy Court so-ordered a stipulation between the Trustee and BNY allowing BNY to turn over to the Trustee all property held in the Segregated Accounts. *Id.*, Ex. H. On December 20, 2007, the Bankruptcy Court entered an order permitting the liquidation of securities currently held by BNY, and allowing BNY to hold the proceeds of such liquidation. *Id.*, Ex. I. The Trustee has obtained an extension of 180 days (through June 13, 2008) in which to file a plan and disclosure statement. *Id.*, Ex. J. And on two separate occasions, the Trustee has filed a motion to extend his time to seek removal of both this action and the Shatkin/Bloom Action to the Bankruptcy Court. *Id.*, Exs. K and L.

Finally, on February 28, 2008, BNY filed a complaint against the Trustee in the Bankruptcy Court seeking a declaratory judgment that by statute and operation of law, and pursuant to governing agreements between BNY and Sentinel, BNY has a valid, first-priority, perfected security interest in and lien upon the collateral securing BNY's loans to Sentinel. *Id.*, Ex. M. In that complaint, BNY alleges, among other things, that Sentinel -- and only Sentinel -- could direct a transfer out of a Segregated Account, and that Sentinel represented that it had the absolute authority to make such transfers. Ex. M. ¶¶ 32-33. Furthermore, Sentinel, in written agreements, "represented and warranted that it owned the securities [pledged as collateral] free and clear of all liens, claims, security interests and encumbrances or, if the securities were

beneficially owned by others, that [Sentinel] had the right to transfer and pledge such assets as collateral to BNY." Ex. M. ¶ 34.

**ARGUMENT**[3]

**I.    PLAINTIFF'S CAUSES OF ACTION MUST BE DISMISSED UNDER NEW YORK UCC SECTION 8-503(E)**

Though Plaintiff alleges various common law causes of action, they are all predicated on the allegation that the securities which are in BNY's possession and control (and which are BNY's collateral) should never have been used to secure BNY's loans. The Bankruptcy Code already provides a structure for the resolution of such claims, but more importantly for present purposes, New York statutory law **_expressly forbids_** suits for the recovery of financial assets in precisely these circumstances, **_no matter how those suits are framed or what legal theory is utilized by an entitlement holder_**.

Section 8-503 of the Uniform Commercial Code, as adopted by the State of New York, directly addresses circumstances identical to those alleged here – namely, where a "securities intermediary" such as Sentinel pledges financial assets supposedly belonging to a customer as collateral for a loan. In such circumstances, the entity providing the loan is deemed a "purchaser" of the assets, and, except in highly specific and unusual circumstances not present here, the customer (the "entitlement holder" of the financial assets pledged) cannot assert any

---

[3]    As an initial matter, defendant The Bank of New York Mellon Corporation should be dropped from this case because it is an improperly named party. The Bank of New York Mellon Corporation is BNY's parent (FAC ¶ 16), and none of the allegations in the Complaint relate to its activities as opposed to those of its subsidiary, BNY. An entity should not be a co-defendant simply by virtue of the fact that another defendant is a subsidiary of that entity. *See Glendora v. Malone*, 917 F. Supp. 224, 227 (S.D.N.Y. 1996) (dismissing parent company of one of the defendants and declaring that dismissal of a parent company pursuant to FED. R. CIV. P. 21 is appropriate when "it is clear that discovery would not likely reveal facts demonstrating that the [parent company] participated" in the alleged wrongful conduct).

6

claim directly against the purchaser to recover those assets. Section 8-503(e) is dispositive and requires dismissal of the Complaint in its entirety.

Under Section § 8-503(e):

> An action based on the entitlement holder's property interest with respect to a particular financial asset * * *, whether framed in conversion, replevin, constructive trust, equitable lien, or other theory, may not be asserted against any purchaser of a financial asset or interest therein who gives value, obtains control, and does not act in collusion with the securities intermediary in violating the securities intermediary's obligations under Section 8-504.[4]

As discussed below, (i) Plaintiff, Sentinel and BNY meet the statutory definitions of "entitlement holder", "securities intermediary", and "purchaser", respectively; and (ii) this is an action based on the Plaintiff's alleged property interest in the financial assets currently held by BNY. Accordingly, because BNY gave value, obtained control, and is not alleged to have acted in collusion with Sentinel (and, in fact, did not act in collusion with Sentinel) in violating Sentinel's obligations under Section 8-504, the Complaint should be dismissed as a matter of law.

