# Exhibit C

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **SENTINEL MANAGEMENT GROUP, INC.,** | ) | **CASE NO. 07 B 14987** |
| | ) | |
| Debtor. | ) | Hon. John H. Squires |
| ——————————————————— | ) | |
| | ) | |
| **FREDERICK J. GREDE**, as Chapter 11 Trustee | ) | |
| for Sentinel Management Group, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **ADV. NO. _____** |
| **THE BANK OF NEW YORK** and | ) | |
| **THE BANK OF NEW YORK MELLON** | ) | |
| **CORP.,** | ) | |
| | ) | |
| Defendants. | | |

## <u>COMPLAINT</u>

Plaintiff Frederick J. Grede, not individually but as Chapter 11 Trustee ("the Trustee") for Sentinel Management Group, Inc. ("Sentinel" or "Debtor"), hereby states for his Complaint as follows:

### <u>NATURE OF THE ACTION</u>

1.      This is an adversary proceeding by the Trustee against The Bank of New York and The Bank of New York Mellon Corp. (hereafter collectively referred to as "BONY").  For more than ten years BONY performed three roles for Sentinel, acting as custodian of securities on behalf of Sentinel and its customers, clearing agent for Sentinel's securities transactions, and lender to Sentinel.

2.      In August 2007, Sentinel's business collapsed, costing Sentinel and its customers hundreds of millions of dollars.  BONY's misconduct played a pivotal role in that collapse, in at least four distinct ways.

3.     First, ***BONY established a fundamentally flawed account structure for Sentinel's accounts in violation of its obligations under federal law and its duties to Sentinel.*** The account structure: (a) commingled customer assets,[1] which should have been strictly segregated, with Sentinel's own assets and the assets of other customers; (b) facilitated the misuse of customer assets as security for BONY's loan to Sentinel; and (c) allowed BONY, on a daily basis, to apply the proceeds of virtually every securities transaction involving customer assets to pay down a portion of Sentinel's debt to BONY.

4.     Second, ***BONY aided and abetted breaches of fiduciary duty committed by certain Sentinel insiders***.  These Sentinel insiders misused what were supposed to be customer securities for their own financial benefit, causing Sentinel hundreds of millions of dollars in losses.  BONY colluded in and knowingly facilitated this misconduct.

5.     Third, ***BONY knowingly accepted fraudulent and preferential transfers as part of the Sentinel insiders' scheme***, disregarding the overwhelming evidence that the insiders were acting improperly.

6.     Fourth, ***BONY engaged in inequitable conduct***.   BONY's bad faith and inequitable conduct included:  (a) violating the Commodity Exchange Act and participating in violations of the Investment Advisers Act of 1940; (b) extending credit to Sentinel far in excess of any reasonable line of credit for Sentinel's business, having actual knowledge that Sentinel did not have sufficient assets to secure that credit and would need to use customer assets to secure those loans; (c) illegally transferring securities from a segregated customer account to a collateral account in order to secure its own loan; (d) consistently preferring its own pecuniary

---

[1]     Unless noted otherwise, the terms "customer assets" and "customer securities" are used in this Complaint to describe assets and securities which were supposed to be, but were not, separately accounted for and segregated for the benefit of customers.

interests as a lender to its obligations under federal law and its duty to segregate and hold in custody Sentinel's customer assets; and (e) asserting liens over assets which it knew were intended to be segregated for customers.

7.      BONY's motive to participate in this misconduct was pecuniary:  it generated tens of millions of dollars in interest income on its ever-increasing loan to Sentinel.  Indeed, as a BONY officer explained in an email to colleagues on April 24, 2006:  "Sentinel Investment Management is one of SIBD (and the Bank's) biggest customers in regard to Credit (loans)."

8.      Absent the unlawful account structure established by BONY and BONY's other misconduct, Sentinel's collapse would not have occurred, and Sentinel would not have suffered hundreds of millions of dollars in losses and increased liabilities.

9.      The Trustee brings this action for, among other causes of action, avoidance and recovery of fraudulent and preferential transfers, equitable subordination and transfer of subordinated lien, aiding and abetting breaches of fiduciary duty, disallowance of proof of claim, and a determination that the liens asserted by BONY cannot be enforced and are invalid.

10.     This Complaint seeks damages exceeding Five Hundred and Fifty Million Dollars ($550,000,000).

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) because this adversary proceeding arises in, is related to, and arises under the Chapter 11 case, *In Re Sentinel Management Group, Inc.*, pending in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, as Case No. 07 B 14987.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

13.     This Complaint is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (C), (E), (F), (H), (K) and (O).

14.     BONY has expressly submitted itself to the equitable jurisdiction of this Court by, *inter alia*, filing a proof of claim and demanding adequate protection and by filing a complaint for declaratory judgment.

15.     The Trustee is the representative of the Debtor's estate and has standing to bring each of the claims set forth in this Complaint pursuant to section 323 of the Bankruptcy Code. To the extent any of the claims set forth herein seek recovery of, or arise from or relate to, any transfers of customer assets to or for the benefit of BONY, such transferred assets are property of the Debtor's estate by virtue of, among other things, the Debtor's failure to separately account for those assets, the commingling of those assets, Sentinel's treatment of those assets, and the other facts and circumstances of the Debtor's case.

16.     The Debtor's case is pending as a case under chapter 11 of the Bankruptcy Code. In the event that this Court converts the Debtor's case to a case under subchapter III of chapter 7 of the Bankruptcy Code (Stockbroker Liquidation) and/or subchapter IV of chapter 7 of the Bankruptcy Code (Commodity Broker Liquidation), the Trustee reserves the right to assert any additional claims and causes of action which he may be entitled to assert under such subchapters of chapter 7 of the Bankruptcy Code, including but not limited to claims under sections 749 and 764 of the Bankruptcy Code.

## THE PARTIES AND RELATED ENTITIES

17.    Plaintiff Frederick J. Grede is the chapter 11 trustee for the Debtor, duly appointed under section 1104 of the Bankruptcy Code by Orders of this Court dated August 23 and 29, 2007.

18.    Defendant The Bank of New York is, on information and belief, a state-chartered bank with its principal place of business in New York, New York.  It is a subsidiary of Defendant The Bank of New York Mellon Corp.

19.    Defendant The Bank of New York Mellon Corp. is a corporation organized under the laws of Delaware, with its principal place of business in New York, New York.  It is the successor-in-interest to The Bank of New York, Inc. and was formed in July 2007 by a merger between The Bank of New York, Inc. and Mellon Financial Corporation.

20.    BONY has offices in 34 countries on six continents.  It holds itself out to the public as one of the world's leading banks, with more than $20 trillion in assets under custody and administration.  BONY claims on its website that it "has a rich and long history of providing custody and investment services."  It also claims that its "ability to support the highest quality securities processing solutions almost anywhere in the world ensures that we remain the provider of choice for leading institutions around the globe."

21.    Sentinel is an Illinois corporation, headquartered in Northbrook, Illinois.  Sentinel is registered with the Securities and Exchange Commission ("SEC") as an investment adviser ("Investment Adviser"), and with the U.S. Commodity Futures Trading Commission ("CFTC") as a futures commission merchant ("FCM").  It is also a member of the National Futures Association ("NFA"), which is Sentinel's designated self-regulatory organization ("DSRO").

22.     Philip Bloom, Eric Bloom, and Charles Mosley (the "Sentinel Insiders") were officers and directors of Sentinel who participated in a scheme to defraud Sentinel and to breach their fiduciary duties to Sentinel.  There were at all relevant times one or more officers and employees of Sentinel who were not part of the Sentinel Insiders' scheme.

## BACKGROUND

A.     Sentinel's business and the customer "SEGs"

23.     Sentinel managed investments of cash for various clients, including commodity brokers (also known as futures commission merchants or "FCMs"), hedge funds, financial institutions, pension funds, and individuals.

24.     Sentinel divided its customers into three groups and was supposed to strictly segregate the investments of these three customer groups from each other and from Sentinel's own funds.

25.     The first customer group, known within Sentinel as SEG 1, was supposed to consist solely of the funds and property of customers of other FCMs, which typically invested their customers' funds through Sentinel in order to take advantage of Sentinel's purported cash management and investment expertise.

26.      The second customer group, known within Sentinel as SEG 2, was supposed to consist solely of the funds and property of customers of other FCMs that were engaged in trading at foreign exchanges.

27.     The third customer group, known within Sentinel as SEG 3, was supposed to consist of the funds and property of all other types of clients, including FCM house (*i.e.*, non-customer) funds, as well as the funds and property of hedge funds, trust accounts, endowments and individuals.

28.     In addition to managing investments for the SEG 1, SEG 2, and SEG 3 customer portfolios, Sentinel owned  a "House" or "Street" portfolio of securities traded by Sentinel for the ultimate benefit of the Sentinel Insiders.

**B.**    Regulatory requirements applicable to Sentinel's business

*i.*      *The Commodity Exchange Act and CFTC Rules*

29.     FCMs are permitted to deposit their customer funds only with certain types of banks, depositories or other FCMs.  Sentinel registered with the CFTC as an FCM, and thus was able to manage customer funds belonging to other FCMs.  Unlike traditional FCMs, however, Sentinel did not engage in any commodities trading for its customers, but instead only invested funds deposited by other FCMs and Sentinel's other customers.

30.     Because Sentinel was an FCM managing funds required to be segregated for the benefit of customers, Sentinel and any depository bank selected by Sentinel as custodian for funds belonging to customers were subject to the provisions of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("the CEA") and CFTC rules and regulations promulgated pursuant to the CEA, 17 C.F.R. §§ 1.1-190.10, with respect to such funds.

31.     Section 4d(a)(2) of the CEA provides that money, securities and property of customers must be separately accounted for and not commingled with the funds of the FCM.  7 U.S.C. § 6d(a)(2).

32.     Section 4d(b) of the CEA provides that "it shall be unlawful for any person, including . . . any depository, that has received any money, securities and property for deposit in a  separate account as provided for in [section 4d(a)(2) of the CEA], to hold, dispose of, or use any such money, securities or property as belonging to the depositing futures commission

merchant or any person other than customers of such futures commission merchant." 7 U.S.C. § 6d(b).

33. CFTC Rule 1.20(a) provides that all customer funds shall be segregated as belonging to commodity customers, and that when deposited with any bank, shall be deposited under an account name which clearly identifies them as customer property.

34. CFTC Rule 1.20 requires that any bank acting as custodian for FCM customer funds must acknowledge in writing that the funds are customer funds and are being held in accordance with the provisions of the CEA.

35. CFTC Rule 1.20(a) also provides that "Under no circumstances shall any portion of customer funds be obligated to . . . any depository except to purchase, margin, guarantee, secure, transfer, adjust or settle trades, contracts or commodity option transactions of commodity or options customers." CFTC Rule 1.20(a) thus prohibits the pledging of customer funds to secure a loan for any purpose other than for customer commodity transactions.