A.    **Plaintiff is an "Entitlement Holder," Sentinel is a "Securities Intermediary" and BNY is a "Purchaser" Under UCC Section 8-503**

It is indisputable that Sentinel is a "securities intermediary," Plaintiff is an "entitlement holder," and BNY is a "purchaser" within the meaning of UCC Section 8-503. Sentinel is a "securities intermediary" – defined as either a clearing corporation or "a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity" (N.Y. U.C.C. § 8-102(14)) – because, according to the Complaint, it is

---

[4]    Section 8-504 imposes certain obligations on a securities intermediary, including that the securities intermediary "shall promptly obtain and thereafter maintain a financial asset in a quantity corresponding to the aggregate of all security entitlements it has established in favor of its entitlement holders with respect to that financial asset. The securities intermediary may maintain those financial assets directly or through one or more other securities intermediaries." N.Y. U.C.C. § 8-504(a).

a manager of assets and investments that maintains securities accounts for its customers, including Plaintiff (FAC ¶¶ 1, 2). Plaintiff is an "entitlement holder" – defined as "a person identified in the records of a securities intermediary as the person having a security entitlement against the securities intermediary" (NY UCC § 8-102(7)) – because he allegedly was a customer of Sentinel who signed an Investment Advisory Agreement declaring that Sentinel "shall not own or have any interest in funds or securities in the Account or of any other funds or securities in which Client has a beneficial interest" (FAC ¶ 23). And BNY, under the terms of Section 8-503, is a "purchaser" because it allegedly has taken assets "by sale, lease, discount, negotiation, mortgage, *pledge*, *lien*, *security interest*, issue or reissue, gift, or any other voluntary transaction creating an interest in property." N.Y. U.C.C. § 1-201(29), (30) (emphasis added). On its face, this definition encompasses a creditor that obtained a security interest in financial assets, and the official comments to Section 8-503 only reinforce the point: "The rules of Section 8-503(c) through (e) apply to transferees generally, including pledgees." N.Y. U.C.C. § 8-503, cmt. 3.

**B.**    **This is an Action Based on Plaintiff's Alleged Property Interest in Financial Assets Held by BNY**[5]

This is "[a]n action based on the entitlement holder's property interest with respect to a particular financial asset" because, at its core, the Complaint seeks recovery of the value of financial assets. The Complaint refers to Sentinel "improperly shifting . . . client assets" to accounts "where the assets were used as security for Sentinel's huge line of credit." FAC ¶ 7. It alleges that the assets "rightfully belong to Plaintiff and the Class." FAC ¶ 10. The main section of the Complaint describing the allegedly wrongful conduct is titled: "Assets Belonging to

---

[5]    Plaintiff alleges that the financial assets that are the subject to this suit are the property of Plaintiff and the putative class. BNY accepts these allegations as true solely for purposes of this Motion, and for no other purpose. For the reasons discussed below, even assuming that plaintiff has a property interest in the financial assets at issue here, plaintiff's claims should still be dismissed as a matter of law.

Plaintiff and the Class Are Used as Collateral to Secure Huge Loans Made by the Defendants to Sentinel." FAC ¶ 28. Plaintiff alleges that "specific assets" listed on Plaintiff's client report "appear[ed] on a list of collateral held by the Defendants" (FAC ¶ 37), and that "[c]ertain of the securities that Defendants have seized and has [sic] either sold or intends [sic] to sell are, on information and belief, the rightful property of Plaintiff and the Class" (FAC ¶ 42). And Plaintiff's alleged damages, and those of the putative class, are defined entirely in terms of the assets "missing" from the Segregated Accounts. FAC ¶ 43. It is plain that Plaintiff is seeking the recovery of financial assets.

In fact, the only activity that allegedly gives rise to BNY's liability is BNY's alleged "purchase" of assets that Plaintiff now claims are his. The wrongful conduct alleged to have been committed by BNY, and the premise of the three common law claims, boils down to (i) BNY having "allowed" Sentinel to transfer assets from the Segregated Accounts to the Street Account (FAC ¶¶ 28, 32), and (ii) BNY having "wrongfully provided Sentinel with huge loans secured by the value of securities that they knew or were negligent or reckless in not knowing rightfully belonged to Plaintiff and the Class" (FAC ¶ 29). Both of these purported actions would constitute BNY's "purchase" of assets. As the Complaint alleges, when these assets were transferred out of the Segregated Accounts and into the Street Account, they "became immediately subject to a security agreement in favor of the Defendants guaranteeing a previously issued line of credit from the Defendants to Sentinel." FAC ¶ 33. In other words, according to the Complaint, the transfer *was* the purchase. Without that purchase, the assets would have remained in the Segregated Account, unencumbered. There would have been no alleged

misappropriation of Plaintiff's assets, and no damage to Plaintiff because no assets would be "missing." There would be no claim against BNY.[6]