36. The investment of FCM customers' funds is subject to the strict investment standards embodied in CFTC Rule 1.25, 17 C.F.R. § 1.25, and generally is restricted to only the highest grade corporate and government securities and similar highly liquid investments. (Prior to an amendment to Rule 1.25 which became effective on December 28, 2000, the CFTC's investment standards were even stricter, and FCM customer funds could be invested only in government securities and certain other limited instruments.)

37. CFTC Rule 1.25 permits FCMs to acquire securities constituting permitted investments under CFTC Rule 1.25 by using repurchase agreements, and to invest customer funds under reverse repurchase agreements. Customer securities delivered pursuant to any repurchase or reverse repurchase transaction, however, are limited to types of investments

otherwise permitted under Rule 1.25 and are subject to concentration limits and numerous other limitations. *See generally* 17 C.F.R. § 1.25(d). Moreover, any funds received under repurchase agreements or securities received under reverse repurchase agreements are required to be segregated for the benefit of customers (17 C.F.R. §§ 1.20(a) and 1.25(d)), and the delivery of securities to or from the customer segregated account must take place simultaneously with the offsetting transfer of funds to or from the customer segregated account. 17 C.F.R. § 1.25(d)(8). The CEA and CFTC regulations thus prohibit any repurchase or reverse repurchase transactions from taking place outside of customer segregated accounts, and require that all repurchase transactions for the benefit of customers take place and settle solely in segregated accounts.

38.     Under CFTC Rule 1.26, any securities in which customer funds are invested also must be maintained in segregation. Like CFTC Rule 1.20, CFTC Rule 1.26 requires that any bank acting as custodian for FCM customer securities must acknowledge in writing that the securities are customer securities and are being held in accordance with the provisions of the CEA.

39.     Funds of FCM customers engaged in trading at foreign exchanges also must be separately segregated and invested in accordance with CFTC Rule 30.7, 17 C.F.R. § 30.7, which imposes certain restrictions on the investment of customer funds.

40.     Subject to the segregation and other requirements of the CEA and CFTC Rules, under CFTC Rule 1.49 (adopted in 2003), FCM customer funds may be held in certain foreign depositories, namely institutions in the "G-7" countries (the United States, Canada, France, Italy, Germany, Japan, and the United Kingdom), and in the currency denominations of those countries, as well as the Euro.

41.     The CEA and CFTC regulations do not authorize customer funds or securities to be pledged to a bank or other third party to secure loans or other obligations incurred to meet "haircuts" imposed by a repurchase agreement counterparty.

42.     Effective December 31, 1980, the CFTC promulgated regulations which required FCMs to maintain adjusted net capital (essentially liquid assets in excess of customer funds) of no less than 4% of all funds required to be segregated by FCMs for the benefit of its customers. *See generally* 17 C.F.R. § 1.17.  On May 7, 1981, based upon (among other things) Sentinel's representations to the CFTC concerning the trust structure described in paragraphs 50-51 below, Sentinel obtained from the CFTC a "no action" letter exempting Sentinel from the 4% net capital requirement applicable to other FCMs, and requiring that Sentinel maintain only the minimum capital required for FCMs that are not a member of a contract market (at that time $100,000). (Exhibit A attached).

*ii.     The Investment Advisers Act and SEC Rules*

43.     Sentinel was also registered as an Investment Adviser, and Sentinel was subject to the provisions of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* (the "Investment Advisers Act"), and the rules and regulations of the SEC promulgated thereunder, 17 C.F.R. §§ 275.0-2 – 275.222-2.

44.     Section 206 of the Investment Advisers Act makes it illegal to "employ any device, scheme, or artifice to defraud any client or prospective client" and to "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."  15 U.S.C. § 80b-6.

45.     The regulations promulgated by the SEC under section 206 provide that it is a "fraudulent, deceptive, or manipulative act, practice, or course of business" to have custody of

client funds or securities except as provided in SEC Rule 206(4)-2.  SEC Rule 206(4)-2, 17 C.F.R. § 275.206(4)-2, requires that client funds and securities be maintained at a "qualified custodian," which includes a depository bank, "[i]n a separate account for each client under that client's name" or "[i]n accounts that contain only [the investment adviser's] clients' funds and securities, under [the investment adviser's] name as agent or trustee for the clients."

46.     SEC Rule 206(4)-2 further provides that if an investment adviser opens an account with a qualified custodian, either under the client's name or its name as agent, it must "notify the client in writing of the qualified custodian's name, address, and the manner in which the funds or securities are maintained, promptly when the account is opened and following any changes to this information."

47.     It also is a violation of Section 206 of the Investment Advisers Act to use one client's assets to cover or secure securities purchases for another client when the former client does not have sufficient cash in its account to cover securities purchases on the settlement date.

*iii.     BONY's conduct in violation of federal law*

48.     BONY knowingly violated the CEA and CFTC Rules by permitting customer assets to be pledged to secure BONY's loan to Sentinel, by commingling customer assets with Sentinel's own assets, by clearing customer securities transactions through BONY accounts that were not segregated and on a daily basis applying the proceeds of those transactions to Sentinel's loan balance, and by facilitating billions of dollars of repo transactions outside of the segregated account structure.

49.     BONY also knowingly participated in conduct that violated the Investment Advisers Act and SEC Rules by permitting customer assets to be commingled with Sentinel's own assets, by permitting customer assets to be cleared through and maintained in BONY

accounts which were not registered in Sentinel's name as agent or trustee for its customers, by maintaining customer assets in a manner different than that disclosed to customers, and by assisting Sentinel in the use of assets of members of one SEG group to cover or secure securities purchases for other SEGs, or for Sentinel itself, when they did not have sufficient cash to cover securities purchases on the settlement date.

## SENTINEL'S RELATIONSHIP WITH BONY
## AND THE UNLAWFUL ACCOUNT STRUCTURE

A.    <u>The Inception of the Sentinel-BONY Relationship</u>

50.    Prior to 1980, Sentinel's business consisted almost exclusively of providing cash management services to other FCMs, and Sentinel had established two trust accounts at Continental Illinois Bank and Trust Company of Chicago into which its clients' funds were placed and invested.  One trust account was used to hold the customer funds of other FCMs (SEG 1 funds), and the other trust account was used to hold the house funds of other FCMs (SEG 3 funds).

51.    FCMs for which Sentinel provided cash management services executed trust agreements designating Sentinel as the trustee for funds deposited by them.  Under this trust arrangement, participating FCMs directly notified Continental Bank of the amounts they wished to deposit or withdraw from the trust account and Sentinel merely directed the investment of those funds. Sentinel subsequently moved its custodial business to the First National Bank of Chicago.

52.    In early 1997, the First National Bank of Chicago decided to exit the custodial account business and close its custody division.  BONY competed with several other banking institutions to win Sentinel as a client of BONY's Institutional Custody Division.  Sentinel moved its custodian account business to BONY in or about March 1997.

53.    At the outset of the relationship, BONY and Sentinel entered into a Global Custody Agreement, dated March 13, 1997, appointing BONY as the custodian of securities and cash held for the benefit of Sentinel's customers.  (Exhibit B attached).  Under this arrangement, customer cash and securities were maintained by BONY in custodial accounts, and securities purchased and sold were settled by cash credits and debits to those custodial accounts.

54.    As required by CFTC Rules, on or about March 14, 1997, BONY and Sentinel entered into a letter agreement, attached as Exhibit C, in which Sentinel proposed to open an account designated as "Sentinel Management Group, Inc. Customer Segregated Funds Account I (§4.d-2)," into which it would deposit money and securities that were supposed to be segregated for its SEG 1 customers.  BONY acknowledged and agreed that this segregated account was being opened to meet the requirements of the CEA, which provides that such assets must be segregated and treated as belonging solely to Sentinel's SEG 1 customers, rather than to Sentinel itself.  In addition to the requirements set forth in CFTC Rules 1.20(a) and 1.26, BONY further agreed that "the funds in said accounts will not be subject to [its] lien or offset for, and on account of, any indebtedness now or hereafter owing [by] (*sic*) us to [BONY] and shall not be applied by [BONY] upon any such indebtedness nor will [BONY] apply the funds in said accounts to the indebtedness of either our so-called Seg II or Seg III accounts."  BONY further agreed that the letter agreement would supersede any other documents related to the account that conflict with it.

55.    On the same date, Sentinel and BONY entered into two additional letter agreements, one pertaining to "Sentinel Management Group, Inc. Customer Segregated Funds Account II (Part 30)" established for funds and securities attributable to Sentinel's SEG 2 customers, and another pertaining to "Sentinel Management Group, Inc. Customer Segregated

Funds Account III" established for funds and securities deposited by Sentinel's SEG 3 clients. These letter agreements, attached as Exhibits D and E, respectively, are identical in material respects to the SEG 1 segregation letter.

56.     In or about March 1997, BONY opened the three segregated custodial accounts contemplated in the segregation letter agreements and began accepting funds and securities from Sentinel.  Sentinel also established a house or street account.

B.      <u>BONY begins ignoring its custodial obligations</u>

57.     As part of its arrangement with Sentinel, and consistent with Sentinel's arrangements with BONY's predecessors, BONY from time to time made short-term extensions of credit to Sentinel so that Sentinel could meet customer requests for redemption, and thereafter sell the securities that had been attributable to the redeeming customers.  BONY's extensions of credit were made in the form of daytime "overdrafts" which would be eliminated upon sale of the applicable securities.  If necessary, the daytime overdrafts would be converted to short-term overnight loans.

58.     Within a few months of the commencement of BONY's relationship with Sentinel, BONY personnel began to express concern about the custodial account structure required under applicable law.  Specifically, BONY was extending credit in the form of daytime "overdrafts" so that Sentinel could satisfy customer redemptions sought on short notice, and it was difficult for BONY personnel to determine whether there were sufficient "excess" customer securities in the segregated custodial accounts to repay BONY's advances of credit.  In an email dated August 18, 1997, a BONY officer described Sentinel's custodial account structure as "an accident waiting to happen," indicated that he was no longer comfortable clearing Sentinel's

transactions, and insisted on an immediate response from the BONY official in charge of the Sentinel business.

59.     As a result, less than six months after having won Sentinel's custodial business, BONY caused Sentinel to move its business from BONY's Institutional Custody Division to its Broker/Dealer Services Division ("SIBD"), where Sentinel would buy and sell securities through a typical broker/dealer and securities clearing account.  BONY did so even though Sentinel was not a broker/dealer and Sentinel's business as an FCM and Investment Adviser was fundamentally different from the business of a broker/dealer because it involved customer funds and securities that were subject to strict custodial and segregation requirements.  As set forth below, the new SIBD account structure violated the segregation requirements imposed by applicable law and was inconsistent with BONY's commitments in its segregation letter agreements that customer funds would at all times be segregated and not be subject to BONY's lien.

60.     After BONY insisted that Sentinel move its business from BONY's Institutional Custody Division to its Broker/Dealer Services Division, in October 1997 BONY required Sentinel to execute a clearing agreement appointing BONY as Sentinel's clearing agent "in furtherance of [Sentinel's] business as a broker/dealer of securities."   (Exhibit F attached). Sentinel and BONY also entered into a Security Agreement, dated October 21, 1997 (Exhibit G attached), giving BONY a security interest in Sentinel's securities clearing account.