Plaintiff seeks to make an end-run around Section 8-503 by labeling his assorted causes of action as negligence, conversion, and breach of fiduciary duty, but Section 8-503(e) expressly precludes this type of artful pleading. On its face, Section 8-503(e) applies to all actions "based on the entitlement holder's property interest with respect to a particular financial asset" *no matter how the cause of action is framed*, "whether framed in *conversion*, replevin, constructive trust, equitable lien, *or other theory*." N.Y. U.C.C. § 8-503(e) (emphasis added).

For all these reasons, this Complaint constitutes an "an action based on the entitlement holder's property interest with respect to a particular financial asset."

### C.   Because BNY Gave Value, Obtained Control, and Did Not Act in Collusion With Sentinel, the Complaint Must Be Dismissed

As discussed, under Section 8-503(e), Plaintiff is *forbidden* from asserting claims against a "purchaser" – BNY – who "gives value, obtains control, and does not act in collusion with the securities intermediary in violating the securities intermediary's obligations under Section 8-

---

[6]     Notably, the Complaint does not (and cannot) allege any contract between BNY and the Plaintiff, or any other source of duties running from BNY to Sentinel's customers. The Investment Advisers Act provision cited in the Complaint (FAC ¶ 28) imposes no duties whatsoever on a bank in BNY's position (*see* n.7, *infra*), and New York has long adhered to the general rule that "a depository bank has no duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those accounts from fiduciary misappropriation." *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 287 (2d Cir. 2006) (quoting *Norwest Mortgage, Inc. v. Dime Sav. Bank of N.Y.*, 280 A.D.2d 653,654 (2d Dep't 2001)). New York courts have recognized an exception to this rule only in very rare instances where a bank "has *actual knowledge or notice* that a diversion is to occur or is ongoing." *Home Savings of America, FSB v. Amoros*, 233 A.D.2d 35, 39 (App. Div. 1st Dep't 1997) (emphasis added); *Lerner*, 459 F.3d at 287-90. For reasons discussed *infra*, Plaintiff does not and cannot allege any activity that provided BNY with such "actual knowledge or notice." Finally, under New York law, a party does not owe duties to the client of a client. *See Thermal Imaging, Inc. v. Sandgrain Securities, Inc.*, 158 F.Supp.2d 335, 343 (S.D.N.Y. 2001).

504." Because all three conditions have been satisfied here, the Complaint should be dismissed in its entirety.

First, Plaintiff admits that BNY "gave value" – namely, by giving loans to Sentinel in consideration for a security interest in the pledged financial assets. FAC ¶¶ 5, 28. Second, Plaintiff admits that BNY obtained control of the assets; according to the Complaint, BNY has "seized" securities belonging to Shatkin and the other potential plaintiffs. FAC ¶ 42. And third, Plaintiff has not alleged any conduct that would constitute "collusion" between BNY and Sentinel in Sentinel's violation of its obligations under Section 8-504. Indeed, the Complaint contains no allegation that Sentinel even breached its obligations under Section 8-504 or that BNY colluded in Sentinel's violation of those obligations.

Collusion is a standard legal term that means an "agreement to defraud another or to do or obtain something forbidden by law." BLACK'S LAW DICTIONARY (8th ed. 2004) (emphasis added). The United States Supreme Court has defined collusion as "an agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law." *Dickerman v. No. Trust Co.*, 176 U.S. 181, 190 (1900) (internal quotation marks omitted) (emphasis added); *see also In re N.Y. Trap Rock Corp.*, 42 F.3d 747, 752 (2d Cir. 1994) (defining collusion as "secret cooperation for a fraudulent or deceitful purpose" (internal quotation marks omitted)); *People v. Coleman*, --- N.E.2d ---, 2008 WL 351682, at *7 (Ill., Feb. 7, 2008) (defining collusion as "a secret agreement; secret cooperation for a fraudulent or deceitful purpose" (internal quotation marks omitted)); *In re Toys "R" Us, Inc. Shareholder Litig.*, 877 A.2d 975, 1019 n.50 (Del. Ch. Ct. 2005) (same); *Patrons Oxford Ins. Co. v. Harris*, 905 A.2d 819, 828 (Me. 2006) (relying upon definition from Black's Law Dictionary); *Bender v. Phillips*, 8 P.3d 1074, 1078 & n.2 (Wyo. 2000) (same).