61.     BONY knew that Sentinel was not a broker/dealer and that its form broker/dealer agreement did not fit Sentinel's FCM and Investment Adviser business.   Moreover, the architecture BONY established for Sentinel's accounts guaranteed that BONY could not keep its

contractual promises and meet its statutory obligations to keep customer funds and securities segregated from Sentinel's own assets or from those of other customers.

        C.      <u>The unlawful account architecture established by BONY</u>

       62.     BONY established segregated cash accounts for U.S. denominated funds held for Sentinel's customers in SEGs 1, 2 and 3, respectively.  BONY also established segregated securities accounts for government and government agency securities (hereinafter collectively referred to as "government securities"), such as U.S. Treasury notes, Fannie Mae and Ginnie Mae notes held for Sentinel's customers in SEGs 1, 2, and 3, respectively.

       63.     However, BONY improperly established a single, non-segregated clearing account for all government securities transactions.  Thus, all purchases and sales of government securities had to be processed through this single account, whether they were on behalf of SEGs 1, 2 or 3 or Sentinel itself.  As a result, government securities and cash held by BONY on behalf of one customer SEG were routinely commingled with those belonging to other SEGs or Sentinel's own portfolio, in direct contravention of applicable law and the segregation letter agreements.  This structure led to and facilitated the conduct of Sentinel insiders in commingling customer assets and led to BONY maintaining client funds and securities in an account which was neither segregated as required under Sections 4d(a)(2) and 4d(b) of the CEA and CFTC Rule 1.20, nor registered as a custodial account under SEC Rule 206(4)-2.

       64.     BONY also improperly established this government securities clearing account as the collateral account securing all loans made by BONY to Sentinel.  Indeed, the account is identified in BONY's records and reports as the "SEN Clearance Coll A/C FBO BNY" (Sentinel Clearance Collateral Account For the Benefit Of Bank of New York), and also was known within Sentinel and BONY as the "SLM-SEN Clearance Coll A/C FBO BNY," the "SLM"

account, the "Street" account, "the clearance account," the "collateral account," the "SEN" account, and the "box." (Hereafter, this account is referred to in this Complaint as the "Clearing/ Collateral Account.")

65.    BONY continued to make short-term loans to Sentinel, initially so that Sentinel could meet customer requests for redemption. Those loans took place in the form of daytime "overdrafts" of Sentinel's Clearing/Collateral Account, which BONY then converted to overnight loans as necessary. The overnight loans were reversed the next morning, putting the Clearing/Collateral Account back into an overdraft situation if sufficient funds were not deposited (or securities liquidated) to pay off the loan. BONY accepted and took as security for its overnight loans to Sentinel any government securities that were in the Clearing/Collateral Account, without regard to whether those securities were Sentinel House securities or customer securities. Under CFTC Rule 1.20(a), however, customer assets never could be used as security for the BONY loans.

66.    To effect a sale of a government security held in a segregated customer account, Sentinel was required to request that BONY "desegregate" the security and move it into the Clearing/Collateral Account. Once there, BONY could take the position that the security was subject to its lien, regardless of whether that security was a customer asset. Worse, because BONY's daytime advances of credit to Sentinel were made in the form of an "overdraft" (negative) balance in the Clearing/Collateral Account, and any sales of customer government securities would automatically settle to the Clearing/Collateral Account, the proceeds of customer securities sales (instead of being available for the applicable customers) were automatically applied against, and reduced the amount of, BONY's "overdraft" loan to Sentinel.

67.      When a government security was purchased for a segregated account, BONY's account structure similarly required that the security be purchased in the Clearing/Collateral Account, and then Sentinel would request that the security be "segregated" to the applicable customer segregated account.  Under the account structure established by BONY, however, BONY retained the ability to refuse to segregate customer securities purchased through the Clearing/Collateral Account if Sentinel did not post sufficient collateral for BONY's loans to Sentinel.

68.      Further, BONY's clearing account structure required that any customer security purchased or sold pursuant to a repo or reverse repo transaction also clear and settle through the Clearing/Collateral Account, instead of directly into the applicable segregated custodial account.

69.      BONY thus established a clearing structure in which it could not fulfill its contractual promises and which violated applicable law including Sections 4d(a)(2) and 4d(b) of the CEA and CFTC Rule 1.20 (which requires that customer funds at all times be segregated as belonging to commodity customers, and be deposited only in accounts which clearly identifies them as customer property); CFTC Rule 1.20(a) (which expressly prohibits the pledging of customer funds to secure a loan for any purpose other than for customer commodity transactions); CFTC Rule 1.25 (which prohibits any repurchase or reverse repurchase transactions from taking place outside of customer segregated accounts, and requires that all repo transactions for the benefit of customers take place and settle solely in segregated accounts); Section 4d(a)(2) of the CEA and CFTC Rule 1.26 (which mandates that any securities in which customer funds are invested must be maintained at all times in segregation); and Section 4(b) of the CEA and CFTC Rule 30.7 (which requires that funds of FCM customers engaged in trading at foreign exchanges also be separately segregated and invested).

70.     In addition, the Clearing/Collateral Account was not registered in the name of Sentinel as agent or trustee for its clients, and therefore, no customer funds or securities could be cleared through or maintained in the Clearing/Collateral Account, even briefly, without violating Section 206 of the Investment Advisers Act and SEC Rule 206(4)-2.

### THE CHANGE IN SENTINEL'S BUSINESS AND BONY'S EXPANSION OF THE UNLAWFUL ACCOUNT STRUCTURE TO CORPORATE SECURITIES

A.     CFTC Rule 1.25 Amendments and Adoption of CFTC Rule 1.49

71.     Historically, Sentinel typically directed the investment of client funds in high-quality, low-risk government securities, and did not engage in significant repo or reverse repo transactions.  Sentinel's borrowings from BONY typically were used to provide liquidity for customer redemptions, and Sentinel's loan balances (if any) were relatively modest.

72.     However, at the end of 2000, CFTC Rule 1.25 was modified substantially to permit FCMs to invest customer funds in, among other things, high-grade corporate securities, and also to enter into repo and reverse repo agreements utilizing such securities.  Sentinel was a strong proponent of these changes and provided written comments to the CFTC concerning the rule changes.

73.     In addition, with the 2003 adoption of CFTC Rule 1.49, Sentinel began to direct investments in Euroclear registered securities and certain customer funds were held by BONY in Euro and G-7 currency denominations in non-U.S. bank accounts.

B.     The new accounts

74.     Following the implementation of changes to CFTC Rule 1.25 and the adoption of CFTC Rule 1.49, both Sentinel's business and its relationship with BONY changed dramatically.

75.     In order to accommodate the changes to Sentinel's business, BONY opened a series of new BONY accounts to hold corporate securities registered with the Depository Trust

Corporation (or DTC), corporate securities registered in the Euroclear system, and securities that were not registered in electronic clearing systems (so-called "physical" securities).

76.      Sentinel executed a new broker/dealer clearing agreement with BONY known as the Global Clearing and Custody Agreement.  (Exhibit H attached).  BONY and Sentinel also executed a new Security Agreement.  (Exhibit I attached).  Both agreements were dated January 9, 2003.

77.      Article II, Section 1(a) of the Global Clearing and Custody Agreement appointed BONY as Sentinel's clearing agent.  In Article II, Section 2(a), BONY acknowledged that it "will not have, and will not assert, any claim or lien against Securities held in a Segregated Account."  Article III, Sec. 1(a) authorized BONY to act as custodian of the segregated accounts.

78.      The 2003 Security Agreement provided that BONY, at its discretion, could make loans or otherwise extend credit to Sentinel.  Under Schedule A to the agreement, the collateral for that loan was to be:  "Any and all Securities and other property held in the Account, as these terms are defined in the Global Clearing and Custody Agreement between the Debtor and the Bank, and any cash balances held in any cash account maintained by the Bank in connection therewith."

79.      The Global Clearing and Custody Agreement and the 2003 Security Agreement establish that there is to be only a single combined clearing and collateral Account, against which BONY may assert a lien.

C.      The DTC securities accounts

80.      BONY established three segregated securities accounts to hold DTC-registered corporate securities for Sentinel's customers in SEG 1, SEG 2 and SEG 3, respectively.

81.   BONY also established a DTC clearing account, also known as the "FC1 account" or the "Street Securities Account" ("the DTC Clearing Account" hereafter) to clear both customer and House transactions in DTC securities.   Just like the Collateral/Clearing Account, however, the DTC Clearing Account was not a segregated account.

82.   The DTC Clearing Account was not used for cash transactions.  Cash deposits, withdrawals and settlement payments relating to DTC corporate transactions were processed in the Clearing/Collateral Account.

83.   Because the DTC Clearing Account was not segregated, BONY could not fulfill its statutory duties and promises to Sentinel to keep assets pertaining to different customer SEGs separate from each other and from Sentinel's house assets.  DTC-registered securities clearing through the DTC Clearing Account, like the government securities clearing through the Clearing/Collateral Account, were necessarily commingled with securities belonging to other customer SEGs and with House assets.

84.   In addition, the DTC Clearing Account was not registered in the name of Sentinel as agent or trustee for its clients, and therefore, no customer funds or securities could be cleared through or maintained in the DTC Clearing Account, even briefly, without violating SEC Rule 206(4)-2.

85.   Moreover, because the DTC Clearing Account was not a segregated customer account, it specifically could not be used under CFTC Rules 1.20(a), 1.25(d) and 1.26 to effectuate the delivery of customer securities to or from counterparties in connection with repo or reverse repo transactions.

86.   Further, under the DTC Clearing Account structure, every time a customer security was sold, the cash proceeds of that sale were automatically credited to the

Collateral/Clearing Account and served to reduce the overdraft loan balance in that account, instead of being immediately credited to the appropriate SEG.

87.    In addition, under the DTC Clearing Account structure, every time a customer security was purchased, the customer security cleared into the DTC Clearing Account, against which BONY has asserted a lien.

### D.    The Euroclear securities and foreign currency accounts

88.    In 2003, Sentinel also established a series of Euroclear and foreign currency accounts at BONY to hold customer securities registered in the Euroclear system and settled in foreign currencies.  Account number 521010 (the "Euroclear Securities Clearing Account") was denominated as a clearing account for all Euroclear securities, and two other accounts, 521011 and 521012, were denominated as customer segregated Euroclear securities accounts for SEG 1 and SEG 3, respectively.  A series of corresponding cash accounts also were opened in various foreign currency denominations.

89.    Under the structure it established for Euroclear securities, BONY could not fulfill its promise to Sentinel to keep assets pertaining to different customer SEGs separate from each other and from House assets. Euroclear-registered securities clearing through the Euroclear Securities Clearing Account, like the government securities clearing through the Clearing/Collateral Account and DTC securities clearing through the DTC Clearing Account, were necessarily commingled with securities belonging to other customer SEGs and with House assets.