11

The Official Comment to Section 8-503 elaborates on the definition of "collusion," making clear that the "purchaser" – here, BNY – must have "affirmatively engaged in wrongful conduct." Official Comment 3 first observes that the purpose of the collusion test is to further "the interests of investors generally." The Comment then describes the collusion standard and its operation:

> *[C]ustomers of a failed intermediary must show that the transferee from whom they seek to recover was **affirmatively engaged in wrongful conduct**, rather than casting on the transferee any burden of showing that the transferee had no awareness of wrongful conduct by the failed intermediary*. The rule of Section 8-503(e) is based on the long-standing policy that *it is undesirable to impose upon purchasers of securities any duty to investigate whether their sellers may be acting wrongfully*.

N.Y. U.C.C. § 8-503, cmt. 3 (emphasis added). In addition, when it adopted Article 8 of the U.C.C. the New York legislature discussed the meaning of collusion in a statement of legislative intent:

> *The legislature intends collusion to include acting in concert, acting by conspiratorial arrangement, or acting by agreement for the purpose of violating the entitlement holder's rights or with actual knowledge that the securities intermediary is violating those rights.*

N.Y. U.C.C. Article 8 "Legislative intent and declaration," N.Y. Advance Legislative Service, 1997 Session, Ch. 566, Assembly Bill 6619-C, available on LEXIS at 1997 N.Y. A.L.S. 566, *1.

The clear message of these various definitions of "collusion" is that a purchaser must do something substantially more than passively not protect an entitlement holder from a securities intermediary's violation of its duties. The purchaser must have "affirmatively engaged in wrongful conduct," and is under no independent obligation to investigate whether the securities intermediary is acting wrongfully. *See also* 1997 N.Y. A.L.S. 566, *1 (declaring that "nothing in this [collusion] standard imposes a duty of inquiry" and that "a purchaser's knowledge of the

12

precarious financial situation of the financial intermediary coupled with rumors, allegations, or reports of suspected wrongdoing does not amount to collusion").

The Complaint never so much as mentions "collusion," and the conduct it describes as "wrongful" falls woefully short of meeting that definition. Plaintiff alleges simply that Sentinel transferred assets from Segregated Accounts to the Street Account, that BNY was "aware of (or [was] negligent or reckless in not being aware of)" a regulation disallowing such a transfer, and that BNY "knew or should have known" that the assets securing BNY's loans (which allegedly were not used for Plaintiff's benefit) were customer assets. But there is no allegation of cooperation or agreement between BNY and Sentinel to violate Sentinel's obligations under Section 8-504 or to defraud Sentinel's customers or violate the law. There is no allegation that BNY knew that Sentinel (purportedly) was not authorized by its clients to transfer and pledge the assets it did. And there is no allegation that BNY knew that the loans (allegedly) were not being used for the benefit of Sentinel's clients. Indeed, BNY was entitled to rely on representations of Sentinel that the financial assets BNY received as collateral were free of adverse claims. *See* N.Y. U.C.C. § 8-109 (requiring that a "person who originates an entitlement order to a securities intermediary warrant[]" that such person is entitled to make such order and that there is "no adverse claim to the security entitlement"). If Sentinel was, in fact, engaged in wrongful conduct and concealing that wrongful conduct not only from its customers but also from BNY, that comes nowhere close to suggesting that BNY was aware of, let alone affirmatively agreed to and engaged in, that wrongful conduct. And the fact that Sentinel allegedly violated its own

obligations under the regulation cited by Plaintiff – a regulation that imposes no duty whatsoever on BNY – hardly rises to the level of "collusion."[7]

Because the Complaint does not allege activity that fits within the limited exceptions to Section 8-503(e), the Complaint must be dismissed.