90.    In addition, Sentinel specifically advised BONY that each of the Euroclear and foreign currency accounts, including the Euroclear Securities Clearing Account, needed to be denominated as customer segregated accounts, and provided segregation acknowledgements for

BONY's execution.  Although BONY did execute segregation letters with respect to the SEG 1 and SEG 3 Euroclear securities accounts and certain corresponding foreign currency accounts, BONY failed to provide executed segregation acknowledgements for the Euroclear Securities Clearing Account and some related foreign currency accounts.

91.     Notwithstanding the foregoing, the account statements provided by BONY to Sentinel specifically indicated that the securities maintained in the Euroclear Securities Clearing Account were held in a "segregated" account.  Further, not a single customer transaction ever took place in the SEG 1 and SEG 3 Euroclear securities accounts, and it appears that those accounts were never even activated.  Thus, all Euroclear securities purchased for customers were held by BONY in the Euroclear Securities Clearing Account.

92.     BONY acknowledged in internal communications that the Euroclear Securities Clearing Account was not intended to hold any material amount of securities, and was being used solely for clearing customer transactions.  Nonetheless, BONY has now taken the position that the securities in the Euroclear Securities Clearing Account are not customer securities, and that it may assert a lien against securities held in the Euroclear Securities Clearing Account and related foreign currency accounts.

93.     Moreover, if (as BONY claims) the Euroclear Securities Clearing Account is not a segregated customer account, it specifically could not be used under CFTC Rules 1.20(a), 1.25(d) and 1.26 to effectuate the delivery of customer securities to or from counterparties in connection with repo or reverse repo transactions.

94.     Further, if (as  BONY claims) the Euroclear Securities Clearing Account was not a segregated account in the name of Sentinel as agent or trustee for its clients, no customer funds

or securities could be cleared through or maintained in the Euroclear Securities Clearing Account, even briefly, without violating SEC Rule 206(4)-2.

E.    Physical securities

95.    In addition to the DTC and Euroclear securities and related accounts, in connection with the change in Sentinel's business, BONY also established an account to clear and hold physical securities (*i.e.,* certificated securities that were not registered in the DTC or Euroclear systems) (the "Physical Clearing/Custodial Account").    Unlike with the U.S. government, DTC and Euroclear securities, no separate segregated accounts were ever established for physical securities.    Thus, all House and customer transactions in physical securities cleared through the single Physical Clearing/Custodial Account, and all physical securities were held by BONY in that account.    Like the DTC Clearing Account, the Physical Clearing/Custodial Account was not used for cash transactions.    Cash deposits, withdrawals and settlement payments relating to physical securities transactions were processed in the Clearing/Collateral Account.

96.    As a result of the fact that the Physical Clearing/Custodial Account was not segregated (and BONY made no attempt to establish any segregated accounts for physical securities attributable to Sentinel customers), BONY could not fulfill its statutory duties and promises to Sentinel to keep assets pertaining to different customer SEGs separate from each other and from Sentinel's house assets.    Physical securities held in or clearing through the Physical Clearing/Custodial Account were necessarily commingled with securities belonging to other customer SEGs and with House assets.

97.    In addition, the Physical Clearing/Custodial Account was not registered in the name of Sentinel as agent or trustee for its clients, and therefore, no customer funds or securities

could be cleared through or maintained in the Physical Clearing/Custodial Account, even briefly, without violating SEC Rule 206(4)-2.

98.    Moreover, because the Physical Clearing/Custodial Account was not a segregated customer account, it specifically could not be used under CFTC Rules 1.20(a), 1.25(d) and 1.26 to effectuate the delivery of customer securities to or from counterparties in connection with repo or reverse repo transactions.

99.    Further, under the Physical Clearing/Custodial Account structure, every time a customer security was sold, the cash proceeds of that sale were automatically credited to the Collateral/Clearing Account and served to reduce the overdraft loan balance in that account, instead of being immediately credited to the appropriate SEG.

### THE SENTINEL INSIDERS' SCHEME AND THE BONY LOAN

A.    The Repo Activity

100.    Following the opening of the DTC Clearing Account, the Euroclear Securities Clearing Account, and the Physical Clearing/Custodial Account, Sentinel radically changed its investment strategies and borrowing.

101.    Sentinel's actions in this regard, and the conduct described in paragraphs 102-167, were undertaken at the instance of the Sentinel Insiders and were adverse to the interests of the company. (For purposes of clarity and conciseness, that allegation is not reiterated each time Sentinel's actions are described.)

102.    Among other things, Sentinel began purchasing a substantial amount of securities for the Sentinel "House" account, which ultimately benefited the Sentinel Insiders. Sentinel also dramatically increased its use of leverage, which put both Sentinel and its customers at risk if the market moved adversely.

103.    No later than 2003, Sentinel began financing the acquisition of many of the securities it controlled using overnight repurchase agreements.  In a typical overnight repurchase or "repo" transaction, the repo borrower (in this case Sentinel) acquires and transfers a security to a repo lender, which in turn makes a repo "loan" to Sentinel and holds the security as collateral.  Under most overnight repo agreements, absent a default, Sentinel was entitled to all principal and interest payments received on account of the security that was the subject of the repo transaction.

104.    Repo counterparties imposed a "haircut" on the amount loaned to Sentinel in order to provide a sufficient collateral cushion above market value to satisfy Sentinel's repo obligations in the event of a default.  Thus, a repo lender advanced to Sentinel, for example, only 90% of the current market value of the security subject to the repo transaction (a 10% "haircut"). Because Sentinel had virtually no capital, the Sentinel Insiders financed the balance of the acquisition cost for securities that were the subject of a repo transaction (*i.e.* the haircut) using Sentinel's overnight loan facility with BONY.  Thus, beginning no later than 2003, instead of funding short-term liquidity needs related to Sentinel customer redemptions, Sentinel began using the BONY loan for Sentinel's highly-leveraged speculation in securities, a fact which BONY knew.

105.    Although prior to the summer of 2007 most of Sentinel's overnight repo positions were rolled over each day, both Sentinel and the repo counterparty had the right to close out an overnight repo position at any time, in which case the repo counterparty was contractually obligated to return the security to Sentinel, and Sentinel was contractually obligated to pay off the funds borrowed plus interest.

106.    At times, Sentinel also participated in so-called "reverse repo" transactions, in which Sentinel was the repo lender holding securities as collateral for a loan made by Sentinel to a repo borrower.

107.    Over time, Sentinel controlled an ever-increasing number of securities pursuant to repo transactions, subjecting Sentinel and its customers to substantial risk arising from the leverage associated with repo transactions.  All of the securities that were the subject of repo activity cleared through the BONY Collateral/Clearing Account, DTC Clearing Account, Euroclear Securities Clearing Account, and Physical Clearing/Custodial Account.

108.    By the end of 2003, Sentinel had purchased and controlled more than $242 million in securities under repo agreements.  By the end of 2004, that amount had increased to more than $922 million; by the end of 2005 it had increased to more than $1.3 billion; and by the end of 2006 it had increased to more than $2.0 billion.  This $2.0 billion+ repo position put Sentinel, which at all times had, at best, only a few million dollars of capital, at tremendous risk in the event of a decrease in the value of the securities that it controlled.

B.    The BONY Loan

109.    Beginning no later than the end of 2003, the Sentinel Insiders began exploiting the flawed account structure established by BONY and used that account structure to unlawfully and without disclosure to their clients: (a) commingle customer assets among SEGs and with Sentinel's House assets; (b) use securities that were supposed to be held in segregated customer accounts to collateralize loans from BONY, including loans that were used to purchase House securities and to engage in billions of dollars of undisclosed repo transactions; and (c) pay down Sentinel's debt to BONY using customer assets.

110.    The Sentinel Insiders' scheme to use customer assets to secure the purchase of securities for the Sentinel House account and to increase leverage using repo agreements resulted in a dramatic increase in Sentinel's loan balance with BONY.  For example, while Sentinel's loan balance stood at $23 million at the end of 2002, by the end of 2003 the loan had more than doubled to $55 million.  By the end of 2004, the loan had more than doubled again to over $120 million, and by the end of 2005 it had more than doubled yet again, to approximately $280 million.  By June 2007, the loan balance had again more than doubled, to over $570 million.

111.    BONY allowed Sentinel to continue borrowing amounts far in excess of the overnight loan credit limit BONY set for Sentinel, and far in excess of any reasonable line of credit for Sentinel's business (and its very small capital), and continually increased that limit.  In 2000, Sentinel's overnight loan credit limit was $30 million.  By the end of 2004, that limit had increased to $95 million.  By the end of 2005, Sentinel's credit limit with BONY was $175 million, although the credit extended by BONY routinely exceeded $300 million.  In 2006, BONY increased the overnight credit limit to $300 million.  When Sentinel's loan blew through the $300 million credit limit in January and February 2006, BONY extended more credit, notwithstanding the fact that BONY knew that Sentinel's net capital was, at best, only a few million dollars.

112.    Moreover, BONY imposed no daytime overdraft limit whatsoever upon Sentinel.  Thus, the Sentinel Insiders could run up tens of millions (and on certain days hundreds of millions) of dollars in additional liability to BONY during any given day.

113.    BONY required that Sentinel post collateral to secure its overnight loans to Sentinel.  Because Sentinel House securities and other House funds Sentinel held were insufficient to secure the loan, and because of the commingling permitted by BONY's account

structure, the insiders began collateralizing the BONY loan with hundreds of millions of dollars in customer securities, in violation of Sections 4(b), 4d(a)(2), and 4d(b) of the CEA and CFTC Rules 1.20, 1.25, 1.26, 1.49 and 30.7, as well as Section 206 of the Investment Advisers Act and SEC Rule 206(4)-2.

        C.      BONY's Knowledge of the Misuse of Customer Assets
                 and False Statements to Regulators and the Public

114.    BONY was well aware that Sentinel had fundamentally changed its business model, that it was purchasing large amounts of securities for the House account and for repo activities using credit provided by BONY, and that the Sentinel loan was financed almost exclusively with customer securities that were supposed to be segregated.

115.    BONY, including (as of November 23, 2005) the managing director of BONY in charge of Financial Institutions Credit, was well aware that Sentinel had a leveraged trading strategy.

116.    BONY received and reviewed Sentinel's year-end financial statements for 2005 and 2006. Those statements, *inter alia*, reflected that "Sentinel purchases securities for customers and for its own account. . . ."

117.    BONY also received copies of numerous financial statements and regulatory reports from Sentinel that revealed that Sentinel was providing false and misleading information to regulators and its customers.

118.    Specifically, at least between September 2005 and June 2007, BONY received from Sentinel nearly every monthly CFTC Form 1-FR report submitted to regulators by Sentinel, which filed each statement approximately three weeks after the end of the month-long period covered by the statement. BONY routinely received copies of these monthly reports within a few days of the filing date.