### D.    The New York Legislature Intended To Protect Purchasers Under These Circumstances

It is not simply that the Complaint should be dismissed based on a plain reading of Section 8-503(e). The legislative history – as evidenced by the Official Comments to Section 8-503 and a description of its drafting history by the official Reporter – demonstrates that the allegations in this case present a paradigmatic example of a situation where a purchaser is protected under Section 8-503(e) from claims by an alleged entitlement holder. The New York legislature has carefully considered the balance of equities, and determined that to allow customers of a failed securities intermediary to look past that intermediary to purchasers of those customers' assets would fundamentally undermine the larger interests of the securities markets. According to the Official Comment to Section 8-503, the rules for governing securities intermediaries and purchasers should be assessed from a "forward-looking perspective" and not

---

[7]      The regulation to which Plaintiff refers is Section 275.206(4)-2(a) of the Investment Advisers Act, which makes it unlawful for an "investment adviser" to have custody of client funds or securities unless, among other things, a "qualified custodian" maintains those funds and securities in a separate account for each client, or in an account in the investment adviser's name "as agent or trustee for the clients." It imposes no duties on the "qualified custodian." 17 C.F.R. § 275.206(4)-2.

Moreover, this provision creates no obligation on the part of the qualified custodian to inform the investment adviser's customers of any transfer of assets. Although an account statement may be delivered by the qualified custodian to the investment adviser's customer, that becomes unnecessary where, as here, the "investment adviser" sent account statements directly to its customers. 17 C.F.R. § 275.206(4)-2(a)(3)(ii); FAC ¶ 36 (describing alleged misrepresentations in a client account statement "from Sentinel").

based on what may be advantageous "to a particular class of persons" in the occasional case in which someone acted wrongfully:

> *Although one can devise hypothetical scenarios where particular customers might find it advantageous to be able to assert rights against someone other than the customers' own intermediary, commercial law rules that permitted customers to do so would impair rather than promote the interest of investors and the safe and efficient operation of the clearance and settlement system . . .* There is no reason to think that rules permitting customers of an intermediary to trace and recover securities that their intermediary wrongfully transferred work to the advantage of investors in general. To the contrary, application of such rules would often merely shift losses from one set of investors to another. The uncertainties that would result from rules permitting such recoveries would work to the disadvantage of all participants in the securities markets.

N.Y. U.C.C. § 8-503, cmt. 3 (emphasis added).

Moreover, the drafters extended the protections of Section 8-503 to entities such as BNY that secured loans with financial assets from a securities intermediary such as Sentinel, *even if those entities knew that the assets belonged to customers of a securities intermediary*. As the Reporter to the Drafting Committee to Revise U.C.C. Article 8 wrote in a law review article describing the operation and purpose of Article 8:

> Some have suggested that although persons who buy securities from intermediaries should not take the risk that the intermediary was acting wrongfully as against customers, different considerations are presented when an intermediary borrows money and grants a security interest in securities. The Article 8 Drafting Committee considered this point at great length and concluded that no such distinction should be drawn. As is the case with outright sales of customers' securities, *there is nothing unusual or suspicious about a transaction in which a securities intermediary pledges securities that it was holding for its customers*. That is how margin lending is commonly financed. Although some very large brokers may be able to fund margin lending internally, smaller firms can offer that service only by "rehypothecating" their customer's securities. The customer borrows from the broker, granting the broker a security interest in the securities, and the

> broker obtains the money it lends to the customer by borrowing it from a bank, granting the bank a security interest in the securities that the broker holds as pledgee. In effect, the broker goes to a bank and says, "Here are some securities that I am holding for my customers. I want you to lend money to me, and I will grant you a security interest in these customers' securities. My customers have authorized me to do so." There is nothing suspicious about the transaction. It is, of course, possible that the broker is lying when it asserts that the customers authorized the transaction, but that is no different from the routine transaction in which a broker sells a customer's securities purporting to be authorized by the customer.

James Stevens Rogers, "Policy Perspectives on Revised U.C.C. Article 8," 43 UCLA Law Rev. 1431, 1533-34 (1996) (emphasis added).

Accordingly, the allegation that BNY somehow "knew" or was "negligent or reckless in not knowing" that the pledged assets "rightfully belonged to Plaintiff" (FAC ¶ 29) is beside the point. Even if Sentinel's alleged use of customer assets was unauthorized, there is no allegation – nor could there be given the contractual and statutory representations that Sentinel made to BNY – that BNY knew (or should have known) that the use of these assets was improper.

For all of these reasons, the Complaint should be dismissed in its entirety.