119.    Each monthly CFTC Form 1-FR submitted by Sentinel included several different financial reports, including a Statement Of Financial Condition (Sentinel's assets and liabilities); a Statement Of Computation Of Minimum Capital Requirements imposed upon Sentinel; and a Statement Of Segregation Requirements And Funds In Segregation.

120.    Each and every one of the financial reports comprising the Form 1-FR provided by Sentinel to regulators and BONY contained patently false information.  Among other things, each and every Statement Of Financial Condition included as part of Sentinel's monthly Form 1-FR filings reflected that Sentinel owed $0 in loans to BONY (Statement of Financial Condition, Lines 21.A-C).  Each and every Statement Of Financial Condition included as part of Sentinel's monthly Forms 1-FR filings reflected that Sentinel engaged in no repo activity whatsoever (Statement Of Financial Condition, Lines 3, 4 and 29). Each and every Statement Of Computation Of Minimum Capital Requirements included as part of Sentinel's monthly and annual Forms 1-FR carried through the false information provided in the corresponding Statement Of Financial Condition. And each and every Statement Of Segregation Requirements And Funds In Segregation included as part of Sentinel's monthly and annual Forms 1-FR indicated that all of Sentinel and its customers' funds and securities were held in segregated accounts. Statement Of Funds In Segregation, Lines 7.A-C).  Every one of these assertions, as BONY knew, was patently false.

121.    BONY also knew that Sentinel was making flagrant misrepresentations to actual and potential customers about Sentinel's relationship with BONY and how customer assets were held at BONY.  For example, on June 27, 2007, a senior BONY official in charge of Sentinel's account received by email from another BONY officer a Sentinel marketing brochure that included statements that BONY knew were patently untrue.

122.    Among other things, the brochure said that Sentinel currently had "over $1.8 billion under management held in fiduciary accounts at our custodian, The Bank of New York." BONY knew that that assertion was untrue and that of the $1.8 billion held by BONY, hundreds of millions of dollars worth of customer assets were not held in fiduciary accounts but instead were held in BONY's Clearing/Collateral Account and subject to BONY's lien or were held in other non-fiduciary accounts.

123.    The brochure also falsely stated that a Sentinel "client retains a pro-rata undivided interest in the underlying securities pool held in a segregated account at The Bank of New York" and that "Securities are held in segregated, bankruptcy proof accounts."  BONY knew that these statements were false because substantial customer assets were held in the BONY Clearing/Collateral Account and the DTC Clearing Account, not in a segregated account.

124.    And the brochure indicated that the sale and purchase of securities on behalf of customers at BONY involved movement only between a "Sentinel Client Segregated Cash Account" and a "Sentinel Segregated Client Securities Account."   BONY knew that this representation was false and that in fact whenever securities were bought or sold, the cash and securities had to run through clearing accounts which were not segregated and as to which BONY asserted a lien.

125.    BONY also knew that, in order to collateralize Sentinel's loan, Sentinel at times was transferring hundreds of millions of dollars of securities from segregated customer accounts in bulk transfers to the BONY Clearing/Collateral Account under circumstances which plainly could not have related to legitimate investment activities or other transactions authorized by Sentinel's customers.  BONY also knew or should have known that Sentinel Insiders caused Sentinel to make these transfers of hundreds of millions of dollars from segregated customer

accounts to the BONY Clearing/Collateral Account or other non-segregated accounts with the intent to hinder, delay or defraud Sentinel's other creditors, including Sentinel's customers.

126.    BONY also knew of but deliberately ignored numerous red flags relating to Sentinel's activities, including: (a) the dramatic increase in the amounts borrowed by Sentinel from BONY, unrelated to customer redemption requests or other short-term liquidity needs; (b) the fact that Sentinel routinely exceeded its large credit limit with BONY; (c) the fact that Sentinel's leverage with repo counterparties had exponentially increased, such that by 2006 more than $2.0 billion in securities were the subject of repo agreements, almost all of which had been financed in part using the BONY loan; (d) Sentinel's purchase of lower-grade and illiquid securities, which was inconsistent with Sentinel's stated purpose of acting as a cash manager; (e) Sentinel was declaring dividends in excess of Sentinel's already minimal net capital; and (f) customer assets were posted to Sentinel's balance sheet as Sentinel assets.

### BONY'S PARTICIPATION IN THE RAIDING OF SEGREGATED ACCOUNTS AND THE COLLAPSE OF SENTINEL

A.    Overview

127.    Leading up to 2007, the unlawful account structure established by BONY, as well as BONY's willingness to turn a blind eye to wrongdoing at Sentinel and its extension of hundreds of millions of dollars in credit, permitted certain Sentinel insiders to reap tens of millions of dollars in profit through the wrongful pledge of customer assets to BONY and excessive leverage.

128.    In the spring and summer of 2007, following a downturn in the credit market and a decrease in the value of the billions of dollars of securities controlled by Sentinel through excessive leverage, Sentinel's business quickly collapsed.  BONY's actions played a pivotal role in the collapse of Sentinel.

129.    BONY's actions were motivated by its own financial interests, at the expense of its duties as custodian of customer assets.  From January 2004 through August 2007, BONY charged Sentinel over $38 million in interest.  More than $28 million of that amount was charged by BONY in just the period January 2006 through August 2007.

B.    Sentinel's collapse

130.    Many of the securities that Sentinel purchased during the 2004 - 2007 time-period were acquired using repurchase agreements under which repo counterparties such as Fimat and Cantor Fitzgerald lent money to Sentinel to finance most of Sentinel's acquisition costs of the securities, with the balance financed by BONY.  Many of the securities that were the subject of those repo agreements were illiquid, highly-structured investments and not the subject of material secondary market trading, and many (the physical securities) were not even registered in the DTC system.

131.    As of May 2007, Sentinel had incurred over $2.4 billion in obligations to repo counterparties.  As the credit market tightened in the spring and summer of 2007, repo counterparties began to refuse to accept these lower-grade securities from Sentinel under repo agreements, increasing their margin (haircut) requirements or simply refusing to continue to engage in repo transactions in such securities.

132.    At the end of May 2007, Fimat became the first major Sentinel counterparty to refuse to continue financing certain securities.  Fimat closed out the repo transactions related to those securities, and returned more than $100 million (face value) in securities to Sentinel through the BONY clearing system.  Pursuant to its repo agreements with Fimat, Sentinel was obliged to pay its repo obligation to Fimat or risk a default.  Because Sentinel could not finance

its repo payment to Fimat in any other way, on June 1, 2007, it borrowed an additional $94 million from BONY, increasing the BONY total loan balance to more than $353 million.

133.    Thereafter, on every business day from June 1, 2007 until August 13, 2007, when Sentinel's business finally collapsed, BONY allowed Sentinel to exceed its already excessive $300 million overnight loan credit limit by tens (and sometimes hundreds) of millions of dollars. At all relevant times during that period, however, BONY attempted to ensure that its loan was fully secured, even though its security was provided by customer assets that BONY had promised would not be used to secure Sentinel's loan.

134.    To secure the increased loan, on June 1, Sentinel and BONY desegregated large blocks of government securities from both the SEG 1 and SEG 3 segregated government securities accounts, with a face value of almost $87 million, and moved those securities into the Clearing/Collateral Account (the "June 1 Transfers"). These transfers took place at the end of the day, and did not coincide with any large customer redemptions or other potentially legitimate customer transactions. This also left less than $15 million in face value of government securities in the SEG 1 segregated government securities account.

135.    BONY personnel recognized that the Sentinel Insiders must be improperly using customer securities to collateralize Sentinel's loan obligations to BONY. After receiving a report on Sentinel's collateral position on June 13, 2007, a senior BONY credit official asked subordinates: "How can they have so much collateral? With less than $20MM in capital I have to assume most of this collateral is for somebody else's benefit. Do we really have rights on the whole $300MM?" (Emphasis added.)

136.    On June 25, 2007, Fimat informed Sentinel that it would no longer finance an additional batch of securities through repo agreements, and it returned another $140 million (face

amount) in securities to Sentinel's physical account at BONY. As a result, Sentinel was obligated to repay Fimat under its repo agreements with Fimat. In order to do so, it once again borrowed additional funds from BONY using customer funds as collateral.

137. Sentinel's loan balance at the end of the day on June 25, 2007 was already a remarkably high $358 million. By June 27, Sentinel's loan with BONY ballooned to $573 million. BONY and Sentinel attempted to secure the massive loan in the manner described below.

138. At first, BONY temporarily accepted the physical securities that had been returned by Fimat as security for the BONY loan. BONY quickly determined, however, that there was no market for the physical securities. It therefore demanded additional collateral.

139. Recognizing that BONY was under-collateralized, on June 26, 2007, Sentinel and BONY transferred virtually all of the remaining government securities in the SEG 1 and SEG 3 segregated government securities accounts, totaling in excess of $66 million in face value, out of segregation and into the Clearing/Collateral Account. This left no government securities in the SEG 1 government securities account, and only $15,000 face value of government securities in the SEG 3 government securities account. By this date, of some $463.6 million in face value of government securities held at BONY in connection with the Sentinel accounts, $463.1 million – more than 99% of all of Sentinel's government securities – were being held in the Clearing/Collateral Account for the benefit of BONY, not in segregated customer accounts.

140. On June 28, BONY informed Sentinel that considering the size of the loan for that day, which was $546 million, the wires still due to go out from Sentinel, and the collateral currently held by BONY, Sentinel's collateral position still was substantially short. Sentinel agreed to post additional securities as collateral for the loan. Because virtually all customer

government securities already had been moved to the Clearing/Collateral Account, Sentinel agreed to permit BONY to take securities in the DTC Clearing Account as collateral for the loan, and if necessary to move additional securities from segregated accounts into the DTC Clearing Account to collateralize the loan.

141.    On June 29, BONY determined that it would no longer accept any of the physical securities that had been returned by Fimat as collateral for Sentinel's loan. As a result, at the close of business on June 29, 2007, Sentinel was short $145 million in collateral. In order to fully collateralize the loan, Sentinel and BONY desegregated approximately $170 million in face value of corporate securities from the SEG 1 DTC account, representing one-half of the total value of that account, and transferred them into the DTC Clearing Account to be used as collateral for the BONY loan (together with the transfers described in paragraph 139 above, the "June 25-29 Transfers"). In the DTC Clearing Account, these customer assets, which were supposed to be segregated, were commingled with assets belonging to the insiders' House account and the assets of other SEGs.

142.    These transfers took place at the end of the day, after the amount of that evening's overnight loan was determined, and did not coincide with any large customer redemptions or other potentially legitimate customer transactions. BONY further knew that under CFTC Rule 1.20(a), customer assets never could be used as security for the BONY loans. BONY also knew that Sentinel needed the massive loan in order to pay for the physical security repo positions that had been closed by Fimat and cleared into the Physical Clearing/Custodial Account – an account with no linked customer segregated accounts and which had been used solely to clear House securities trades. Despite its knowledge and the fact that it was unlawful under Section 4d(b) of the CEA for BONY to hold, dispose of, or use any customer assets as belonging to Sentinel or

any person other than Sentinel's customers, BONY allowed and participated in the bulk movement of SEG 1 DTC securities into the Clearing/Collateral Account, where they could then be pledged as collateral to BONY.