## II.    IF THE COMPLAINT IS NOT DISMISSED, THE ACTION MUST BE STAYED PURSUANT TO UCC SECTION 8-503(D)

Under New York statutory law, even if the Complaint could somehow be read as adequately alleging "collusion" for the purposes of Section 8-503(e), this action should be stayed. Section 8-503(d) expressly forbids an action by an entitlement holder against a purchaser from proceeding until the trustee or other liquidator in the bankruptcy proceedings elects not to file a claim to recover the financial asset.

Section 8-503(d) states that an "entitlement holder's property interest with respect to a particular financial assets * * * may be enforced against a purchaser" only if certain conditions are met, including the initiation of insolvency proceedings and the condition that the purchaser

"is not protected under subsection (e)." Section 8-503(d) therefore requires that an entitlement holder clear the hurdles of Section 8-503(e) in order to be able to enforce a claim against a purchaser. However, even if all of these conditions are satisfied, ***no action may be brought until the Trustee in the insolvency proceeding, in the first instance, has elected not to pursue a claim against the purchaser***:

> The trustee or other liquidator, acting on behalf of all entitlement holders having security entitlements with respect to a particular financial asset, may recover the financial asset, or interest therein, from the purchaser. ***If the trustee or other liquidator elects not to pursue that right, an entitlement holder whose security entitlement remains unsatisfied has the right to recover its interest in the financial asset from the purchaser.***

N.Y. U.C.C. § 8-503(d) (emphasis added).

Assuming for present purposes that the conditions for enforcement of an entitlement holder's property interest are met and BNY is not protected under Section 8-503(e) (despite the absence of a single allegation of collusion), it is only if the Trustee elects not to recover the assets from BNY that the entitlement holder – Plaintiff – can seek to recover its alleged interest from BNY.

On this question, *Drage v. First Concord Sec., Ltd.*, 184 Misc. 2d 92 (Sup. Ct. N.Y. 2000), the lone case applying Section 8-503(d) under similar circumstances, is dispositive.[8] In *Drage*, the plaintiff maintained a brokerage account with First Concord Securities (FCS). FCS, the securities intermediary, opened a security clearance account with M&T Bank. In connection with the opening of the account, M&T issued FCS a demand promissory note, so that it could make advances to FCS secured by assets held in the account. FCS ultimately defaulted on those

---

[8] The *Drage* court found that collusion was adequately alleged for purposes of Section 8-503(e), based on allegations that the defendant bank affirmatively engaged in wrongful conduct, unlike the allegations against BNY here. 184 Misc. 2d at 98.

advances, and M&T seized the assets held in the FCS account. *Id.* at 94. Plaintiff brought

claims of conversion, constructive trust, and negligence against M&T.

Analyzing the defendant's request for a stay under Section 8-503(d), the New York State

Supreme Court held that a stay was required:

> [B]ecause UCC 8-503(d) and the Official Comments to UCC 8-511 make clear that an entitlement holder like plaintiff, through its representative in insolvency proceedings, must first attempt to recover the interest from the secured creditor before prosecuting a separate action, this action . . . must be stayed pending resolution of the foreign insolvency proceeding.

*Id.* at 99.

Section 8-503(d) provides the only circumstances under which Plaintiff and the putative

class can enforce a claim against BNY. Even if Plaintiff could satisfy the four conditions set

forth in Section 8-503(d) – and it cannot – a stay is mandated so that the bankruptcy proceedings

can run their course.[9]

## III.    EVEN IF A STAY WERE NOT MANDATED BY SECTION 8-503(D), THIS COURT SHOULD GRANT A STAY AS AN EXERCISE OF DISCRETION

Even if Section 8-503(d) did not mandate a stay, which it does, a stay would still be

appropriate as an exercise of this Court's discretion. The power to grant a stay stems from the

inherent powers of the Court: "The power to stay proceedings is incidental to the power inherent

in every court to control the disposition of the causes on its own docket with economy of time

and effort for itself, for counsel, and for litigants." *Landis v. No. Am. Co.*, 299 U.S. 248, 254

(1936). According to Judge Sand:

> A trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case. This rule applies whether the separate

---

[9]    To be clear, even if the Trustee elects to assert causes of action against BNY or to file a claim to recover the financial assets from BNY, that claim would be completely without merit and all defenses would be available to BNY in such an action.

> proceedings are judicial, administrative, or arbitral in character, and does not require that the issues in such proceedings are necessarily controlling of the action before the court.