143.    Between the end of June and mid-July, Sentinel reduced its loan from BONY to approximately $383 million.  However, on July 17, the loan increased to almost $497 million when another repo counterparty, Cantor Fitzgerald, closed out over $150 million (face amount) in repo positions with Sentinel.

144.    In order to provide additional collateral for the increased loan resulting from this close-out, on July 17, 2007 Sentinel and BONY again moved customer securities from the segregated SEG 1 DTC account into the DTC Clearing Account, this time more than $84 million in face value of DTC securities (the "July 17 Transfers").

145.    BONY knew that Sentinel was desegregating customer assets and transferring them to the DTC Clearing Account for the sole purpose of covering a shortfall in collateral. BONY further knew that under CFTC Rule 1.20(a), customer assets never could be used as security for the BONY loans.  Again, these transfers took place at the end of the day, after the amount of that evening's overnight loan was determined, and did not coincide with any large customer redemptions or other potentially legitimate customer transactions. Despite its knowledge, BONY again allowed and participated in the bulk movement of SEG 1 DTC securities into the Clearing/Collateral Account, where they could then be pledged as collateral to BONY.

146.    By mid-July, the SEG 1 DTC account, which had held about $338 million in face value of securities in segregation until late June, had only $85 million in face value of securities remaining.  All told, over a period of less than seven weeks, Sentinel and BONY had transferred

in bulk transfers, for the sole purpose of providing BONY with securities for its loan to Sentinel, more than $150 million in customer government securities and $250 million in DTC securities from segregated accounts. These transfers were in addition to the more than $300 million in customer government securities BONY already was improperly holding as collateral as of the beginning of May 2007.

147.    Sentinel managed to reduce its loan balance to $362 million by late July. However, BONY continued to hold as collateral for its loan more than $500 million in DTC and government securities that were supposed to be segregated.

148.    On about July 30, Sentinel's chief financial officer determined that SEG 1 customer assets should not have been used as collateral for the bank loan. Sentinel then began a program, with BONY's assistance, to move huge blocks of securities serving as BONY collateral back into segregation. In order to ensure that BONY was fully collateralized on its loan, however, Sentinel and BONY undertook this program at the expense of Sentinel's SEG 3 customers and removed from segregation essentially all remaining SEG 3 customer assets that had not already been pledged for the BONY loan.

149.    As part of this program, on July 30, Sentinel and BONY moved $248 million (face value) in securities out of the DTC Clearing Account, where they had been used as collateral for the loan, and transferred them to the segregated SEG 1 DTC account. On the following day, July 31, Sentinel and BONY moved $264 million (face value) in government securities, which had been sitting in the Clearing/Collateral Account, from that account to the SEG 1 government securities account.

150.    The transfer of over $500 million (face value) of securities to SEG 1 segregated accounts over this two-day period would have created a gaping shortfall in BONY's collateral.

In order to plug that hole, on July 30 Sentinel and BONY took $289 million (face value) of securities from the segregated SEG 3 DTC account and moved them to the DTC Clearing Account, where these customer assets were commingled with assets belonging to the Insiders' House portfolio and were posted to the Clearing Collateral account as security for Sentinel's loan (the "July 30 Transfers").  This action virtually emptied the SEG 3 DTC account, leaving only $900,000 (face value) of DTC registered securities in a segregated account which for months had consistently held more than $250 million (face value) worth of securities.

151.    BONY knew that Sentinel and BONY were desegregating essentially everything in the SEG 3 DTC account and moving it into the DTC Clearing Account in order to secure the BONY loan.  BONY personnel expressed surprise at Sentinel's request to desegregate but did nothing to question or prevent it.

152.    BONY further knew, because Sentinel expressly told BONY personnel, that Sentinel's policy was simply to desegregate sufficient customer assets and put them in the DTC Clearing Account so that they could serve as collateral for the BONY loan.

153.    On or about August 7, a BONY officer asked Eric Bloom, the chief executive officer of Sentinel, what would happen to Sentinel if BONY insisted on cutting its loan to $300 million, Sentinel's supposed credit limit.  Bloom informed BONY in substance that Sentinel would not be able to meet its obligations to its customers.

154.    On August 9, Sentinel entered instructions to move a substantial amount of customer securities from the DTC Clearing Account back to the DTC SEG 1 and SEG 3 accounts.  BONY refused those instructions because carrying them out would have meant that Sentinel would not have enough collateral remaining to cover the BONY loan.

155.    On August 10, Sentinel emailed the assistant treasurer at BONY and asked for a list of all securities that were being held in the DTC Clearing Account that were not being used as collateral "so that we can seg all the securities that you are unable to use as collateral." This email again explicitly told BONY what it already knew: that customer securities were being moved into and out of segregation based on BONY's need for collateral, not based on customer redemptions or any other legitimate customer transactions.

156.    On August 13, 2007, Sentinel was unable to meet customer redemption requests and issued a letter to customers stating that redemptions had been suspended. The BONY loan for that date was $415 million.

157.    On August 14, BONY officers traveled from New York to Northbrook, Illinois and met with Sentinel personnel. At that time, BONY configured its systems so that Sentinel personnel could not effect any further transactions without BONY's express approval. Government regulators also were on Sentinel's premises by that date.

158.    As of August 14, approximately $113 million in customer funds had been delivered to counterparties pursuant to overnight reverse repo agreements; the counterparties had delivered to Sentinel government securities to secure their payment obligations. These overnight reverse repos had been undertaken for the benefit of certain SEG 1 customers and unwound on a daily basis unless they were renewed. Although some of the government securities (those securing reverse repo loans totaling $36.2 million) were held in the SEG 1 segregated government securities account, additional government securities securing reverse repo loans of $77.2 million were held in the Clearing/Collateral Account in violation of CFTC Rules 1.25 and 1.26.

159.    On August 14 and 15, Sentinel allowed these overnight reverse repos to unwind. As a result, the securities were returned to the counterparties through the Clearing/Collateral Account.    The counterparties paid their repo obligations to Sentinel through the Clearing/Collateral Account.

160.    Because of the account architecture established by BONY, these reverse repo proceeds initially were not made available to Sentinel's customers, but were instead automatically credited against Sentinel's loan (overdraft) balance, reducing the daytime overdraft in the Clearing/Collateral Account by more than $113 million.    Apparently recognizing the serious flaws in the unlawful account structure that had been established by BONY, BONY permitted Sentinel's overdraft (loan) balance to increase by $36.2 million (the amount of reverse repo proceeds associated with securities that had been held in the SEG 1 government securities account as of August 14, 2007), and permitted Sentinel to transfer that amount to SEG 1 cash accounts.    BONY did not release, however, the more than $77.2 million in reverse repo proceeds associated with securities that had been held in the Clearing/Collateral Account.    Instead, those funds were used to reduce Sentinel's loan balance at the expense of the Sentinel customers.

161.    On August 14, BONY wired $25 million on behalf of Sentinel to Fimat in order to meet a repo agreement margin call by Fimat.    Eric Bloom had informed a bank officer that Bloom would move positions from a DTC SEG account into the DTC Clearing Account in order to provide additional collateral to cover the wires, but did not do so.

162.    On August 15, in blatant violation of Section 4d(b) of the CEA and CFTC Rules 1.20 and 1.26, BONY acted unilaterally to secure its loan.    Without receiving any desegregation instructions from Sentinel or customer instructions, BONY unlawfully moved approximately $52

million (face value) in corporate securities out of the SEG 1 DTC account and into the DTC Clearing Account to serve as collateral for the loan.

163.    The following day, Sentinel contacted BONY's assistant treasurer seeking the return of those securities to the SEG 1 DTC account.  The assistant treasurer said that he would only do so upon the instructions of the high-ranking BONY officer who had unilaterally authorized the moves in the first place.  That officer approved the return of the securities, and they were in fact returned to the SEG 1 DTC account.

164.    On August 16, 2007, Eric Bloom entered into an agreement with Citadel Equity Fund, Ltd. and Citadel Limited Partnership to sell the SEG 1 portfolio to Citadel, and thereafter consummated that sale.  Even though BONY plainly knew that the securities being sold to Citadel were supposed to be segregated for SEG 1 customers, BONY nonetheless refused to release all of the proceeds of the Citadel sale to Sentinel.  Instead, beginning on or about August 16, 2007, and continuing thereafter, BONY asserted a lien against the Euroclear Securities Clearing Account. As a result, BONY continued to hold, *inter alia,* $16.1 million in proceeds from the Citadel sale in a cash account associated with the Euroclear Securities Clearing Account.

165.    In addition, BONY asserts a lien against all other securities in the Euroclear Securities Clearing Account, as well as all securities in the DTC Clearing Account and Physical Clearing/Custodial Account.   Although on the petition date BONY's loan balance was approximately $312 million, BONY has asserted a lien against, and has refused to release to the Trustee, cash and securities worth hundreds of millions of dollars in excess of that amount.

166.    The transactions described herein and BONY's assertion of liens over funds and securities held in Sentinel's accounts have irreparably harmed Sentinel and have created losses to Sentinel and liabilities of Sentinel to its customers.

167.    BONY has filed a proof of claim in the Debtor's case, which has been assigned claim no. 76 by the Clerk of the Court, in an amount not less than $312,252,000 (the "BONY Proof of Claim'), and alleges that it holds a secured claim against the Debtor's estate by virtue of the Loan Documents (as defined in the BONY Proof of Claim) and sections 506(a) and 553 of the Bankruptcy Code.  BONY further seeks in the BONY Proof of Claim pre- and post-petition interest, indemnification, and other amounts.

## COUNT ONE

### Avoidance and Recovery of Fraudulent Transfers Pursuant to §§ 548(a)(1)(A) and 550(a) of the Bankruptcy Code

168.    Plaintiff restates and realleges paragraphs 1 through 167 of this Complaint as though fully set forth herein.

169.    Each and every transfer of cash or securities made by Sentinel from a segregated account to the Clearing/Collateral Account, DTC Clearing Account, the Euroclear Securities Clearing Account, and the Physical Clearing/Custodial Account made within two years before the Petition Date constituted a transfer of an interest in Sentinel's property.

170.    Without limiting the foregoing, each of the June 1 Transfers, the June 25-29 Transfers, the July 17 Transfers and the July 30 Transfers (the "June-July 2007 Transfers") constituted a transfer of an interest in Sentinel's property.

171.    Each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, were made, mediately or immediately, to or for the benefit of BONY.

43

172.    Each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, were made with the actual intent to hinder, delay, or defraud Sentinel's creditors.

173.    The Trustee may avoid each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, pursuant to section 548(a)(1)(A) of the Bankruptcy Code.