*Goldstein v. Time Warner N.Y.C. Cable Group*, 3 F. Supp. 2d 423, 437-38 (S.D.N.Y. 1998).

If this case is not dismissed, as it should be, few situations in a federal court cry out for a discretionary stay as strongly as this one.  As discussed above, bankruptcy proceedings have commenced in the Northern District of Illinois, discovery is ongoing, and Sentinel's conduct and BNY's entitlement to its collateral are currently the subject of examination by the Trustee. Plaintiff has filed a proof of claim in the Bankruptcy Court (Gonzalez Dec., Ex. G), the Trustee has filed an adversary complaint against Sentinel's principals (*id.*, Ex. E), stipulations concerning the assets held by BNY have been so-ordered by the Bankruptcy Court (*id.*, Ex. H), and the Trustee has filed two motions to extend his time to seek removal of this action to the Bankruptcy Court (*id.*, Exs. K and L).  Furthermore, BNY has filed a complaint for declaratory judgment against the Trustee asserting that it has a valid, first-priority, perfected security interest and lien upon "cash and securities held in all accounts established and maintained for Sentinel by BNY other than accounts that were specifically named and designated as 'segregated accounts'" – that is, the very assets at issue in this case.  Ex. M ¶ 1.  Whatever the outcome of the bankruptcy proceedings, the events currently unfolding in the Bankruptcy Court will unquestionably impact this case by rendering moot, or at the very least substantially narrowing, the issues here.

The proceedings in the Bankruptcy Court constitute ongoing, parallel litigation – the classic situation justifying the imposition of a stay.  *See LaSala v. Needham & Co.*, 399 F. Supp. 2d 421, 427 (S.D.N.Y. 2005) ("a court might, in the interest of judicial economy, enter a stay pending the outcome of proceedings which bear upon the case, even if such proceedings are not necessarily controlling of the action that is to be stayed").  The parties to the parallel proceeding

need not be the same for a stay to be warranted, so long as the proceeding subject to the stay would be affected by the parallel proceeding. *HMT, Inc. v. Bell BCI Co.*, 2007 WL 295328, at *3 (W.D.N.Y. Jan. 30, 2007).

Though the grant of a stay is a pure exercise of discretion on the part of a court, and there is no hard-and-fast test for when a stay is appropriate, this Court will generally look to five factors articulated in *Kappel v. Comfort*, 914 F. Supp. 1056 (S.D.N.Y. 1996). Those factors include (i) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (ii) the private interests of and burden on the defendants; (iii) the interests of the courts; (iv) the interests of persons not parties to the civil litigation; and (v) the public interest. *Id.* at 1058.

Each of these five factors counsels strongly for a discretionary stay here. Plaintiff would suffer no prejudice from a stay; his interests are being represented in the bankruptcy proceedings and he has filed a proof of claim in the Bankruptcy Court in the amount of the alleged "losses" here. The burden on BNY of proceeding in this action is enormous, because it raises the specter of duplicative discovery, which would require a tremendous investment of time and resources by BNY, and even the possibility of conflicting rulings. The interest of the courts clearly weigh in favor of a stay, so that each issue will only be litigated a single time, and the Court need not resolve an issue that may well be rendered moot, or dramatically altered, by events in the Bankruptcy Court. The interests of persons not parties to this litigation also weigh heavily in favor of a stay because, after the implosion of Sentinel, there are limited funds available for recovery and allowing Plaintiff to proceed outside of the orderly bankruptcy procedures creates the likelihood that other customers and creditors of Sentinel will not be treated fairly. Finally, the public has a strong interest in the bankruptcy procedures taking precedence, and disallowing

parties such as Plaintiff to do an end-run around those procedures.  As another court in this Circuit recently noted in granting a stay, waiting for the other proceedings to conclude would "more than likely narrow the issues before this Court and ultimately save the parties and the Court from a needless or duplicative expenditure of resources." *HMT, Inc.*, 2007 WL 295328, at *2.

## **CONCLUSION**

This Court should grant BNY's motion to dismiss or, in the alternative, stay this action pending resolution of the parallel proceedings in the Bankruptcy Court.

Dated: New York, New York
February 29, 2008

Respectfully submitted,

MAYER BROWN LLP

By:    /s/ *Hector Gonzalez*___
       Hector Gonzalez
       Matthew D. Ingber
       Daniel Kirschner

1675 Broadway
New York, New York 10019
(212) 506-2500

*Attorneys for Defendants*