174.    The Trustee may recover, for the benefit of the estate, each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, or their value, from BONY as the party that received the transfers or benefited therefrom as described in this Complaint, as either (1) the initial transferee of the transfers or the entity for whose benefit the transfers were made, or (2) the immediate or mediate transferee of such initial transferee, pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order: avoiding each of the transfers made within two years before the Petition Date (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, pursuant to section 548(a)(1)(A) of the Bankruptcy Code; ordering the return and recovery of such transfers, or entering judgment against BONY pursuant to section 550(a) of the Bankruptcy Code in the amount of such transfers; awarding the Trustee punitive damages in an amount to be determined by the Court, pre- and post-judgment interest, costs and attorneys' fees and expenses; and granting such other equitable relief as may be just and proper.

## COUNT TWO

**Avoidance and Recovery of Fraudulent Transfers Pursuant to 740 ILCS 160/5(a)(1) and 160/8(a), and §§ 544(b)(1) and 550(a) of the Bankruptcy Code**

175.     Plaintiff restates and realleges paragraphs 1 through 174 of this Complaint as though fully set forth herein.

176.     Each and every transfer of cash or securities made by Sentinel from a segregated account to the Clearing/Collateral Account, DTC Clearing Account, the Euroclear Securities Clearing Account, and the Physical Clearing/Custodial Account on an after January 1, 2004 constituted a transfer of an interest in Sentinel's property.

177.     Without limiting the foregoing, each of the June 1 Transfers, the June 25-29 Transfers, the July 17 Transfers and the July 30 Transfers (the "June-July 2007 Transfers") constituted a transfer of an interest in Sentinel's property.

178.     Each of the transfers made on and after January 1, 2004 (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, was made, mediately or immediately, to or for the benefit of BONY.

179.     Each of the transfers made on and after January 1, 2004 (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, was made with actual intent to hinder, delay, or defraud Sentinel's creditors within the meaning of section 5 of the Illinois Uniform Fraudulent Transfer Act ("UFTA"), 740 ILCS 160/1 *et seq.*

180.     A creditor exists that could avoid such transfers, and could obtain further relief, pursuant to section 8(a) of the UFTA.

181.     Such creditor could obtain a judgment against BONY for the value of the transfers received by BONY as described in this Complaint, as either (1) the first transferee of

the asset or the person for whose benefit the transfers were made, or (2) a subsequent transferee, pursuant to section 9(b) of the UFTA.

182.    The Trustee may avoid the Transfers pursuant to section 544(b)(1) of the Bankruptcy Code and may recover, for the benefit of the estate, each of the transfers made on and after January 1, 2004 (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, or their value, from BONY, as either (1) the initial transferee of the transfers or the entity for whose benefit the transfers were made, or (2) the immediate or mediate transferee of such initial transferee, pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order: avoiding each of the transfers made on and after January 1, 2004 (other than transfers made in connection with legitimate customer redemptions), and specifically the June-July 2007 Transfers, pursuant to 740 ILCS 160/8(a) and section 544(b)(1) of the Bankruptcy Code; ordering the return and recovery of the transfers, or entering judgment against BONY pursuant to section 544(b)(1) and 550(a) of the Bankruptcy Code in the amount of the transfers; awarding the Trustee punitive damages in an amount to be determined by the Court, pre- and post-judgment interest, costs and attorneys' fees and expenses; and granting such other equitable relief as may be just and proper.

## COUNT THREE

### Avoidance and Recovery of Preferential Transfers Pursuant to §§ 547(b) and 550(a) of the Bankruptcy Code

183.    Plaintiff restates and realleges paragraphs 1 through 182 of this Complaint as though fully set forth herein.

184.    The June 25-29 Transfers constituted transfers of an interest in Sentinel's property.

185.    The June 25-29 Transfers were made, mediately or immediately, to or for the benefit of BONY.

186.    The June 25-29 Transfers were made on account of antecedent debt owed by the Debtor before the June 25-29 Transfers were made.

187.    The June 25-29 Transfers were made while Sentinel was insolvent.

188.    The June 25-29 Transfers were made on or within 90 days before the Petition Date.

189.    The June 25-29 Transfers enabled BONY to receive more than it would receive if this case was a case under chapter 7 of the Bankruptcy Code, the June 25-29 Transfers had not been made, and BONY received payment in such chapter 7 case to the extent provided by the Bankruptcy Code.

190.    The Trustee may avoid the June 25-29 Transfers pursuant to section 547(b) of the Bankruptcy Code.

191.    The Trustee may recover, for the benefit of the estate, the June 25-29 Transfers or their value from BONY, as either (1) the initial transferee of the June 25-29 Transfers or the entity for whose benefit the June 25-29 Transfers were made, or (2) the immediate or mediate transferee of such initial transferee, pursuant to section 550(a) of the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order: avoiding each of the June 25-29 Transfers pursuant to section 547(b) of the Bankruptcy Code; ordering the return and recovery of the June 25-29 Transfers, or entering judgment against BONY pursuant to section 550(a) of the Bankruptcy Code in the amount of the June 25-29 Transfers; awarding the Trustee pre- and post-judgment interest, costs and attorneys' fees and expenses; and granting such other equitable relief as may be just and proper.

## COUNT FOUR

### Equitable Subordination of Claims and Transfer of Subordinated
### Lien Pursuant to § 510(c) of the Bankruptcy Code

192.    Plaintiff restates and realleges paragraphs 1 through 191 of this Complaint as though fully set forth herein.

193.    BONY established an account structure for Sentinel that violated applicable law and its own contractual promises, in contravention of its duties and responsibilities as a custodian for customer securities, which permitted Sentinel Insiders to engage in wrongdoing that benefited them and BONY.

194.    In addition, as set forth in detail in this Complaint, prior to the Petition Date, BONY engaged in transactions with or involving Sentinel solely for its own benefit and gain, in violation of its duties to Sentinel and Sentinel's customers, and to the extreme detriment of Sentinel and its other creditors, which conduct was inequitable under the circumstances.

195.    The following actions by BONY, among others, constitute inequitable conduct: (a) establishing an account structure that violated the CEA and the Investment Advisers Act and permitted segregated customer funds and securities to be commingled with Sentinel "House" assets and with the assets of other customer segregated accounts in the clearing accounts; (b) establishing an account structure under which, when securities were sold on behalf of segregated customer accounts, the proceeds of those sales automatically reduced the overdraft on Sentinel's

loan, instead of being immediately credited to the segregated customer account;  (c) establishing an account structure under which customer cash deposits remaining in the Clearing/Collateral Account at the end of the day would automatically be credited against Sentinel's loan; (d) permitting customer assets to be pledged for the BONY loan in violation of the CEA and CFTC regulations; (e) permitting assets in each of the customer SEGs to be transferred out of segregation and into the Clearing/Collateral Account or the DTC Clearing Account for the sole purpose of collateralizing BONY's loan to Sentinel; (f) permitting Sentinel Insiders to use customer assets to collateralize the House loan; (g) unilaterally moving securities out of segregation and into the DTC Clearing Account in order to permit BONY to assert a lien against those securities; (h) refusing to transfer securities from the Clearing/Collateral Account or the DTC Clearing Account to segregated customer accounts despite instructions to do so, in order to ensure the BONY loan was fully collateralized; (h) clearing repurchase transactions involving customer assets outside of segregated accounts; (i) failing to use account names that clearly identified accounts as belonging to customers, despite its legal obligations and explicit requests by Sentinel that BONY do so; (j) asserting a lien against the segregated customer accounts and against securities in those accounts; and (k) failing to perform its obligations under its contract in good faith.

196.    BONY continued to extend new credit to Sentinel, knowing that Sentinel was undercapitalized and was already in financial trouble.  BONY's actions caused other creditors, who were unaware of Sentinel's undercapitalization, its debt and its financial problems, to continue to deposit additional funds with Sentinel and/or to fail to withdraw funds from Sentinel.

197.    BONY took advantage of its position to obtain hundreds of millions of dollars in customer assets as security for its loans to Sentinel, which were delivered to BONY in violation of applicable law.

198.    As a proximate and foreseeable result of BONY's conduct, Sentinel has been damaged in an amount exceeding the amount of BONY's claims.

199.    As a result of BONY's inequitable and unlawful conduct, good cause exists to subordinate payment of all of BONY's claims to a level below all other creditors.

200.    Subordination of BONY's claims is not inconsistent with the Bankruptcy Code.

201.    Pursuant to section 510 of the Bankruptcy Code, BONY's liens, to the extent valid, should be transferred to the estate.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order subordinating, pursuant to 11 U.S.C. § 510(c)(1), all claims asserted by BONY (including the claims set forth in the BONY Proof of Claim) to a level below all other creditors, transferring, pursuant to 11 U.S.C. § 510(c)(2), any lien supporting such claims to the estate, and granting such other and further relief as this Court deems equitable and just.

## COUNT FIVE

### Disallowance of Proof of Claim

202.    Plaintiff restates and realleges paragraphs 1 through 201 of this Complaint as though fully set forth herein.

203.    BONY has filed the BONY Proof of Claim in the Debtor's case, seeking an amount not less than $312,252,000 and alleging that it holds a secured claim against the Debtor's estate by virtue of the Loan Documents (as defined in the BONY Proof of Claim) and sections

506(a) and 553 of the Bankruptcy Code.  BONY further seeks in the BONY Proof of Claim pre-
and post-petition interest, indemnification, and other amounts.

204.    BONY has failed to turn over to Plaintiff property of the Debtor's estate which is
recoverable by the Plaintiff, namely the amounts demanded in Counts One through Eight herein.

205.    Pursuant to Section 502(d) of the Bankruptcy Code, each claim asserted by
BONY must be disallowed because property of the Debtor's estate is recoverable from BONY
and BONY has not turned over that property to Plaintiff.

206.    In addition, as set forth in detail in this Complaint, prior to the Petition Date,
BONY engaged in transactions with or involving Sentinel solely for its own benefit and gain, in
violation of its duties to Sentinel and Sentinel's customers, and to the extreme detriment of
Sentinel and its other creditors, which conduct was inequitable under the circumstances.

207.    The following actions by BONY, among others, constitute grounds for the
disallowance of BONY's claim:  (a) establishing an account structure that violated the CEA and
the Investment Advisers Act and permitted segregated customer funds and securities to be
commingled with Sentinel "House" assets and with the assets of other customer segregated
accounts in the clearing accounts;  (b) establishing an account structure under which, when
securities were sold on behalf of segregated customer accounts, the proceeds of those sales
automatically reduced the overdraft on Sentinel's loan, instead of being immediately credited to
the segregated customer account;  (c) establishing an account structure under which customer
cash deposits remaining in the Clearing/Collateral Account at the end of the day would
automatically be credited against Sentinel's loan; (d) permitting customer assets to be pledged
for the BONY loan in violation of the CEA and CFTC regulations; (e) permitting assets in each
of the customer SEGs to be transferred out of segregation and into the Clearing/Collateral

Account or the DTC Clearing Account for the sole purpose of collateralizing BONY's loan to Sentinel; (f) permitting Sentinel insiders to use customer assets to collateralize the House loan; (g) unilaterally moving securities out of segregation and into the DTC Clearing Account in order to permit BONY to assert a lien against those securities; (h) refusing to transfer securities from the Clearing/Collateral Account or the DTC Clearing Account to segregated customer accounts despite instructions to do so, in order to ensure the BONY loan was fully collateralized; (h) clearing repurchase transactions involving customer assets outside of segregated accounts; (i) failing to use account names that clearly identified accounts as belonging to customers, despite its legal obligations and explicit requests by Sentinel that BONY do so; (j) asserting a lien against the segregated customer accounts and against securities in those accounts; and (k) failing to perform its obligations under its contract in good faith.

208.    BONY's claim against the Debtor's estate should also be disallowed because the clearing and custody agreements, the security agreements, and the account structure established by BONY contradict the express provisions of and are unlawful under Sections 4(b), 4d(a)(2), and 4d(b) of the CEA and CFTC Rules 1.20, 1.25, 1.26, 1.49 and 30.7, and the agreements are therefore illegal, void and unenforceable by BONY.

209.    As a proximate and foreseeable result of BONY's conduct, including but not limited to the conduct described in paragraphs 1 through 167 of the Complaint, Sentinel has been damaged in an amount exceeding the amount of BONY's claims.

210.    As a result of BONY's conduct, including but not limited to the conduct described in paragraphs 1 through 167 of the Complaint, good cause exists to equitably disallow any and all of BONY's claims against Sentinel.

211.    As a result of BONY's inequitable and improper conduct, the BONY Proof of Claim should be disallowed.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment disallowing each and every claim asserted by BONY against the Debtor's estate, expressly including but not limited to the BONY Proof of Claim, and for such other relief as this Court deems equitable and just.

## COUNT SIX

### Equitable Disallowance of Proof of Claim

212.    Plaintiff restates and realleges paragraphs 1 through 211 of this Complaint as though fully set forth herein.

213.    BONY established an account structure for Sentinel that violated applicable law, in contravention of its duties and responsibilities as a custodian for customer securities, which permitted Sentinel Insiders to engage in wrongdoing that benefited them and BONY.

214.    In addition, as set forth in detail in this Complaint, prior to the Petition Date, BONY engaged in transactions with or involving Sentinel solely for its own benefit and gain, in violation of its duties to Sentinel and Sentinel's customers, and to the extreme detriment of Sentinel and its other creditors, which conduct was inequitable under the circumstances.

215.    The following actions by BONY, among others, constitute grounds for the equitable disallowance of BONY's claim: (a) establishing an account structure that violated the CEA and the Investment Advisers Act and permitted segregated customer funds and securities to be commingled with Sentinel "House" assets and with the assets of other customer segregated accounts in the clearing accounts; (b) establishing an account structure under which, when securities were sold on behalf of segregated customer accounts, the proceeds of those sales

automatically reduced the overdraft on Sentinel's loan, instead of being immediately credited to the segregated customer account;  (c) establishing an account structure under which customer cash deposits remaining in the Clearing/Collateral Account at the end of the day would automatically be credited against Sentinel's loan; (d) permitting customer assets to be pledged for the BONY loan in violation of the CEA and CFTC regulations; (e) permitting assets in each of the customer SEGs to be transferred out of segregation and into the Clearing/Collateral Account or the DTC Clearing Account for the sole purpose of collateralizing BONY's loan to Sentinel; (f) permitting Sentinel insiders to use customer assets to collateralize the House loan; (g) unilaterally moving securities out of segregation and into the DTC Clearing Account in order to permit BONY to assert a lien against those securities; (h) refusing to transfer securities from the Clearing/Collateral Account or the DTC Clearing Account to segregated customer accounts despite instructions to do so, in order to ensure the BONY loan was fully collateralized; (h) clearing repurchase transactions involving customer assets outside of segregated accounts; (i) failing to use account names that clearly identified accounts as belonging to customers, despite its legal obligations and explicit requests by Sentinel that BONY do so; (j) asserting a lien against the segregated customer accounts and against securities in those accounts; and (k) failing to perform its obligations under the contract in good faith.

216.    BONY continued to extend new credit to Sentinel, knowing that Sentinel was undercapitalized and was already in financial trouble.  BONY's actions caused other creditors, who were unaware of Sentinel's undercapitalization, its debt and its financial problems, to continue to deposit additional funds with Sentinel and/or to fail to withdraw funds from Sentinel.

217.    BONY took advantage of its position to obtain hundreds of millions of dollars in customer assets as security for its loans to Sentinel, which were delivered to BONY in violation of applicable law.

218.    As a proximate and foreseeable result of BONY's conduct, Sentinel has been damaged in an amount exceeding the amount of BONY's claims.

219.    As a result of BONY's inequitable and unlawful conduct, good cause exists to equitably disallow any and all of BONY's claims against Sentinel.

220.    Equitable disallowance of BONY's claims is not inconsistent with the Bankruptcy Code.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order equitably disallowing all claims asserted by BONY, including the BONY Proof of Claim, and granting such other and further relief as this Court deems equitable and just.

## COUNT SEVEN

### Action to Determine Validity and Extent of Lien and for
### Turnover of Property under 11 U.S.C. §§ 542 and 506

221.    Plaintiff restates and realleges paragraphs 1 through 220 of this Complaint as though fully set forth herein.

222.    BONY has asserted in the BONY Proof of Claim and otherwise that Sentinel granted it a valid, perfected and enforceable security interest in the Clearing/Collateral Account, the DTC Clearing Account, the Euroclear Securities Clearing Account, and the Physical Clearing/Custodial Account, the securities contained therein, and in certain cash accounts linked or associated with the foregoing accounts (collectively, the "Alleged Collateral Accounts").

223.    BONY knew that the cash and securities now held in the Alleged Collateral Accounts were supposed to be the property of Sentinel's customers and that Sentinel could not pledge or deliver that property as collateral for BONY's loans to Sentinel.

224.    The clearing and custody agreements and the agreements purportedly granting BONY a security interest in one or more of the Alleged Collateral Accounts contradict the express provisions of the CEA and Investment Advisers Act, including Sections 4d(a)(2) and 4d(b) of the CEA and CFTC Rule 1.20 (which requires that customer funds at all times be segregated as belonging to commodity customers, and be deposited only in accounts which clearly identifies them as customer property); CFTC Rule 1.20(a) (which expressly prohibits the pledging of customer funds to secure a loan for any purpose other than for customer commodity transactions); CFTC Rule 1.25 (which prohibits any repurchase or reverse repurchase transactions from taking place outside of customer segregated accounts, and requires that all repo transactions for the benefit of customers take place and settle solely in segregated accounts); Section 4d(a)(2) of the CEA and CFTC Rule 1.26 (which mandates that any securities in which customer funds are invested must be maintained at all times in segregation); and Section 4(b) of the CEA and CFTC Rule 30.7 (which requires that funds of FCM customers engaged in trading at foreign exchanges also be separately segregated and invested), and are therefore illegal, void and unenforceable by BONY.

225.    The clearing and custody agreements and the agreements purportedly granting BONY a security interest in one or more of the Alleged Collateral Accounts, as well as the account structure established by BONY, are unlawful under Sections 4(b), 4d(a)(2), and 4d(b) of the CEA and CFTC Rules 1.20, 1.25, 1.26, 1.49 and 30.7, and Section 206 of the Investment

Advisers Act and SEC Rule 206(4)-2, and are therefore illegal, void and unenforceable by BONY.

226.     To the extent BONY asserts liens or rights of set-off by reason of its possession or control over cash and securities in the Alleged Collateral Accounts, such liens or rights of set-off are unlawful and cannot be enforced.

227.     In the alternative, the agreements purportedly granting BONY a security interest in one or more of the Alleged Collateral Accounts do not grant BONY a security interest in any of the Alleged Collateral Accounts or the assets held therein.

228.     Further, in the alternative, BONY's claims against the Debtor are not allowed secured claims, and pursuant to section 506(d) of the Bankruptcy Code any liens securing such claims are void.

229.     Pursuant to section 542 of the Bankruptcy Code, BONY is required to turn over the cash and securities held in the Alleged Collateral Accounts to the Trustee.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order, pursuant to 11 U.S.C. § 506, determining that BONY does not have a valid, perfected and enforceable security interest in any of Alleged Collateral Accounts or the securities or cash held therein, ordering pursuant to 11 U.S.C. § 542 the immediate turnover and delivery of all securities and cash held in the Alleged Collateral Accounts to the Trustee, and granting such other and further relief as this Court deems equitable and just.

## **COUNT EIGHT**

### **Aiding and Abetting/Knowing Participation in Breach of Fiduciary Duty by Sentinel Insiders**

230.     Plaintiff restates and realleges paragraphs 1 through 229 of this Complaint as though fully set forth herein.

231.    At all times relevant to this Complaint, Philip Bloom, Eric Bloom and Charles Mosley were officers, directors and/or controlling shareholders of Sentinel.

232.    As directors, officers and controlling shareholders of Sentinel, Philip Bloom, Eric Bloom and Charles Mosley owed a fiduciary duty of loyalty to Sentinel.

233.    As directors, officers and controlling shareholders of Sentinel, Philip Bloom, Eric Bloom and Charles Mosley owed a fiduciary obligation to act with due care and to deal honestly and fairly with Sentinel.

234.    Philip Bloom, Eric Bloom and Charles Mosley breached their fiduciary duties to Sentinel, by among other things, commingling customer securities and money with securities and money belonging to the House, commingling customer securities and money from one segregated account with those from another segregated account, pledging customer funds to secure the BONY loan, clearing and maintaining customer funds and securities in accounts that were not registered in Sentinel's name as agent or trustee of its clients, transferring securities out of segregation to collateralize the BONY loan, pledging customer securities to collateralize a loan for the benefit of the Sentinel Insiders themselves, and borrowing funds from BONY far in excess of Sentinel's ability to repay.

235.    BONY colluded with the Sentinel Insiders and knowingly participated in, aided, assisted and benefited from Philip Bloom's, Eric Bloom's and Charles Mosley's breaches of their fiduciary duties to Sentinel.

236.    Sentinel has been damaged as a result of BONY's participation in each of Philip Bloom's, Eric Bloom's, and Charles Mosley's breaches of their fiduciary duties.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff and against BONY for compensatory damages, plus punitive damages in an amount to

be determined by the Court, interest, costs and attorneys' fees, and grant such other equitable relief as may be just and appropriate.

Dated:  March 3, 2008

                                            Respectfully submitted,

                                            FREDERICK J. GREDE, not individually but as Chapter 11 Trustee of Sentinel Management Group, Inc.

                                            By:_____
                                                One of his attorneys

John F. Kinney (ARDC # 1467867)
Daniel R. Murray (ARDC # 1999951)
J. Kevin McCall (ARDC # 3125685)
Catherine L. Steege (ARDC # 6183529)
Chris C. Gair (ARDC # 6190781)
Vincent E. Lazar (ARDC # 6204916)
JENNER & BLOCK LLP
330 N. Wabash Ave.
Chicago, IL  60611
Phone: (312) 222-9350
Facsimile: (312) 527-0484